JINSHU ZHANG (Bar No. 166981)
john.zhang@dentons.com
JAE K. PARK (Bar No. 234474)
jae.park@dentons.com
DENTONS US LLP
601 South Figueroa Street, Suite 2500
Los Angeles, California  90017-5704
Telephone:   (213) 623-9300
Facsimile:    (213) 623-9924

William T. O'Brien (*pro hac vice* pending)
william.obrien@dentons.com
Daniel Morris (*pro hac vice* pending)
daniel.morris@dentons.com
1900 K Street, N.W.
Washington, D.C. 20006
Telephone: (202) 496-7500
Facsimile: (202) 496-7756

Attorneys for Petitioner
Shanghai Qichengyueming Investment
Partnership Enterprise (Limited Partnership)

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Shanghai Qichengyueming Investment Partnership Enterprise (Limited Partnership),<br><br>Petitioner,<br><br>v.<br><br>Jia Yueting,<br><br>Respondent. | Case No.<br><br>**DECLARATION OF JINSHU ZHANG IN SUPPORT OF PETITION TO RECOGNIZE AND ENFORCE A FOREIGN ARBITRAL AWARD** |

DECLARATION OF JINSHU ZHANG IN
SUPPORT OF PETITION TO RECOGNIZE
AND ENFORCE A FOREIGN ARBITRAL
AWARD

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

I, Jinshu Zhang, state the following:

1.      I am over the age of 18 and am competent to make this declaration.

2.      Except as otherwise stated herein, I make the statements contained herein from personal knowledge, and if sworn as a witness, will testify to the truth thereof.

3.      I am a partner in the Los Angeles office of Dentons US LLP.

4.      I make this affidavit in support of the Petition to Recognize and Enforce a Foreign Arbitral Award of Shanghai Qichengyueming Investment Partnership Enterprise (Limited Partnership) ("Shanghai Qichengyueming").

5.      Attached hereto as **Exhibit 1** is a true and correct copy of the Final Award.

6.      Attached hereto as **Exhibit 2** is a certified translation from Chinese to English of the Final Award.

7.      Attached hereto as **Exhibit 3** is a true and correct copy of the Convertible Note Purchase Agreement (the "Purchase Agreement") between Shanghai Qichengyueming; Leview Mobile Ltd.; Leview Holding (Beijing) Limited ("Leview Holding"); Le Ltd.; Lesai Mobile Technology (Beijing) Co., Ltd.; QC Investment Ltd.; and Mr. Jia Yueting.

8.      In the arbitration, Shanghai Qichengyueming sought to obtain payments due it under the Purchase Agreement and related agreements.

9.      The Arbitral Tribunal found substantially in favor of Shanghai Qichengyueming and against Mr. Jia and Leview Holding.

10.     In the Final Award, the Arbitral Tribunal:

        a.      Ordered Mr. Jia and Leview Holding to pay to Shanghai Qichengyueming redemption prices for the convertible notes at issue in the arbitration (including principal and interest) of RMB648,284,650;

DECLARATION OF JINSHU ZHANG IN
SUPPORT OF PETITION TO RECOGNIZE
AND ENFORCE A FOREIGN ARBITRAL
AWARD

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

1

2

3

4

        b.      Ordered Mr. Jia and Leview Holding to pay to Shanghai Qichengyueming default interest of 4.35% from July 7, 2017 through the date of actual payment on the RMB606,635,250 principal of Convertible Note I;

5

6

7

8

        c.      Ordered Mr. Jia and Leview Holding to pay to Shanghai Qichengyueming default interest of 4.35% from August 17, 2017 through the date of actual payment on the RMB41,649,400 principal of Convertible Note II;

9

10

        d.      Ordered Mr. Jia and Leview Holding to pay to Shanghai Qichengyueming its attorney fees in the amount of RMB1,000,000;

11

12

13

14

        e.      Ordered Mr. Jia and Leview Holding to pay to Shanghai Qichengyueming its asset attachment fees in the amount of RMB5,000, and the premium Shanghai Qichengyueming paid for an asset attachment bond in the amount of RMB972,467.93;

15

16

        f.      Ordered Mr. Jia and Leview Holding to reimburse Shanghai Qichengyueming the arbitration fee of RMB3,544,631;

17

18

19

        g.      Ordered Mr. Jia and Leview Holding to reimburse Shanghai Qichengyueming arbitrator compensation in the amount of US$29,678.49; and

20

21

        h.      Ordered that payment of all such amounts be made by Mr. Jia and Leview Holding within five days.

22

23

    11.    Based upon my personal knowledge, I certify that the documents attached to this declaration are genuine.

24

25

26

27

28

DECLARATION OF JINSHU ZHANG IN SUPPORT OF PETITION TO RECOGNIZE AND ENFORCE A FOREIGN ARBITRAL AWARD

1    I declare under penalty of perjury under the laws of the United States of

2  America that the foregoing is true and correct.

3        Executed on August 28, 2018.

4

5

6

7                                    _____

                                     Jinshu Zhang

8

108891283\V-1

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

- 4 -

DECLARATION OF JINSHU ZHANG IN
SUPPORT OF PETITION TO RECOGNIZE
AND ENFORCE A FOREIGN ARBITRAL
AWARD

**EXHIBIT 1**

# 中国国际经济贸易仲裁委员会

## 裁　决　书

申　请　人：上海奇成悦名投资合伙企业（有限合伙）

地　　　址：上海市虹口区海宁路 137 号 7 层 c 座
797D 室

仲 裁 代 理 人：陈世颐 北京观韬中茂（上海）律师事务所

第一被申请人：贾跃亭(身份证号：14262319731215081X)

地　　　址：北京市朝阳区姚家园路 105 号乐视大厦 16 楼

第二被申请人：乐视控股（北京）有限公司

地　　　址：北京市朝阳区姚家园路 105 号 3 号楼 10 层
1102

仲 裁 代 理 人：邹义 北京中书律师事务所

北　京

二○一八年五月九日

Exhibit 1

-6-

# 裁 决 书

〔2018〕中国贸仲京裁字第 0436 号

中国国际经济贸易仲裁委员会（以下简称"仲裁委员会"）根据申请人上海奇成悦名投资合伙企业（以下简称"申请人"）与第一被申请人贾跃亭（以下简称"第一被申请人"）、第二被申请人乐视控股（北京）有限公司（以下简称"第二被申请人"，与第一被申请人合称"被申请人"）于 2015 年 6 月 3 日签订的《可转债购买协议》（以下简称"《购买协议》"）中仲裁条款的约定以及申请人于 2017 年 7 月 5 日向仲裁委员会提交的书面仲裁申请，受理了申请人与被申请人之间的可转股债券购买协议争议案。本案案件编号为 X20170753。

本案仲裁程序适用仲裁委员会自 2015 年 1 月 1 日起施行的《中国国际经济贸易仲裁委员会仲裁规则》（以下简称"《仲裁规则》"）。

2017 年 7 月 12 日，仲裁委员会仲裁院向双方当事人分别寄送了本案仲裁通知、《仲裁规则》和《仲裁员名册》，同时向被申请人附寄了申请人提交的仲裁申请书及其附件。经查，上述邮件均已妥投。

案涉仲裁条款约定仲裁语言为英文，经双方当事人共同申请，本案仲裁语言自 2017 年 8 月 29 日变为中文。

申请人选定杨良宜先生担任本案仲裁员。被申请人选定强力先生担任本案仲裁员。由于双方未在规定期限内共同选定或共同委托仲裁委员会主任指定首席仲裁员，仲裁委员会主任根据《仲裁规则》之规定指定王雪华先生担任本案首席仲裁员。上述仲裁员在签署接受指定《声明书》后，于2017年10月19日组成仲裁庭，共同审理本案。仲裁委员会仲裁院于同日以特快专递的方式向双方当事人寄送了本案组庭通知及其所附《声明书》。

仲裁庭经商仲裁委员会仲裁院，决定于2017年12月7日在北京开庭审理本案。仲裁委员会仲裁院于2017年10月31日以特快专递的方式向双方当事人寄送了本案开庭通知。经查，上述文件均已妥投。

后原定于2017年12月7日举行的开庭审理因故延期至2017年12月20日进行。仲裁委员会仲裁院于2017年11月30日以特快专递的方式向双方当事人寄送了本案延期开庭通知。经查，上述文件均已妥投。

本案于2017年12月20日如期在北京开庭审理。双方均委派仲裁代理人出席了庭审。仲裁委员会仲裁院对于双方当事人当庭提交的文件向对方予以转交。庭审中，双方陈述了本案事实、出示了相关证据原件并质证，就有关法律问题进行了辩论，并回答了仲裁庭提出的问题。

庭后，双方分别提交了补充文件，仲裁庭以特快专递的

方式向对方予以转寄。

有关本案的所有仲裁文件均已按照《仲裁规则》的规定有效送达双方当事人。

本案现已审理终结。仲裁庭根据现有书面文件以及庭审所查清的事实和查证的证据，经合议，作出本裁决。

现将本案案情、仲裁庭意见以及裁决内容分述如下：

# 一、案 情

（一）申请人的仲裁请求及事实、理由

申请人在其仲裁申请书中称：

2015 年 6 月 3 日，申请人与 Leview Mobile Ltd.（以下称"债务人"）、Le Ltd.、第一被申请人、乐赛移动科技（北京）有限公司（下称"乐赛移动"）、第二被申请人及 QC Investment Ltd.(下称"原债权人")共同签署了一份《Convertible Note Purchase Agreement（可转债购买协议）》（下称"购买协议"），约定原债权人认购债务人发行的可转债，本金为 7,500 万美元（下称"可转债 I"），到期日为交割日起的第二周年日或第三周年日，由原债权人自行决定；赎回价款为届时可转债本金总额加上年化 15%的利息，利息按天计算。债务人于同日向原债权人发行了 Convertible Note（可转债券）。

2015 年 6 月 3 日，购买协议的签约各方共同签署了一份

《Supplementary Agreement》（下称"补充协议 I"），约定购买协议项下的赎回价款以人民币支付，按照交割日中国人民银行公布的美元销售价计算。

2015 年 6 月 3 日，被申请人共同向申请人及原债权人出具《承诺及保证函》（下称"承诺函 I"），明确承诺：被申请人就债务人在可转债 I 项下的清偿义务提供不可撤销的连带保证责任；在目标公司未按交易文件（即"购买协议"、Convertible Note 及补充协议 I）的约定按期履行还款义务的情况下，原债权人有权将其持有的目标公司可转债项下的债权转让至申请人，转让价格由申请人及 QC Investment 共同确定。该等债权转让无须经过任何第三方同意。债权转让完成后，目标公司应向申请人履行还款义务。两方被申请人就目标公司向申请人承担的还款义务提供不可撤销的连带责任保证担保，且申请人有权直接要求两方被申请人履行还款义务。

2015 年 7 月 7 日，原债权人通过银行汇款的方式向债务人支付了美元 7,500 万元整。

2015 年 7 月 7 日，购买协议的签约各方签署了第二份"Supplementary Agreement"（下称"补充协议 II"）作为购买协议的补充，约定原债权人向债务人购买第二笔可转债，本金为美元 500 万元（下称"可转债 II"），条款和条件与购买协议的约定基本相同。

4

Exhibit 1
-10-

2015 年 7 月 7 日，被申请人出具了第二份《承诺与保证函》（下称"承诺函 II"），承诺对债务人在可转债 II 项下的清偿义务提供不可撤销的连带责任担保，条款和条件与可转债 I 相同。

2015 年 8 月 17 日，原债权人通过银行汇款的方式向债务人支付了美元 500 万元整。

自 2017 年 3 月 13 日起，原债权人向债务人发出数份赎回通知，明确要求在两笔可转债到期日时赎回相关可转债。2017 年 6 月 1 日，原债权人委托观韬律师事务所（香港）向债务人发出律师函及赎回通知，明确通知债务人，原债权人要求赎回可转债，可转债 I 的赎回价款为美元 97,500,000 元，即人民币 606,635,250 元，可转债 II 的赎回价款为美元 6,500,000 元，即人民币 41,676,700 元。同日，原债权人及申请人共同委托观韬律师事务所（香港）向被申请人分别发出律师函，通知两方被申请人，原债权人已向债务人发出赎回通知，要求债务人向原债权人支付赎回价款，总额为人民币 648,311,950 元，并要求被申请人促使债务人到期清偿，否则，原债权人将针对被申请人执行承诺函 I 及承诺函 II，并向被申请人索偿其支付的所有花费及费用。此外，自 2017 年 3 月 21 日起，申请人及原债权人的代表与债务人及被申请人的代表多次开会协商清偿可转债 I 及可转债 II 项下赎回价款事宜，试图以友好协商的方式解决相关争议，但均无结果。

　　鉴于目前连续爆发出有关被申请人及其关联企业的关于诉讼、各种财产被冻结、未能清偿到期债务、与供应商、贷款人及投资人发生争议，及资金链断裂等新闻，原债权人有理由相信债务人将无法按时赎回可转债，因此，其于 2017 年 7 月 4 日与申请人签署了《转让协议》，将其在购买协议、两份可转债、两份承诺函及其他交易文件项下的全部权利、主张、利益及权益全部转让给申请人。

　　为维护申请人的合法权益，根据购买协议第 14 条约定的仲裁条款——"与本协议的存在、效力、解释、履行、违约或终止、仲裁条款的效力、范围及可执行性，及与其相关的非合同义务等相关的任何争议、异议、主张或矛盾，各方应友好协商解决。如争议发生后 30 天内无法协商解决的，任何一方均可将争议提交中国国际经济贸易仲裁委员会，根据该会届时有效的仲裁规则，在北京仲裁解决。"申请人特向仲裁委员会提起仲裁申请。

　　申请人提出如下仲裁请求：

　　1. 裁决被申请人支付系争可转债赎回价款本息共计人民币 648,311,950 元；

　　2. 裁决被申请人支付前述计人民币 648,311,950 元的逾期付款利息，按照中国人民银行同期贷款利息计算；或者，根据香港 High Court ordinance Cap. 4 Laws 第 48、49 条的规定，由仲裁员决定逾期利息的利率及计息期限；

3. 裁决被申请人支付申请人因本案所产生的律师费，包括中国律师费（目前为人民币 8,708,119 元），及香港律师费，目前约为港币 400,000 元，具体金额以实际发生的金额为准；

4. 裁决被申请人承担因本案所产生的一切费用和开支，包括但不限于仲裁费、财产保全费等；以及

5. 其他相关救济。

庭审过程中，申请人将第 2 项仲裁请求变更为"裁决被申请人支付前述计人民币 648,311,950 元的逾期付款利息，按照中国人民银行同期贷款利息计算"。

就上述仲裁请求，申请人进一步作出了如下说明：

1. 就申请人《仲裁申请书》中所列仲裁请求第 1 项，申请人请求仲裁庭裁决被申请人共同连带给付 2015 年 6 月 3 日签署的可转债购买协议项下的可转债 I 对应的赎回价格共计美元 97,500,000 元，按照 2015 年 7 月 7 日中国银行公布的卖出价汇率（每 100 美元现汇卖出价人民币 622.19 元）折算为人民币 606,635,250 元；以及 2015 年 7 月 7 日签署的补充协议 II 项下的可转债 II 对应的赎回价格共计美元 6,500,000 元，按照 2015 年 8 月 17 日中国银行公布的卖出价汇率（每 100 美元现汇卖出价人民币 640.76 元）折算为人民币 41,649,400 元；合计为人民币 648,284,650 元；

2. 就申请人《仲裁申请书》所列仲裁请求第 2 项，申请人请求仲裁庭裁决被申请人共同连带给付前述可转债 I 对应

的赎回价格的逾期付款利息，自 2017 年 7 月 7 日（可转债 I 的赎回日）起，按照中国人民银行公布的现行短期（一年以内，含一年）贷款基准利率 4.35%计算，请求裁决至被申请人实际给付之日止，暂计至 2018 年 1 月 15 日，为人民币 13,881,144.13 元；以及前述可转债 II 对应的赎回价格的逾期付款利息，自 2017 年 8 月 17 日起（可转债 II 的赎回日），按照中国人民银行公布的短期（一年以内）贷款利率 4.35%计算，请求裁决至被申请人实际给付之日止，暂计至 2018 年 1 月 15 日，为人民币 749,518.04 元；两项合计暂为 14,630,662.17 元；

3. 就申请人《仲裁申请书》所列仲裁请求第 3 项，申请人请求仲裁庭裁决两被申请人共同赔偿申请人因本案所产生的律师费损失，包括中国内地律师费人民币 8,708,119 元，及香港律师费人民币 767,293.30 元，合计人民币 9,475,412.30 元；

4. 就申请人《仲裁申请书》所列仲裁请求第 4 项，申请人请求仲裁庭裁决（1）两被申请人共同赔偿申请人因本案所产生的财产保全费用损失，包括财产保全费人民币 5,000 元，及申请人因向被申请人提起财产保全而支付的财产保全保险费用人民币 972,467.93 元，合计人民币 977,467.93 元；以及（2）本案仲裁费由两被申请人承担。

（二）被申请人的初步答辩意见

　　申请人在第二项、第三项、第四项仲裁请求中主张由被申请人支付逾期付款利息、支付律师费、承担因本案所产生的一切费用及开支，该项主张缺乏基础依据，被申请人没有理由承担逾期付款利息、律师费及其他费用开支。

　　第一，申请人的仲裁请求缺乏合同依据。

　　本案中，无论是《购买协议》还是《补充协议》《补充协议 II》中，协议当事人均没有关于被申请人需承担逾期付款利息及维权费用（律师费、因本案所产生的一切费用及开支等）的相关约定，协议当事人并未就此达成一致意见。申请人要求被申请人承担上述利息及费用开支的最基本前提应是当事人已对利息及维权费用问题作出约定，本案中当事人没有相关约定，故申请人无权要求被申请人承担逾期付款利息及律师费等实现债权的费用开支。

　　第二，申请人要求被申请人承担逾期付款利息、律师费等费用开支无形中加重了被申请人的负担，违背公正公平的基本法律准则。

　　本案中的两笔可转债的到期日分别为 2017 年 7 月 7 日、2017 年 8 月 13 日，申请人在 2017 年 7 月 5 日可转债回购日尚未届满时，即申请仲裁，未给予被申请人适当的反应与协商机会，申请人此举是不遵循民事活动基本诚实信用原则的一种体现，合同当事人应具备善意的心理状况，申请人在可转债尚未到期时就直接申请仲裁并要求被申请人支付逾期

9

Exhibit 1
-15-

付款利息、律师费等，属于利用优势地位要求被申请人负担高额的额外费用，对被申请人是极为不公平的。申请人的行为显然有悖法理，仲裁庭不应支持该行为。

第三，申请人并未提供有效证据证明相关费用的发生。

合同的一方当事人要求另一方负担律师费等实现债权的费用时，首先需证明双方当事人就此费用负担达成一致意见，其次在有一致约定的情形下，还需证明该项费用实际已发生。本案中，申请人仅提供了两份委托代理协议，未提供其实际支付律师费的相关证据，依据现有证据无法证明律师费等实现债权的费用已经发生，故即便不考虑双方未就费用负担达成一致的现实情况，申请人也无权要求被申请人承担高额的律师费等费用支出。

第四，申请人所主张的律师费用明显过高。

退一步讲，即便是被申请人要支付律师费，律师费支付标准也必须合理，申请人主张的律师费是不合理、不合法的。申请人主张中国律师费人民币 870.8119 万元、香港律师费目前港币 40 万元，合计人民币 900 余万元，相较于本案争议标的人民币 64,831.1950 万元，根据《上海市律师服务收费政府指导价标准》的规定，明显过高。申请人主张的律师费超过合理范畴，若按照其要求，将不适当地增加债务人的财务负担，其主张仲裁庭应予驳回。

（三）申请人的代理意见

10

Exhibit 1
-16-

申请人的代理人补充提交了如下意见：

1. 被申请人依据相关交易文件，对申请人承担赎回价格的支付义务

2015 年 6 月 3 日，申请人与债务人、Le Ltd.、第一被申请人、乐赛移动、第二被申请人及原债权人共同签署了一份购买协议，约定原债权人认购债务人发行的可转债 I。购买协议第 2.1 条及附表 1 的约定，可转债 I 的本金为美元 7,500,000 元；第 7.2 条(a)款约定："原债权人有权在到期日或在交割日的第二个周年日当日或紧随其后，发出事先书面通知（下称"赎回通知"），要求目标公司按照赎回价格（定义见下）赎回可转债"；第 7.2 条(c)款(iii)项约定："原债权人行使赎回权的，应有权以赎回价格赎回可转债，计算方式为：可转债项下全部未清偿本金，加上任何已发生但未支付的利息，其年利率为 15%，根据到期本金乘以自交割日起计算的实际天数计算，一年按 365 天计；该等金额应以现金支付，且原债权人有权要求被申请人或其他实控人指定或持有的公司及机构提供现金进行支付"。

2015 年 6 月 3 日，《可转债购买协议》的签约各方共同签署了一份补充协议 I，其第 1 条约定："相关方依据购买协议，支付的赎回价格币种为人民币。货币兑换按照交割日中国人民银行公布的销售价汇率计算"。

2015 年 6 月 3 日，被申请人共同向申请人及原债权人出

11

Exhibit 1
-17-

具承诺函 I，其鉴于条款第 4 条约定："在债务人未按交易文件（即购买协议、可转债券及补充协议 I）的约定按期履行还款义务的情况下，原债权人有权将其持有的债务人可转债项下的债权转让至申请人，转让价格由申请人及原债权人共同确定。该等债权转让无须经过任何第三方同意。债权转让完成后，债务人应向申请人履行还款义务"。承诺函 I 第 1 条约定："被申请人就债务人的跨境还款义务（即由债务人向申请人履行可转债交易文件项下的还款义务）提供不可撤销的连带责任保证担保，且一旦该等跨境还款义务得以触发，申请人有权直接要求承诺人向其履行跨境还款义务，承诺人解释将按照申请人的要求代目标公司履行跨境还款义务"。

2015 年 7 月 7 日，原债权人通过银行汇款的方式向债务人支付了美元 75,000,000 元整。

2015 年 7 月 7 日，购买协议的签约各方签署了第二份补充协议 II，约定原债权人再次认购债务人发行的可转债 II。补充协议 II 鉴于条款第 3 条的约定，可转债 II 的本金为美元 5,000,000 元；根据第 6 条的约定，除非根据本补充协议 II 的第 1、2、3、4 和 5 条以其他方式解除、终止或修改，购买协议及其任何其他条款和规定应继续完全有效。

2015 年 7 月 7 日，两方被申请人出具了第二份《承诺与保证函》（下称"《承诺函 II》"），承诺对债务人在可转债 II 项下的清偿义务提供不可撤销的连带责任担保，其条款和条

件与承诺函 I 相同。

2015 年 8 月 17 日，原债权人通过银行汇款的方式向债务人支付了美元 5,000,000 元整。

自 2017 年 3 月 13 日起，原债权人向债务人发出数份赎回通知，明确要求在两笔可转债到期日时赎回相关可转债。2017 年 6 月 1 日，原债权人委托观韬律师事务所（香港）向债务人发出律师函及赎回通知，明确通知债务人，原债权人要求赎回可转债。同日，原债权人及申请人共同委托观韬律师事务所（香港）向被申请人分别发出律师函，通知被申请人，原债权人已向债务人发出赎回通知，要求债务人向原债权人支付赎回价格，并要求被申请人促使债务人到期清偿，否则，原债权人将针对被申请人执行承诺函 I 及承诺函 II，并向被申请人索偿其支付的所有花费及费用。此外，自 2017 年 3 月 21 日起，申请人及原债权人的代表与债务人及被申请人的代表多次开会协商清偿可转债 I 及可转债 II 项下赎回价格事宜，试图以友好协商的方式解决相关争议，但均无结果。

2017 年 7 月 7 日，原债权人与申请人签署了《转让协议》，其第 1.1 条约定："基于前述前提，自本协议签署之日起，根据本协议约定的条款和条件，出让方特此将其在主协议、可转债、保证函及其他所有交易文件（如适用）项下的及由此产生的所有权利、主张、权益、利益及收益转让给受让方"。

13

Exhibit 1
-19-

据此，债务人依据购买协议、补充协议 II 及其他相关交易文件，向原债权人承担可转债 I 及可转债 II 分别对应的赎回价格的到期清偿义务。鉴于债务人未能履行前述清偿义务，被申请人应当基于承诺函 I、承诺函 II 及转让协议约定的债权转让，向申请人承担前述赎回价格的支付义务以及对申请人的损害赔偿责任，且被申请人应就该等支付义务承担连带责任。

2. 本案应当适用香港法

购买协议第 14.1 条约定："本协议及其他基础文件适用香港特别行政区法律管辖，并根据完全在该法域履行的合同所适用的香港法进行解释，但不适用任何冲突法原则，而不论任何司法管辖区的法律冲突原则如何"。

补充协议 I 第 7 条约定："管辖法律。本协议受中国香港特别行政区（下称"香港"）法律管辖并解释，但不适用任何可能导致香港以外的其他法域对各方的权利义务产生管辖权的冲突法规则"。

承诺函 I 第 5 条约定："本函适用并按照香港法律解释"。

补充协议 II 第 10 条约定："管辖法律 本补充协议 II 受香港法律管辖并解释，但不适用任何可能导致香港以外的其他法域对各方的权利义务产生管辖权的冲突法规则"。

承诺函 II 第 5 条约定："本函适用并按照香港法律解释"。

据此，本案相关合同及其他法律文件均明确约定适用香

港法律，本仲裁案亦应当适用香港法。

根据《中华人民共和国涉外民事关系法律适用法》第十条的规定："涉外民事关系适用的外国法律，由人民法院、仲裁机构或者行政机关查明。当事人选择适用外国法律的，应当提供该国法律。不能查明外国法律或者该国法律没有规定的，适用中华人民共和国法律"。据此，申请人聘请香港大律师 Vod K.S. Chan 于 2018 年 1 月 12 日出具《有关：中国国际经济贸易仲裁委员会案件编号 X20170753 香港法律关于管辖法律，有效性和强制可执行性，利息，费用及其他方面的法律意见》（以下称"香港法律意见书"，为仲裁庭查明香港法律及对香港法律适用提供专业意见。

3. 赎回价款的计算

根据购买协议的相关约定，可转债 I 对应的赎回价格为本金美元 7,500,000 元乘以年利率 15%乘以 2 年，即为美元 97,500,000 元。根据《补充协议 I》第 1 条的约定，货币兑换按照交割日中国人民银行公布的卖出价汇率计算。由于中国人民银行公布的汇率为中间价，因此，根据中国银行公布的 2015 年 7 月 7 日（即可转债I的交割日）截至收盘时间（即当日 16:30）的每 100 元美元现汇卖出价人民币 622.19 元计算，上述可转债 I 对应的赎回价格美元 97,500,000 元，应折算为人民币 606,635,250 元。

根据补充协议 II 的相关约定，可转债 II 对应的赎回价格

为本金 500,000 美元乘以年利率 15%乘以 2 年,即为 6,500,000 美元。根据补充协议 I 第 1 条的约定的汇率计算方式,并根据中国银行公布的 2015 年 8 月 17 日(即可转债 II 的交割日)截至收盘时间(即当日 16:30)的每 100 美元现汇卖出价 640.76 元人民币计算,上述可转债 II 对应的赎回价格美元 6,500,000 元,应折算为人民币 41,649,400 元。

4. 逾期付款利息的计算

鉴于债务人及两方被申请人在收到申请人的代理律师观韬律师事务所(香港)于 2017 年 6 月 1 日发出的律师函及可转债赎回通知后,自可转债 I 的赎回日(即 2017 年 7 月 7 日)及可转债 II 的赎回日(即 2017 年 8 月 17 日)均未履行赎回价格的支付义务,故此,可转债 I 及可转债 II 分别对应的赎回价格所产生的逾期支付利息应自其分别适用的赎回日起,计至被申请人实际给付之日止。

根据中国人民银行公布的现行短期(一年以内,含一年)贷款基准利率 4.35%计算,可转债 I 对应的赎回价格的逾期付款利息应为:自可转债 I 的赎回日(即 2017 年 7 月 7 日)起计算至被申请人实际给付之日止,暂计至 2018 年 1 月 15 日,为人民币 13,881,144.13 元;可转债 II 对应的赎回价格的逾期付款利息应为:自可转债 II 的赎回日(即 2017 年 8 月 17 日)起计算至被申请人实际给付之日止,暂计至 2018 年 1 月 15 日为人民币 749,518.04 元;两项暂合计为人民币

Exhibit 1
-22-

14,630,662.17 元。

5. 被申请人应向申请人赔偿申请人因本案所产生的其他损失和费用

购买协议第 10.1 条约定："赔偿的范围。各方（"赔偿方"）应保证其他方及其董事、高级职员和代理（统称"被赔偿方"）免于任何损失、索赔、损害、负债、判决、罚款、义务、开支以及任何类型或性质的责任，包括但不限于因任何未决或潜在法律诉讼或程序产生的任何调查、法律和其他费用以及为此支付的任何和解金额，但不包括因下述产生或导致的后果性损害赔偿、特殊或附带损害赔偿、间接损害赔偿、惩罚性损害赔偿、利润损失和价值减损（统称"损失"）：(i) 确定违反基础文件或本协议任何附表或附件中所载该赔偿方的任何保证，不考虑其中的任何重要限定条件；或 (ii) 违反或未履行（全部或部分）基础文件中所载该赔偿方的任何承诺或约定，由被赔偿方重大过失或渎职引起的除外。目标公司（即债务人）、外资公司（即乐赛移动科技（北京）有限公司）及实控人（即第一被申请人）应各自并共同保证投资人（即原债权人）及其董事、高级职员和代理免于由下列原因造成的任何损失：(i) 确定违反本协议或任何附表或附件中所载目标公司、外资公司及实控人的任何保证，不考虑其中的任何重要限定条件；或 (ii) 违反或未履行（全部或部分）本协议中所载目标公司、外资公司及实控人的任何承诺或约定，由

17

Exhibit 1
-23-

被赔偿方重大过失或渎职引起的除外。在计算被补偿方的任何损失金额时，应扣除被补偿方因该等损失收到的任何保险金和第三方支付"。

由于债务人及被申请人未能按期向原债权人或申请人支付赎回价格，申请人为实现其债权所采取的法律手段所产生的支出和成本，均应当属于前述《购买协议》第 10.1 条约定的应予赔偿的"损失"。同时，根据《香港法律意见书》的相关意见，被申请人未能履行《购买协议》，支付赎回价格的，应适用前述第 10.1 条的约定，要求被申请人赔偿申请人的损失。

鉴于申请人为实现其债权，已向北京市第三中级人民法院申请对两方被申请人进行财产保全，由此产生的财产保全费人民币 5,000 元，以及为该等财产保全提供担保而向华安财产保险股份有限公司支付的财产保全责任险保费人民币 972,467.93 元，均应属于前述损失。

此外，申请人为实现其债权而聘请中国内地律师及香港律师，由此产生的律师费，亦应属于前述损失。

6. 律师费的计算

根据《香港法律意见书》的相关意见，在本案适用香港法的情况下，申请人因本案所产生的中国内地律师费及香港律师费均可依据香港法向被申请人追偿。

由于申请人就本案所聘请的中国内地律师事务所北京观

18

Exhibit 1
-24-

韬中茂（上海）律师事务所为依据中国法在上海设立及运营的律师事务所，该所与申请人签署的《委托代理协议》（包括其中对律师费的约定）适用中国法的管辖。

上海市发展和改革委员会、上海市司法局于 2017 年 1 月 26 日发布的《上海市律师服务收费管理办法》第八条的规定："实行政府指导价的律师服务收费标准按照《上海市律师服务收费政府指导价标准》（见附件一）执行。政府指导价标准需调整的，由市价格主管部门会同市司法行政部门按规定程序制定并发布。律师事务所应在政府指导价标准的范围内与委托人协商确定具体案件的收费标准。代理重大、疑难、复杂诉讼案件认定办法（见附件二），经律师事务所与委托人协商一致，可以在规定标准 5 倍之内（含 5 倍）协商确定收费标准"。该《管理办法》附件 1《上海市律师服务收费政府指导价标准》第二条规定："代理涉及财产关系的案件可以根据该项法律服务所涉及的标的额，按照下列比例分段累计收费：10 万元以下（含 10 万元）部分收费比例为 8%—12%，收费不足 3,000 元的，可按 3,000 元收取；10 万元以上至 100 万元（含 100 万元）部分收费比例为 5%—7%；100 万元以上至 1,000 万元（含 1,000 万元）部分收费比例为 3%—5%；1,000 万元以上至 1 亿元（含 1 亿元）部分收费比例为 1%—3%；1 亿元以上部分收费比例为 0.5%-1%"。本案的标的额（含赎回价格、逾期付款利息及保全费用）合计为人民币

663,892,780.10 元，根据前述分段累计收费标准，法律服务费的区间为人民币 4,042,463 元到人民币 8,863,927 元之间。

同时，由于本案适用香港法，且涉及三个以上法律关系，属于该《管理办法》附件 2《律师服务收费中重大、疑难、复杂诉讼案件认定办法》第一条规定的"重大、疑难、复杂诉讼案件"。根据该《管理办法》的相关规定，按照规定标准的 5 倍计算，法律服务费的区间为人民币 20,212,315 元到人民币 44,319,635 元之间。

考虑到本案适用香港法，并涉及多个法律关系，难度及复杂程度较大，同时，本案涉及的交易文件几乎全部以英语起草，并在仲裁语言变更为中文后需对全部英语文件进行翻译，代理律师的工作量极大，因此，申请人与北京观韬中茂（上海）律师事务所在《委托代理协议》中约定本案的法律服务费人民币 8,708,119 元，完全在《上海市律师服务收费管理办法》规定的计费区间内，且属于该等计费区间的较低标准，符合适用法规的规定。

此外，申请人就本案所聘请的香港律师事务所观韬律师事务所（香港）为依据香港法设立及运营的律师事务所，该所与申请人签署的《聘用合同》(包括其中对律师费的约定)及该所出具的账单适用香港法的管辖。申请人与观韬律师事务所（香港）在《律师聘用合同》中约定的法律服务费计时收费方式，符合相关香港法的规定。

综上所述，申请人的仲裁请求合理合法，请求仲裁庭支持申请人的各项仲裁请求。

（四）被申请人提交的意见

就律师费的承担与收取标准应当适用香港法这一问题，被申请人提交了如下意见：

被申请人认为本案中律师费是否应承担、费用收取标准之准据法适用应与本案准据法适用保持一致，即统一适用香港法。申请人、被申请人签订的《购买协议》第 14.2 条第（b）款明确约定适用法律为香港法，第二被申请人于 2017 年 10 月正式提出申请，要求为方便审理将准据法变更为中华人民共和国法律，申请人于 2017 年 11 月 2 日明确答复：不同意将本案准据法变更为中华人民共和国法律，要求适用香港法。鉴于双方当事人未就变更准据法达成一致意见，仲裁庭认定本案适用香港法。

本案中，关于律师费、担保费等实现债权的费用是否应由被申请人承担以及相关费用收取是否合理是双方争议的焦点，是判断裁决被申请人责任承担范畴的重要问题，属核心问题，既然申请人一再强调本案应适用香港法，那么本案所有涉及的责任承担、法律问题均应适用香港法，具体而言即：依据香港法判断在当事人未就承担实现债权费用达成一致意见的情形下是否应裁决由债务人承担该项费用、依据香港法裁决债务人承担实现债权费用（包括但不限于律师费等）

的最高额度、依据香港法裁决申请人要求被申请人承担的律师费计费标准是否合理及必需。

被申请人另提交了如下代理意见：

申请人在第二项、第三项、第四项仲裁请求中主张由被申请人支付逾期付款利息、支付律师费、承担因本案所产生的一切费用及开支，该项主张缺乏基础合同依据及法律依据、违背公正公平的基本原则，应予驳回。

第一，申请人的上述仲裁请求缺乏基础合同依据及法律依据，申请人应承担举证不能的不利后果。

申请人要求第一、第二被申请人承担逾期利息、律师费等实现债权的费用，其首先需要举证证明申请人与被申请人之间就上述费用的承担达成了一致意见，但本案中，无论是《购买协议》还是《补充协议》《补充协议II》中，协议当事人均没有关于被申请人需承担逾期付款利息及维权费用（律师费、因本案所产生的一切费用及开支等）的相关约定，协议当事人并未就此达成明确的一致意见。

申请人庭审时主张依据《购买协议》第 10.1 条"赔偿范围"来要求被申请人承担相关费用，但第 10.1 条的约定内容与申请人所要求的事项并无关联，该条约定是："各方（"赔偿方"）应保证其他方及其董事、高级职员和代理（统称"被赔偿方"）免于任何损失、索赔、损害、负债、判决、罚款、义务、开支以及任何类型或性质的责任……"，根据一般正常

人对该约定的理解，第 10.1 条约束的应是各方应履行义务以保证其他方免受损失，并非是约定一方应对其他方支付的费用进行全额的赔偿，申请人依据上述约定肆意倒推被申请人应承担一应费用，显属不当，不应作出此扩大解释。且该条约束的各方责任应是针对本协议效力、签署内容，要求各方应保证其他方不会因协议的签署、效力、内容违法等问题遭受追索，并不涵盖申请人主张的要求被申请人支付逾期付款利息、承担费用开支的内容。且即便是第 10.1 条约定了各方保证其他方免受损失的责任，在该条中但也明确约定了："不包括因下述产生或导致的后果性损害赔偿、特殊或附带损害赔偿、间接损害赔偿、惩罚性损害赔偿、利润损失和价值"，即违反赔偿方保证的后果性损害赔偿、间接损害赔偿、惩罚性损害赔偿、利润损失和价值减损均是不需要承担责任的，申请人主张的逾期付款利息及律师费等维权费用显然属于上述不需承担责任的范畴。

申请人要求被申请人承担上述利息及费用开支的最基本前提应是当事人已对利息及维权费用问题作出约定，如上所述，本案中当事人没有相关约定，故申请人无权依据《购买协议》要求被申请人承担逾期付款利息及律师费等实现债权的费用开支。

在双方当事人缺乏约定的前提下，香港法律中并没有关于债务人承担逾期利息及维权费用的相关规定，申请人作为

权利主张者，应就其请求提供有利的法律依据或判例依据，但申请人一直未能提供，应由申请人承担举证不能的后果。故本案中，申请人之请求缺乏基础合同依据及法律依据，仲裁庭应驳回其诉讼请求。

第二，申请人要求被申请人承担逾期付款利息、律师费等费用开支无形中加重了被申请人的财务负担，违背公正公平的基本法律准则。

本案中的两笔可转债的交割日分别为 2015 年 7 月 7 日、2015 年 8 月 17 日，根据《购买协议》第 7.2（c）（ii）条的约定,两笔可转债相应的赎回日应分别为 2017 年 7 月 7 日、2017 年 8 月 17 日。申请人在第一笔可转债尚未届满时即针对两笔可转债申请仲裁，未给予被申请人适当的反应与协商机会，申请人此举是不遵循民事活动基本诚实信用原则的一种体现，合同当事人应具备善意的心理状况，申请人在可转债尚未到期时就直接申请仲裁并要求被申请人支付逾期付款利息、律师费等，属于利用优势地位要求被申请人负担高额的额外费用，对被申请人是极为不公平的。申请人的行为显然有悖法理，仲裁庭不应支持该行为。

且本案中，申请人是作为投资人参与投资项目的，在享有获得高额利息权利的同时，申请人应自行承担投资失败可能造成的各项费用损失，而不应不当地将应全部费用转嫁到被申请人头上，这违背权利义务相一致的基础原则。购买协

议、补充协议等文件在订立时，被申请人作为借款方及担保方属于弱势的一方，为得到急需的款项，已经承担了高额的利息，被申请人为获得资金权利已付出了极大的成本、承担了极大的风险，在此状况下，再要求被申请人为申请人负担逾期利息、律师费等维权费用，实属加大了被申请人的负担，造成权利义务的极度不对等、损害合同的公正平等。仲裁庭应当对交易主体间事实上的不平等给予适当的平衡，从司法审判上对不合理的权利义务、风险分担进行规制，以求实质正义。

第三，现阶段申请人并未围绕律师费、担保费等费用开支提供有效的证据，且申请人主张的费用数额存在明显不合理之处。

合同的一方当事人要求另一方负担律师费等实现债权的费用时，首先需证明双方当事人就此费用负担达成一致意见，其次在有一致约定的情形下，还需证明该项费用实际已发生。本案中当事人没有相关约定，故申请人无权要求被申请人承担律师费等实现债权的费用开支。退一步说，即便应当由被申请人承担律师费等费用开支，申请人也并未提供有力证据证明费用的实际发生，且申请人主张的各项费用数额明显不合理。

1. 关于律师费，申请人要求被申请人支付中国律师费人民币 870.8119 万元、香港律师费目前港币 40 万元，合计人

民币 900 余万元，此请求应予驳回。

（1）申请人在仲裁时仅提供了两份委托代理协议，未提供其实际支付律师费的相关证据，在被申请人 2017 年 12 月 4 日提交《初步答辩意见》就费用发生提出异议后，申请人在仲裁开庭审理前补充提交下列证据证明律师费的数额：委托代理的北京观韬中茂（上海）律师事务所在 2017 年 12 月 5 日开具了人民币 870.8119 万元的律师费发票；观韬律师事务所(香港)2017 年 11 月 29 日出具的律师计时工作费用单；2017 年 12 月 5 日开具的 18 万元费用单；申请人向北京观韬中茂（上海）律师事务所支付人民币 18 万元、210 万元的付款回单，被申请人代理律师认为上述证据证明力明显不足，无法证据申请人主张的高额律师费已实际发生。

首先，北京观韬中茂（上海）律师事务所开具的律师费发票、香港律师出具的工作费用单及申请人支付费用的付款回单，均是在被申请人提交《初步答辩意见》后形成的，代理律师有理由相信上述证据开具的目的即是为了向被申请人要求高额费用，并非是依据事实出具。其次，中国银行国内支付业务付款回单仅能证明申请人向北京观韬中茂（上海）律师事务所支付了两笔费用，无法证明该笔费用是因本案而产生。再者，依据行业惯例，律师事务所在当事人支付款项前即会开具发票，人民币 870.8119 万元的律师费发票并不能证明律师费已实际发生。

Exhibit 1
-32-

（2）申请人主张的律师费数额明显过高，仲裁庭不应支持。依据申请人及被申请人的约定，本案适用香港法，则仲裁庭在判断是否应由被申请人负担律师费时即应适用香港法、在判断被申请人应承担律师费数额的限额时应适用香港法、在判断申请人主张的律师费收费标准是否合理时也应适用香港法。根据香港法例及律师收费行业惯例，香港律师收费以工作时间为单位，并不受限于案件标的，更没有按百分比收取的情形，本案适用香港法，则在被申请人应承担的律师费数额上，应以香港律师收费制度为准，按照一般香港律师的收费额度进行判断。申请人主张的律师费人民币870.8119万元是根据《上海市律师服务收费政府指导价标准》的规定以案件标的为基数按照较高百分比计算得出，不应得到仲裁庭的支持。

《仲裁规则》第五十二条第（二）款规定："仲裁庭裁定败诉方补偿胜诉方因办理案件而支出的费用是否合理时，应具体考虑案件的裁决结果、复杂程度、胜诉方当事人及/或代理人的实际工作量以及案件的争议金额等因素。"本案中法律关系比较简单，争议不大，代理人的实际工作量较小，综合考量案件情况，根据上述规定，仲裁庭应驳回申请人要求被申请人承担巨额律师费的要求。

2. 关于担保费，申请人要求被申请人支付因财产保全所支出的法院财产保全费用人民币 5,000 元及第三方担保费人

民币 97 万余元，此请求应予驳回。

　　《中华人民共和国民事诉讼法》第一百条第二款规定："人民法院采取保全措施，可以责令申请人提供担保，申请人不提供担保的，裁定驳回申请"。根据此规定，申请人向法院申请财产保全是其诉讼权利，按照法院要求提供担保则是其必须承担的义务，申请人在申请财产保全后，依法向人民法院缴纳了人民币 5,000 元的保全费用，要求被申请人承担，同时为提供法院要求的担保，申请人向第三方保险公司支付了人民币 97 万元的担保费用，由保险公司开具保单，该笔费用亦要求被申请人承担。申请人的要求明显不当。

　　（1）申请人与被申请人未就担保费的承担达成一致意见，不应由被申请人承担。

　　（2）申请人向第三方保险公司支付的人民币 97 万余元担保费并非是依法产生的，该项费用的支出与本案、与被申请人无任何必然关系，该项费用在财产保全中并不是必然产生、必须支付的，绝不应由被申请人承担。申请人申请财产保全需提供担保，但并非是必须由第三方保险公司开具保单。《北京市高级人民法院关于财产保全若干问题的规定》（试行）第四条明确规定："申请人申请财产保全可以以下列方式提供担保：（一）申请人提供物的担保或现金担保；（二）第三人提供信用担保、物的担保或现金担保；（三）专业担保公司提供信用担保"。据此可见，法院可接受的担保方式并非唯

一的，第三方保险公司提供担保不是必须方式，申请人完全可以采取其他担保方式来实现财产保全，申请人因自身原因向第三方保险公司要求担保，因此造成的费用当然应由其自行承担。即便是在当事人就债务人负担维权费用达成一致约定的情形下，债务人所承担的也是维权产生的必要费用，债权人主张的费用也应是本着节约原则产生的，并非是所有债权人肆意挥霍支出的费用均能获得支持，本案当事人都未就费用承担达成一致意见，更不应承担申请人主张的额外、非必要的担保费。

（五）当事人的举证质证情况

申请人在提交仲裁申请书（英文）的同时，一并提交了 12 份证据，包括 Exhibit 1:Convertible Note Purchase Agreement(英文), Exhibit 2: Convertible Note I(英文), Exhibit 3 Supplementary Agreement I( 英 文 ): Exhibit 4: Deed of Undertakings and Guarantees I ( 中文), Exhibit 5: Application for Remittance I(中英双语), Exhibit 6: Supplementary Agreement II (英文), Exhibit 7: Deed of Undertakings and Guarantees II(中文), Exhibit 8: Application for Remittance II(中英双语), Exhibit 9: Redemption Notices ( 中英文各一份，共两份), Exhibit 10: Lawyers Letters (中英双语，共三份) and Delivery Vouchers (中英双语，共三份), Exhibit 11: Deed of Assignment, Exhibit 12: Engagement Agreements (一份中英双语,一份英文,共两份)。

仲裁语言变更为中文后，申请人提交了 7 份证据（中文），包括证据 1：可转债购买协议、证据 2：可转换债券（即可转债 I）、证据 3：补充协议（即补充协议 II）、证据 5：转让协议，证据 6：北京观韬中茂（上海）律师事务所发票、证据 7：观韬律师事务所（香港）发票及付款凭证。庭审过程中，被申请人对申请人提交的上述 7 份证据（中文）发表了质证意见。

庭审结束后，申请人向仲裁庭提交了 7 份补充证据（中文），包括证据 1：香港法律意见书（含附件）、证据 2：中国银行公布的美元现汇卖出价证明、证据 3：中国人民银行公布的短期贷款基准利率、证据 4：北京市第三中级人民法院的财产保全费缴款通知书及付款凭证、证据 5：华安财产保险股份有限公司出具的财产保全责任险保单、发票及付款凭证、证据 6：北京观韬中茂（上海）律师事务所律师费支付凭证、证据 7：观韬律师事务所（香港）账单及付款凭证。就上述 7 份补充证据，被申请人向仲裁庭提交了质证意见。

被申请人未向仲裁庭提交任何书面证据材料。

## 二、仲裁庭意见

根据相关法律、司法解释的规定，结合本案案情、双方当事人申请及答辩意见、举证质证情况，仲裁庭发表如下意

见：

　　（一）关于本案争议的准据法

　　根据《最高人民法院关于适用<中华人民共和国涉外民事关系法律适用法>若干问题的解释（一）》第一条的规定："民事关系具有下列情形之一的，人民法院可以认定为涉外民事关系：（一）当事人一方或双方是外国公民、外国法人或者其他组织、无国籍人；（二）当事人一方或双方的经常居所地在中华人民共和国领域外；（三）标的物在中华人民共和国领域外；（四）产生、变更或者消灭民事关系的法律事实发生在中华人民共和国领域外；（五）可以认定为涉外民事关系的其他情形"。本案中，虽然各方当事人均为中国自然人或法人，且其经常居所地均在中国境内，但涉案可转债的发行和认购均在中国内地以外，属于"产生、变更或者消灭民事关系的法律事实发生在中华人民共和国领域外"这一情形，因此本案具有涉外因素。

　　根据《涉外民事关系法律适用法》第四十一条的规定，"当事人可以协议选择合同适用的法律。当事人没有选择的，适用履行义务最能体现该合同特征的一方当事人经常居所地法律或者其他与该合同有最密切联系的法律。"本案中，根据两被申请人先后出具的两份《承诺及保证函》（"《承诺函I》"和"《承诺函II》"）第1条的约定，"承诺人就目标公司的跨境还款义务提供不可撤销的连带责任保证担保，且一旦

31

Exhibit 1
-37-

该等跨境还款义务得以触发，申请人有权直接要求承诺人向其履行跨境还款义务，承诺人届时将按照申请人的要求代目标公司履行跨境还款义务"。据此，申请人向被申请人主张权利的具体依据为该两份《承诺及保证函》。《承诺函 I》和《承诺函 II》第 5 条均约定："本函适用并按照香港法律解释。"因此，申请人和被申请人已经明确约定本案争议的准据法为香港法律，被申请人在其提交的《关于准据法变更为中华人民共和国法律的意见书》中提议将本案准据法变更为中国内地法律，但申请人在其提交的《关于变更本案准据法的回复函》中明确表示不同意变更准据法，因此，本案实体争议应当适用香港特别行政区法律。

（二）关于涉案相关协议的效力

就本案涉及的《可转债购买协议》《补充协议 I》《补充协议 II》《承诺函 I》《承诺函 II》以及《转让协议》的效力，申请人与被申请人均未提出异议。并且，根据《涉外民事关系法律适用法》第十条的规定，"涉外民事关系适用的外国法律，由人民法院、仲裁机构或者行政机关查明。当事人选择适用外国法律的，应当提供该国法律。不能查明外国法律或者该国法律没有规定的，适用中华人民共和国法律"。本案中，当事人约定实体争议适用香港法律，但就上述涉案协议的效力这一问题，双方均未向仲裁庭提供香港法律下的有关规定，因此应当适用中国内地法律予以认定。仲裁庭认为，上述协

32

Exhibit 1
-38-

议体现了相关当事人真实的意思表示，且并未违反中国法律、行政法规的强制性规定，不存在《中华人民共和国合同法》第五十二条规定的合同无效的情形，因此应当认定为有效。

（三）关于申请人的仲裁请求

1. 关于申请人的第一项仲裁请求

申请人请求被申请人支付系争可转债赎回价款本息共计人民币 648,311,950 元，在申请人提交的《关于仲裁请求的说明》中，申请人将该项仲裁请求的具体金额变更为人民币 648,284,650 元，此等变更是申请人对自身权利的处分，仲裁庭予以认可。对该项仲裁请求，被申请人并无异议，仲裁庭予以支持。

2. 关于申请人的第二项仲裁请求

申请人请求被申请人共同连带支付按照中国人民银行公布的现行短期（一年以内，含一年）贷款基准利率 4.35% 计算的可转债 I 对应的赎回价格的逾期付款利息，计息期间为 2017 年 7 月 7 日（可转债 I 的赎回日）起至被申请人实际支付之日止，暂计至 2018 年 1 月 15 日的利息金额为人民币 13,881,144.13 元；并请求被申请人共同连带支付按照中国人民银行公布的现行短期（一年以内，含一年）贷款基准利率 4.35%计算的可转债 II 对应的赎回价格的逾期付款利息计息期间为 2017 年 8 月 17 日起（可转债 II 的赎回日）至被申请人实际支付之日止，暂计至 2018 年 1 月 15 日的利息金额为

人民币 749,518.04 元；两项合计暂为人民币 14,630,662.17 元。

对于可转债 I，《可转债购买协议》第 7.2(c)(iii)条约定：

"投资人行使赎回权的，应有权以赎回价格赎回可转债，计算方式为：可转债项下全部未清偿本金，加上任何已发生但未支付的利息，其年利率为 15%，根据到期本金乘以自交割日起计算的实际天数计算，一年按 365 天计；该等金额应以现金支付，且投资人有权要求以实控人或其他实控人指定或持有的公司及机构提供现金进行支付"。对于可转债 II，《补充协议 II》第 1 条的约定，《购买协议》第 7.2(c)(iii)条的约定同样适用于可转债 II 的赎回。上述约定中的 15%的利息是按期赎回可转债 I 和可转债 II 时应支付的利息，不是对逾期赎回时应支付的逾期利息的约定，后者在计算时应以每一份可转债的赎回金额（即本金加按年利率 15%计算出的利息）为本金。

因此，关于此项仲裁请求，核心的问题在于：在当事人没有约定逾期赎回的利息的情况下，被申请人是否应向申请人支付该等利息以及如何计算该等利息。如前所述，本案实体争议的准据法为香港法律，被申请人是否应向申请人支付因逾期赎回可转债 I 和可转债 II 而产生的利息以及该等利息的计算属于本案实体争议的一部分，因此应当适用香港法律判断。

根据《涉外民事关系法律适用法》第十条第一款的规定，

当事人选择适用外国法律的，应当提供该国法律。根据申请人提交的《香港法律意见书》，就是否应支付利息以及如何计算利息，仲裁庭查明香港法律下的相关规定如下。

《香港仲裁条例》第 79 条规定：

"（1）除非各方另有协议，否则在第 80 条的规限下，仲裁庭可在其席前进行的仲裁程序中，就

（a）该仲裁庭在该仲裁程序中判给的款项；

（b）在该仲裁程序展开时仍未支付，但在裁决作出前已支付的在该仲裁程序中申索的款项；

或（c）该仲裁庭在该仲裁程序中判给或命令支付的费用，

判给以该仲裁庭认为适当的利率计算的单利息或复利息，计息期为任何在该款项或费用的支付日期或之前结束的期间，而该利息的起计日期及结算期，则按该仲裁庭认为适当者而定。

（2）第（1）款并不影响仲裁庭判给利息的任何其他权力。

（3）在第（1）（a）款中，仲裁庭判给的款项，包括因该仲裁庭作出属宣布性质的裁决而须支付的款额"。

《香港仲裁条例》第 80 条规定：

"在仲裁程序中判给或命令支付的款项或费用的利息

（1）须就仲裁庭判给的款项支付利息，利息由裁决的日

期起计，利率则为判定利率，但如该裁决另有规定则除外。

（2）须就仲裁庭判给或命令支付的费用支付利息，利息由

（a）判给费用的裁决或命令的日期起计；或

（b）指示立即支付被命令支付的费用的日期起计，利率则为判定利率，但如该判给费用的裁决或命令另有规定则除外。

（3）在本条中，判定利率 (judgment rate)指根据《高等法院条例》(第 4 章)第 49(1)(b)条(判决的利息)由终审法院首席法官决定的利率"。

《香港高等法院条例》第 49 条规定：

"判决的利息

（1）判定债项的总额或判定债项当其时尚未清偿的部分须带有单利

（a）利率按原讼法庭所命令者计算；或

（b）如无该项命令时，利率则按终审法院首席法官不时藉命令所决定者计算，由有关判决的日期起计，直至清偿为止。

（2）本条所指的利息，可就不同期间按不同利率计算。"

关于申请人提交的《香港法律意见书》，就其中第 116-127 段"利息的法律适用"部分，被申请人在其提交的质证意见中提出了两点反驳意见：首先，根据《仲裁条例》第 5

条"本条例适用的仲裁"第（2）款规定："如仲裁地点是在香港以外地方，则只有本部、第 20 及 21 条、第 3A 部、第 45、60 及 61 条及第 10 部适用于有关仲裁"，本案是在中国大陆进行的仲裁，《仲裁条例》并不能适用。其次，申请人与被申请人关于本案适用香港法律的约定依据国际惯例应是关于实体准据法的约定，并非是关于程序法的约定，有关仲裁庭裁判规则、仲裁程序、仲裁依据、仲裁规则理应适用《仲裁规则》。

对此，仲裁庭认为申请人提供的香港大律师的法律意见在针对这一问题上并没有太大帮助。首先该意见没有提供确认利息问题是实体法的法律渊源或权威说法；其次该意见认为利息是实体问题而他其所有援引的法律都是香港的程序法。仲裁庭认为这是存在矛盾的。尤其是该法律意见第 114-115 段提出"利息、法律费用和其他费用构成履行和强制执行仲裁协议的一部分，因此香港法适用于利息，法律费用及其他费用"。这种逻辑在法律上是站不住脚。在本案中程序规则已经明确约定适用《仲裁规则》的情况下，构成履行和强制执行仲裁协议的部分，包括开始仲裁、仲裁庭的组成、仲裁程序的进行与裁决书的作出都应该适用《仲裁规则》而非香港《仲裁条例》。

仲裁庭认为裁决利息的问题在本案并没有障碍。因为无论将利息问题认定为是实体规则还是程序规则，也即是适用

香港地区法律还是中国大陆内地的法律，在结果上都没有区别。双方提交的陈词与证据中都没有显示香港地区的法律与中国大陆地区是不支持判与利息。并且根据仲裁庭的理解，利息的计算通常是以同期银行的贷款利率为参考标准。《仲裁规则》中虽然没有具体对仲裁员裁决利息的权利有相关的规定，但是相应的也并没有禁止仲裁员裁决利息，更进一步说，本案仲裁地点北京所在的中国大陆地区内地的适用的民事诉讼程序法完全允许这样做。

本案中，申请人请求从逾期赎回可转债的首日至实际支付之日均按中国人民银行公布的现行短期（一年以内，含一年）贷款基准利率 4.35%计算逾期利息，对于从逾期赎回可转债的首日至本裁决作出之日的利息，仲裁庭认为年利率4.35%的利率是合理的，对于本裁决作出后至实际支付之日的利息，申请人主张的年利率 4.35%低于香港法律下的"判定利率" 8%，属于申请人对自身权利的处分，仲裁庭予以认可。因此，对于申请人提出的第二项仲裁请求，仲裁庭予以支持。

3. 关于申请人的第三项仲裁请求

申请人请求被申请人共同赔偿申请人因本案所产生的律师费损失，包括中国内地律师费人民币 8,708,119 元，及香港律师费人民币 767,293.30 元，合计人民币 9,475,412.30 元。

为支持其该项仲裁请求，申请人提交了北京观韬中茂

（上海）律师事务所律师费支付凭证和观韬律师事务所（香港）账单及付款凭证，分别证明其为本案支付了中国内地律师费人民币 8,708,119 元以及香港律师费人民币 767,293.30 元。其中，北京观韬中茂（上海）律师事务所律师费支付凭证包括四份《中国银行国内支付业务付款回单》，付款金额分别为人民币 2,100,000 元、人民币 3,000,000 元、人民币 2,600,000 元和人民币 1,008,119 元，共计人民币 8,708,119 元，付款时间分别为 2017 年 12 月 18 日、2017 年 12 月 25 日、2018 年 1 月 4 日和 2018 年 1 月 9 日，付款人均为申请人上海奇成悦名投资合伙企业，收款人均为北京观韬中茂（上海）律师事务所。被申请人对上述证据的真实性未提出异议，仲裁庭予以认可。从四份付款回单载明的金额、付款时间以及付款人、收款人的信息来看，可以认定该等金额属于申请人为本案而支付的内地律师费金额。观韬律师事务所（香港）账单及付款凭证包括观韬律师事务所（香港）就本案申请人提供的律师费账单以及两份银行付款回单（金额分别为人民币 767,000 元和人民币 293.30 元，共计 767,293.30 元，付款时间均为 2018 年 1 月 13 日），其中均明确载明了本案的案号，可以认定该等金额属于申请人为本案而支付的香港律师费金额。综上，仲裁庭认定，申请人为进行本案而支出的律师费总额为人民币 9,475,412.30 元。

关于被申请人是否应赔偿申请人的上述律师费以及其

体的赔偿金额问题，仲裁庭认为，律师费属于申请人为进行本案仲裁程序而支出的费用，因此该问题不属于本案的实体争议，而属于程序问题，因此应当先行适用《仲裁规则》的相关规定。《仲裁规则》第五十二条"费用承担"第（二）款规定："仲裁庭有权根据案件的具体情况在裁决书中裁定败诉方应补偿胜诉方因办理案件而支出的合理费用。仲裁庭裁定败诉方补偿胜诉方因办理案件而支出的费用是否合理时，应具体考虑案件的裁决结果、复杂程度、胜诉方当事人及/或代理人的实际工作量以及案件的争议金额等因素"。就本案中申请人支出的律师费而言，考虑到被申请人对申请人提出的第一项仲裁请求并无异议，因此本案争议并不复杂，综合考虑申请人的代理人的实际工作量和本案的争议金额，仲裁庭认为，由被申请人共同连带补偿申请人律师费人民币1,000,000 元较为适宜。

　　4. 关于申请人的第四项仲裁请求

　　申请人请求被申请人共同赔偿申请人因本案所产生的财产保全费用损失，包括财产保全费人民币 5,000 元及申请人因向被申请人提起财产保全而支付的财产保全保险费用人民币 972,467.93 元，合计人民币 977,467.93 元，且本案仲裁费由被申请人承担。

　　关于申请人支付的财产保全费和财产保全保险费，申请人提交了北京市第三中级人民法院的财产保全费缴款通知

书及付款凭证和华安财产保险股份有限公司出具的财产保全责任险保单、发票及付款凭证。其中，财产保全费缴款通知书及付款凭证中载明的金额为人民币 5,000 元，财产保全责任险保单、发票及付款凭证载明的保费金额为人民币 972,467.93 元。对上述证据的真实性,被申请人未提出异议,仲裁庭予以认可。从上述证据载明的付款人、付款时间和用途看，可以认定该等金额属于申请人为进行本案项下的财产保全而支出的费用。

关于被申请人是否应赔偿申请人的上述财产保全费用以及具体的赔偿金额问题，仲裁庭认为，该等费用属于申请人为进行本案仲裁程序而支出的费用，因此该问题不属于本案的实体争议,而属于程序问题,因此同样应当先行适用《仲裁规则》的相关规定。根据前引《仲裁规则》第五十二条"费用承担"第（二）款得规定，仲裁庭认为，申请人主张的该等费用及其金额未超出该款中"合理费用"的范畴，应当予以支持。

关于本案仲裁相关费用的分担，经综合考虑本案的所有情况，仲裁庭决定，本案产生的仲裁费用应全部由被申请人承担。

关于申请人第五项其他救济的仲裁请求，因申请人并未明确该其他救济的具体类型或金额，加之仲裁庭已经对于申请人在本案的实体请求均有裁判，故对于该项仲裁请求不予

支持。

　　本裁决书中援引的申请人与被申请人的陈述意见以及证据，如未包含双方提交的全部信息，并不代表仲裁庭在作出裁决时未考虑该信息，或默示采纳该信息。仲裁庭认为，本裁决已包含的双方陈述意见与证据足以使仲裁庭作出本裁决。

## 三、裁　决

　　基于上述仲裁庭意见，仲裁庭作出裁决如下：

　　（一）被申请人向申请人支付系争可转债赎回价款本息共计人民币 648,284,650 元。

　　（二）被申请人向申请人支付以可转债 I 的赎回金额人民币 606,635,250 元为本金、自 2017 年 7 月 7 日计算至实际支付之日止的逾期利息以及以可转债 II 的赎回金额人民币 41,649,400 元为本金、自 2017 年 8 月 17 日计算至实际支付之日止的逾期利息，利率均按年 4.35% 计算。

　　（三）被申请人支付申请人为本案支出的律师费人民币 1,000,000 元。

　　（四）被申请人支付申请人为本案支出的财产保全费人民币 5,000 元以及财产保全责任险保险费人民币 972,467.93 元。

（五）本案仲裁费人民币 3,544,631 元，由被申请人承担。鉴于该项仲裁费已由申请人向仲裁委员会预缴的等额仲裁预付金全部冲抵，因此，被申请人应向申请人支付人民币3,544,631 元，以偿付申请人代其垫付的仲裁费。申请人选定杨良宜仲裁员特殊报酬为 29,678.49 美元，全部由被申请人承担，该费用与申请人预缴的 43,000 美元冲抵后余款13,321.51 美元，由仲裁委员会退回申请人，被申请人应向申请人支付 29,678.49 美元。被申请人选定强力仲裁员实际费用人民币 1,180 元，全部由被申请人自行承担，该笔费用与被申请人预缴人民币 15,000 元冲抵后余款人民币 13,820 元，由仲裁委员会退回被申请人。

（六）驳回申请人的其他仲裁请求。

上述被申请人应向申请人支付的款项，应于本裁决作出之日起 5 日内履行完毕。

本裁决为终局裁决，自作出之日起生效。

（此页无正文）

首席仲裁员 

仲 裁 员

仲 裁 员

二〇一八年五月九日于北京

# EXHIBIT 2

[Translation from Chinese original]

[Cover]

# CHINA INTERNATIONAL ECONOMIC AND TRADE ARBITRATION COMMISSION

## AWARD

Claimant:                Shanghai Qichengyueming Investment Partnership Enterprise (Limited Partnership)

Address:                 Room 790A, Level 7, Building D, No. 137 Haining Road, Hongkou District, Shanghai

Arbitration Counsel:  Chen Shiyi, Beijing Guantao Zhongmao Law Firm (Shanghai)

First Respondent:     Jia Yueting (identification card number: 14262319731215081X)

Address:                 16/F, Leshi Mansion, 105 Yaojiayuan Road, Chaoyang District, Beijing

Second Respondent:  Leview Holding (Beijing) Limited

Address:                 10/F, Building 3, Suite 1102, 105 Yaojiayuan Road, Chaoyang District, Beijing

Arbitration Counsel:  Zou Yi, Beijing Zhongshu Law Firm

Beijing

May 9, 2018

Exhibit 2

-52-

[Page 1]

# AWARD

(2018) CIETAC Beijing Arbitration 0436

China International Economic and Trade Arbitration Commission (hereinafter "**CIETAC**"), based upon the arbitration clause contained in that certain Convertible Note Purchase Agreement (hereinafter the "**Purchase Agreement**") entered into on June 3, 2015 between claimant Shanghai Qichengyueming Investment Partnership Enterprise (Limited Partnership) (hereinafter "**Claimant**") and first respondent Jia Yueting (hereinafter "**First Respondent**") and second respondent Leview Holding (Beijing) Limited (hereinafter "**Second Respondent**"; collectively with First Respondent, "**Respondents**") and the written arbitration demand submitted to CIETAC by Claimant on July 5, 2017, accepted the dispute between Claimant and Respondents over the Convertible Note Purchase Agreement. This case is numbered X20170753.

*The Arbitration Rules of China International Economic and Trade Arbitration Commission* promulgated by CIETAC on January 1, 2015 (hereinafter the "**Arbitration Rules**") apply to this arbitration proceeding.

On July 12, 2017, the arbitration division of CIETAC separately sent both parties the arbitration notice of this case, the Arbitration Rules and Directory of Arbitrators, and at the same time sent Respondents the arbitration demand and its attachments submitted by Claimant. Upon verification, such mails were all duly delivered.

108666247\V-5

Exhibit 2

-53-

The arbitration clause governing this case provides that the language used in the arbitration shall be English, but upon the parties' joint application the language used in this arbitration was changed to Chinese starting from August 29, 2017.

[page 2]

Claimant appointed Mr. Yang Liang-Yee to be an arbitrator of this case. Respondents appointed Mr. Qiang Li to be an arbitrator of this case. Since both parties failed to jointly appoint, or jointly entrust CIETAC's chairman to appoint, the chief arbitrator by the prescribed deadline, CIETAC's chairman appointed Mr. Wang Xuehua as the chief arbitrator pursuant to the Arbitration Rules. After the above arbitrators executed the affidavits accepting their appointment, the arbitral panel was formed on October 19, 2017 to collectively adjudicate this case. The arbitration division of CIETAC sent both parties a notice of the formation of the arbitral panel of this case with the affidavits attached by express courier service on the same day.

The arbitral panel of the Economic and Commercial Arbitration Committee of the arbitration division decided to hear this case on December 7, 2017 in Beijing. The arbitration division of CIETAC sent both parties a hearing notice for this case on October 31, 2017 by express courier service. Upon verification, such documents were all duly delivered.

Then for some reason the hearing originally scheduled for December 7, 2017 was continued to December 20, 2017. The arbitration division of CIETAC sent both parties a notice of continuance for this case on November 30, 2017 by express courier service. Upon verification, such documents were all duly delivered.

The hearing of this case was held on December 20, 2017 as scheduled. Both parties sent their counsel to appear at the hearing on their behalf. The arbitration division of CIETAC

delivered the documents submitted by each party at the hearing to the other party. During the hearing, both sides stated the facts of this case, presented the originals of the relevant evidence, questioned the witnesses, made legal arguments and responded to questions raised by the arbitral panel.

After the hearing, each side submitted supplemental documents, which the arbitral panel forwarded via express courier ==[Page 3]== to the other side.

All the arbitration documents concerning this case were effectively served on both parties pursuant to the provisions in the *Arbitration Rules*.

The adjudication of this case has now completed. Based upon the documents currently available as well as the facts ascertained and evidence verified at the arbitral hearing, the arbitral panel now makes this arbitral award following conference.

The factual background, the opinion of the arbitral panel and the award are now set forth as follows:

## I. FACTUAL BACKGROUND

(i)      Claimant's Arbitration Demand, Facts and Reasons

In its arbitration demand, Claimant alleged:

On June 3, 2015, Claimant entered into a Convertible Note Purchase Agreement (hereinafter the "*Purchase Agreement*") with Leview Mobile Ltd. (hereinafter the "*Debtor*"), Le Ltd., First Respondent, Lesai Mobile Technology (Beijing) Co., Ltd. (hereinafter "*Lesai Mobile*"), Second Respondent and QC Investment Ltd. (hereinafter the "*Original Creditor*"), which provided that the Original Creditor would purchase a convertible note issued by the

Debtor, in a principal amount of USD75,000,000 (hereinafter "**Convertible Note I**"), to mature on the second or third anniversary following the closing at the choice of the Original Creditor, the redemption price being the total principal of Convertible Note I then plus an annualized interest of 15%, compounded daily. The Debtor issued the Convertible Note to the Original Creditor on that same day.

On June 3, 2015, the parties to the Purchase Agreement entered into a ==[Page 4]== Supplementary Agreement (hereinafter "**Supplementary Agreement I**"), which provided that the redemption payment under the Purchase Agreement shall be paid in RMB, at the US dollar exchange rate published by the People's Bank of China on the closing date.

On June 3, 2015, Respondents jointly provided Claimant and the Original Creditor a Letter of Guarantee (hereinafter "**Letter of Guarantee I**"), expressly promising: Respondents shall have irrevocable joint guarantor obligations for the Debtor's repayment obligations under Convertible Note I; in the event of the target company's failure to timely perform its repayment obligations under the transaction documents (*i.e.*, the Purchase Agreement, Convertible Note and Supplementary Agreement I), the Original Creditor shall have the right to transfer its creditor's rights under the target company's convertible note to Claimant, the transfer price to be jointly determined by Claimant and QC Investment. Such transfer of the creditor's rights would not need the consent of any third party. After consummation of such transfer of the creditor's rights, the target company should perform its repayment obligations to Claimant. The two Respondents provided irrevocable joint liability guarantee for the repayment obligations owed by the target company toward Claimant, and Claimant would have the right to directly demand both Respondents to perform such repayment obligations.

On July 7, 2015, the original creditor paid the Debtor an even USD75,000,000 through a bank wire transfer.

On July 7, 2015, the parties to the Purchase Agreement entered into a second Supplementary Agreement (hereinafter "**Supplementary Agreement II**") as a supplement to the Purchase Agreement, which provided that the original creditor would purchase a second convertible note, with a principal amount of USD5,000,000 (hereinafter "**Convertible Note II**"), with basically the same terms and conditions as set forth in the Purchase Agreement.

[page 5]

On July 7, 2015, Respondents provided a second Letter of Guarantee (hereinafter "**Letter of Guarantee II**"), promising to provide the creditor an irrevocable joint liability guarantee for the Debtor's repayment obligations under Convertible Note II, with the same terms and conditions as Convertible Note I.

On August 17, 2015, the Original Creditor paid the Debtor an even USD5,000,000 through a bank wire transfer.

Starting from March 13, 2017, the Original Creditor sent the Debtor several redemption notices, expressly demanding redemption of the two convertible notes on their maturity dates. On June 1, 2017, the Original Creditor entrusted the law firm Guantao & Chow (Hong Kong) to send the Debtor an attorney's letter as well as a redemption notice, expressly notifying the Debtor that the Original Creditor was demanding redemption of the convertible notes, with the redemption price for Convertible Note I at USD97,500,000, *i.e.*, RMB606,635,250, and the redemption price for Convertible Note II at USD6,500,000, *i.e.*, RMB41,676,700. On that same day, the Original Creditor and Claimant jointly entrusted the law firm Guantao & Chow (Hong

Kong) to send an attorney's letter to Respondents, notifying Respondents that the Original

Creditor had sent a redemption notice to request the Debtor to pay the Original Creditor the

redemption prices totaling RMB648,311,950, and demanding Respondents to urge the Debtor to

make timely repayments, otherwise the Original Creditor would enforce Letter of Guarantee I

and Letter of Guarantee II against Respondents and seek reimbursement from Respondents all

expenses and fees incurred. In addition, starting from March 21, 2017, counsel for Claimant and

the Original Creditor and counsel for Respondents met several times to discuss payment of the

redemption prices for Convertible Note I and Convertible Note II, in an attempt to resolve the

related dispute through amicable consultation, but to no avail.

[page 6]

In light of an ongoing barrage of news stories about Respondents and their affiliates and

their litigation, various assets being frozen, failures to repay debt when due, disputes with their

suppliers, lenders and investors, and liquidity crises, the Original Creditor had reasons to believe

that the Debtor would be unable to timely redeem the convertible notes, so on July 4, 2017 it

entered into a Deed of Assignment with Claimant to assign and transfer all of its rights, claims,

interests and benefits under the Purchase Agreement, the two convertible notes, the two letters of

guarantees and other transaction documents to Claimant.

To protect Claimant's legal rights, pursuant to the arbitration clause set forth in Section

14 of the Purchase Agreement ["In the event of any dispute, controversy or, claim or difference

of any kind whatsoever arising out of, relating to or in connection with this Agreement, including

the existence, validity, interpretation, performance, breach or termination thereof, the validity,

scope and enforceability of this arbitration provision and any dispute regarding no-contractual

Exhibit 2

-58-

obligations arising out of or relating to it (the 'Dispute'), the parties hereto shall firstly consult and negotiate with each other to settle it in an amicable manner. If no settlement can be reached by the parties within 30 days of the occurrence of the Dispute, any party is entitled to submit, at its sole discretion, such dispute to the China International Economic and Trade Arbitration Commission (the 'CIETAC') for arbitration in Beijing in accordance with the then applicable arbitration rules of CIETAC"], Claimant thereby submitted an arbitration demand to CIETAC.

Claimant made the following arbitration demands:

1.      to order Respondents to pay the redemption prices for the convertible notes that were the subject of this dispute plus interest totaling RMB648,311,950;

2.      to order Respondents to pay default interest on the above RMB648,311,950, to be calculated in accordance with the lending rate of the People's Bank of China for the same period; or, the default rate or calculation period to be determined by the arbitrators in accordance with Sections 48 and 49, Cap. 4 of Hong Kong High Court Ordinance;

[page 7]

3.      to order Respondents to pay the attorneys incurred by Claimant in this case, including fees for Chinese attorneys (currently at RMB8,708,119) and fees for Hong Kong attorneys, currently at approximately HKD400,000, with the exact amounts to be in accordance with the amounts actually incurred;

4.      to order Respondents to be responsible for all costs and expenses incurred in connection with this case, including, but not limited to, the arbitration fees and asset attachment fees, etc.; and

     5.      other applicable remedies.

During the hearing, Claimant changed the second arbitration demand to "to order Respondents to pay default interest on the above RMB648,311,950, to be calculated in accordance with the lending rate of the People's Bank of China for the same period."

With regard to the above arbitration demands, Claimant made the following further explanations:

     1.      With respect to arbitration demand No. 1 in the Arbitration Demand, Claimant was asking the arbitral panel to order Respondents to jointly pay the redemption price for Convertible Note I under the Purchase Agreement entered into on June 3, 2015 totaling USD97,500,000, converted to RMB606,635,250 according to the selling exchange rate (every USD100 selling for RMB622.19) published by the People's Bank of China on July 7, 2015; the redemption price for Convertible Note II under Supplementary Agreement II entered into on July 7, 2015 totaling USD6,500,000, converted to RMB41,649,400 according to the selling exchange rate (every USD100 selling for RMB640.76) published by the People's Bank of China on August 17, 2015; totaling RMB648,284,650;

     2.      With respect to arbitration demand No. 2 in the Arbitration Demand, Claimant was asking the arbitral panel to order Respondents to jointly pay default interest on the above redemption price for Convertible Note I [page 8], accruing from July 7, 2017 (the redemption date for Convertible Note I), calculated at the current short-term (within one year, including one year) loan benchmark interest rate of 4.35% published by the People's Bank of China, until the date of the actual payoff by Respondents, provisionally set at January 15, 2018, amounting to RMB13,881,144.13; and default interest on the above redemption price for Convertible Note II,

accruing from August 17, 2017 (the redemption date for Convertible Note II), calculated at the short-term (within one year) loan rate of 4.35% published by the People's Bank of China, until the date of actual payoff by Respondents, provisionally set at January 15, 2018, amounting to RMB749,518.04; the two items provisionally totaling [RMB]14,630,662.17;

3.      With respect to arbitration demand No. 3 in the Arbitration Demand, Claimant was asking the arbitral panel to order the two Respondents to jointly compensate Claimant for the attorneys' fees incurred in connection with this case, including RMB8,708,119 in fees for attorneys in mainland China, and RMB767,293.30 in fees for attorneys in Hong Kong, totaling RMB9,475,412.30;

4.      With respect to arbitration demand No. 4 in the Arbitration Demand, Claimant was asking the arbitral panel to order (1) the two Respondents to jointly compensate Claimant for the asset attachment fees, including RMB5,000 in attachment fee, and RMB972,467.93 in insurance premium paid for attachment of Respondents' assets, totaling RMB977,467.93; and (2) the two Respondents to be responsible for the arbitration fee in this case.

(ii)     Respondents' Preliminary Defenses.

[page 9]

In their arbitration demands Nos. 2, 3 and 4 Claimant wanted Respondents to pay default interest, attorneys' fees, be responsible for all the costs and expenses incurred because of this case. Such claims lacked basic support as Respondents were not obligated for default interest, attorneys' fees or other costs and expenses.

First, Claimant's demands were not based on contract.

In this case, none of the Purchase Agreement, Supplementary Agreement and Supplementary Agreement II contained any agreement among the parties that Respondents would be liable for default interest or enforcement costs (attorneys' fees and other costs and expenses incurred because of this case). Claimant's demand to hold Respondents responsible for the above interest and costs and expenses should be premised on the parties having reached an understanding with regard to such interest or enforcement costs. Since the parties in this case had not reached such an understanding, Claimant was not entitled to payments by Respondents for default interest or enforcement costs such as attorneys' fees.

Second, Claimant's demand for payments by Respondents of default interest, attorneys' fees and other costs and expenses effectively increased Respondents' burden, in violation of the basic legal standard of fair dealing.

The maturity dates for the two convertible notes in this case were July 7, 2017 and August 13, 2017, respectively. Claimant applied for arbitration prior to the July 5, 2017 maturity date for the convertible note and did not give Respondents an adequate opportunity for response and consultation. Such action on the part of Claimant showed failure to adhere to the basic principle of good faith in civil matters. All parties to a contract should have mentality of goodwill. When Claimant went ahead with the arbitration application and demanded Respondents to pay default [page 10] interest, attorneys' fees, etc. prior to the maturity dates of the convertible notes, it was exploiting its advantageous position to make Respondents liable for huge extra costs, which was extremely unfair to Respondents. Such action of Claimant was obviously legally unsound and the arbitral panel should not approve such action.

Third, Claimant failed to provide admissible evidence to prove the incurrence of the fees and expenses.

When a party to a contract asks the other party to reimburse enforcement expenses such as attorneys' fees, etc., such party has to first prove that the parties have reached an agreement regarding reimbursement for such expenses and, then, if there has been such an agreement, such party still has to prove that such expenses have actually been incurred. In this case, Claimant only provided two engagement agreements, without delivering evidence of the actual payment of attorneys' fees. Based upon the evidence available, there is no proof that the expenses such as attorney's fees have already been incurred. Therefore, even if without considering the fact that the parties had not reached an understanding regarding reimbursement of expenses, Claimant is not entitled to demand that Respondents be held liable for the high amounts of expenses such as attorneys' fees.

Fourth, the attorneys' fees claimed by Claimant were obviously excessive.

Even if Respondents were liable for attorneys' fees, the amounts still had to be reasonable. The attorneys' fees claimed by Claimant were unreasonable and unlawful. Claimant demanded RMB8,708,119 for Chinese lawyers, current fees of HKD400,000 for Hong Kong lawyers, totaling over RMB9 million, which compared with the amount of RMB648,311,950 at issue in this case was obviously excessive. The attorneys' fees claimed by Claimant exceeded the scope of reasonableness. If such a claim were to be granted, it would inappropriately increase the debtors' financial burden. As such, such claim should be denied by the arbitral panel.

(iii) Arguments by Claimant's Counsel.

[page 11]

Claimant's counsel made the following additional arguments:

1.      Under the relevant transaction documents Respondents were liable to Claimant

for the redemption payments.

On June 3, 2015, Claimant entered into a purchase agreement with the Debtor, Le Ltd.,

First Respondent, Lesai Mobile, Second Respondent and the Original Creditor, which provided

that the Original Creditor would purchase Convertible Note I issued by the Debtor. Section 2.1

of the Purchase Agreement and Schedule 1 thereto set forth that principal amount of Convertible

Note I at USD75,000,000; Section 7.2(a) provided, "The [Original Creditor] shall have the right

to require the Company to redeem the Convertible Note on the Maturity Date or upon or

immediately following the second-year anniversary of the Completion date at the Redemption

Price (defined as below) by delivering a prior written notice (the 'Redemption Notice')"; Section

7.2(c)(iii) provided, "The [Original Creditor] upon exercise of its redemption right shall have the

right to redeem the Convertible Note at the Redemption Price, which is calculated as the total

outstanding principal amount with respect to the Convertible Note, plus any accrued and unpaid

interest at 15% per annum calculated by using the then outstanding principal amount multiplied

by actual number of days elapsed since the Completion date divided by 365 days; the payment is

to be made by cash, and the [Original Creditor] may request for the cash payment to come from

[First Respondent] or other companies and institutions designated or owned by [First

Respondent]."

On June 3, 2015, the parties to the Convertible Note Purchase Agreement entered into

Supplementary Agreement I, in which Section 1 provided, "The payments for Redemption Price

made by relevant Parties under the Purchase Agreement shall be in RMB. The selling exchange

rates announced by the People's Bank of China as at the Completion Date shall be used for the purpose of currency conversion."

On June 3, 2015, Respondents jointly provided Claimant and the Original Creditor [page 12] Letter of Guarantee I, in which the fourth "whereas" clause stated, "In the event of the Debtor's failure to timely perform its redemption obligation under the transaction documents [i.e., the Purchase Agreement, Convertible Note and Supplementary Agreement I], [the Original Creditor] shall have the right to assign and transfer its creditor's rights under the Convertible Note to [Claimant], the transfer price to be mutually determined between [Claimant] and [the Original Creditor]. Such assignment of the creditor's rights will not require the approval of any third party. After such assignment of creditor's rights, [the Debtor] shall perform its repayment obligation to [Claimant]." Section 1 of Letter of Guarantee I provided, "[Respondents] hereby provide an irrevocable joint liability guarantee for the cross-border repayment obligations of [the Debtor] [i.e., the Debtor's obligation to repay Claimant under the transaction documents for the convertible note], and once such repayment obligation becomes due, [Claimant] shall be entitled to directly demand the guarantors to perform their cross-border repayment obligations and the guarantors shall at that time perform cross-border repayment obligations on behalf of the target company in accordance with [Claimant's] demand."

On July 7, 2015, the Original Creditor paid the Debtor an even USD75,000,000 through a bank transfer.

On July 7, 2015, the parties to the Purchase Agreement entered into Supplementary Agreement II, which provided that the Original Creditor would purchase Convertible Note II issued by the Debtor. The third "whereas" clause of Supplementary Agreement II provided that

the principal amount of Convertible Note II was to be USD5,000,000; as provided in Section 6,
except as otherwise repealed, terminated or amended by Section 1, 2, 3, 4 and 5 of this
Supplementary Agreement II, the Purchase Agreement and any other terms and provisions
thereof should remain in full force and effect.

On July 7, 2015, the two Respondents provided a second Letter of Guarantee (hereinafter
"***Letter of Guarantee II***"), promising an irrevocable joint liability guarantee for the Debtor's
repayment obligation under Convertible Note II, under the same terms and conditions [page 13]
as under Letter of Guarantee I.

On August 17, 2015, the Original Creditor paid the Debtor an even USD5,000,000
through a bank transfer.

Starting from March 13, 2017, the Original Creditor sent several redemption notices to
the Debtor, expressly demanding redemption of the two convertible notes on their maturity dates.
On June 1, 2017, the Original Creditor entrusted the law firm Guantao & Chow (Hong Kong) to
send the Debtor an attorney's letter as well as a redemption notice, expressly notifying the
Debtor that the Original Creditor was demanding redemption of the convertible notes. On that
same day, the Original Creditor and Claimant jointly entrusted the law firm Guantao & Chow
(Hong Kong) to send an attorney's letter to Respondents, notifying Respondents that the Original
Creditor had sent a redemption notice to request the Debtor to pay the Original Creditor the
redemption prices, and demanding Respondents to urge the Debtor to make timely repayments,
otherwise the Original Creditor would enforce Letter of Guarantee I and Letter of Guarantee II
against Respondents and seek reimbursement from Respondents for all expenses and fees
incurred. In addition, starting from March 21, 2017, counsel for Claimant and the Original

Creditor and counsel for Respondents met several times to discuss payment of the redemption prices for Convertible Note I and Convertible Note II, in an attempt to resolve the related dispute through amicable consultation, but to no avail.

On July 7, 2017, the Original Creditor and Claimant entered into a Deed of Assignment, in which Section 1.1 provided that "In consideration of the premises, with the effect on and from the date of this Deed and subject to the terms and conditions of this Deed, the Assignor hereby assigns and transfers to the Assignee absolutely of all the Assignor's rights, titles, interests, advantage and benefits of and in otherwise deriving from each of the Purchase Agreement, the Convertible Notes, the Deed of Undertaking and any other Transaction Documents (as applicable)."

[page 14]

Therefore, the Debtor had the obligation to pay the Original Creditor the respective redemption prices for Convertible Note I and Convertible II when due pursuant to the Purchase Agreement, Supplementary Agreement II and other related transaction documents. Since the Debtor had failed to perform the above repayment obligations, Respondents should, pursuant to Letter of Guarantee I, Letter of Guarantee II and the assignment of creditor's rights under the Deed of Assignment, be liable to Claimant for the above obligation to pay the redemption prices and for the damages suffered by Claimant, and Respondents should be jointly liable for such payment obligations.

2.      Hong Kong law is the governing law in this case.

Section 14.1 of the Purchase Agreement provided, "THIS AGREEMENT TOGETHER WITH OTHER BASIC DOCUMENTS SHALL BE GOVERNED BY, AND CONSTRUED IN

ACCORDANCE WITH THE LAWS OF THE HKSAR [Hong Kong Special Administrative Region] APPLICABLE TO CONTRACTS TO BE PERFORMED WHOLLY WITHIN SUCH JURISDICTION, WITHOUT REGARD TO THE PRINCIPLES OF CONFLICTS OF LAW OF ANY JURISDICTION."

Section 7 of Supplementary Agreement I provided, "This Agreement shall be governed by and construed exclusively in accordance with the laws of the Hong Kong Special Administrative Region of China ('Hong Kong') without giving effect to any choice of law rule that would cause the application of the laws of any jurisdiction other than Hong Kong to the rights and duties of the parties hereunder."

Section 5 of Letter of Guarantee I provided, "This letter shall be governed by and construed in accordance with the laws of Hong Kong."

Section 10 of Supplementary Agreement II provided, "Governing Law. This Supplementary Agreement II shall be governed by and construed exclusively in accordance with the laws of the Hong Kong Special Administrative Region of China ('Hong Kong') without giving effect to any choice of law rule that would cause the application of the laws of any jurisdiction other than Hong Kong to the rights and duties of the parties hereunder."

Section 5 of Letter of Guarantee II provided, "This letter shall be governed by and constructed in accordance with the laws of Hong Kong."

Therefore, the contracts and other legal documents at issue in this case have all expressly provided that the laws of Hong Kong would be the governing law, so Hong [page 15] Kong law should also be the governing law in this arbitration.

Rule 10 of *the Law of the Application of Law of the People's Republic of China on Governing Laws in Foreign-related Civil Matters* provides: "Foreign laws applicable to foreign-related civil matters shall be ascertained by the People's Court, arbitration institution or administrative body. If any party selects any foreign law as the governing law, it shall provide the law of such country. If the foreign law cannot be ascertained or there is no applicable provision in the law of such country, the laws of the People's Republic of China shall be applied." Therefore, Claimant retained Hong Kong barrister Vod K.S. Chan to provide, on January 12, 2018, a letter captioned "Re: CIETAC Case No. X20170753, Legal Opinion on Governing Law, Validity, Enforceability, Interest, Fees and Other Aspects Under Hong Kong Law" (hereinafter the "***Hong Kong Legal Opinion***"), as a professional opinion for the arbitral panel's ascertainment of Hong Kong law and application of Hong Kong law.

3.    Calculation of the redemption prices.

Pursuant to the provisions in the Purchase Agreement, the redemption price for Convertible Note I was USD75,000,000 multiplied by an annual interest of 15% multiplied by two years, or USD97,500,000. Pursuant to Section 1 of Supplementary Agreement I, the exchange rate will be calculated according to the selling exchange rate published on the closing day by the People's Bank of China. Since the exchange rate published by the People's Bank of China is the mean price, calculated according to the selling exchange rate of per USD100 for RMB622.19 published by the People's Bank of China on July 7, 2015 (the closing date for Convertible Note I) at the closing time (16:30 on that day), the above redemption price of USD97,500,000 for Convertible Note I should be converted to RMB606,635,250.

Pursuant to the provisions in Supplementary Agreement II, the redemption price for Convertible Note II [page 16] was USD5,000,000 multiplied by an annual interest rate of 15% multiplied by two years, or USD6,500,000. Calculated based upon the formula set forth in Section 1 of Supplementary Agreement I as well as the selling exchange rate of per USD100 for RMB640.76 published by the People's Bank of China on August 17, 2015 (the closing date for Convertible Note II) at the closing time (16:30 on that day), the above redemption price of USD6,500,000 for Convertible Note II should be converted to RMB41,649,400.

4.      Calculation of default interest.

Since the Debtor has failed to perform its obligation to redeem Convertible Note I from its redemption date (July 7, 2017) and its obligation to redeem Convertible Note II from its redemption date (August 17, 2017) following receipt of the attorney's letter and redemption notice sent by Claimant's counsel Guantao & Chow (Hong Kong) on June 1, 2017, the default interest on the respective redemption prices for Convertible Note I and Convertible Note II should accrue starting on the respective applicable redemption dates through the date of actual payment by Respondents.

Calculated based upon the current short-term (within one year, including one year) loan benchmark interest rate of 4.35%, the default interest for the redemption price for Convertible Note I should accrue from the redemption date for Convertible Note I (July 7, 2015) through the date of actual payment by Respondents, provisionally set at January 15, 2018, amounting to RMB13,881,144.13; the default interest for the redemption price for Convertible Note II should accrue from the redemption date for Convertible Note II (August 17, 2015) through the date of

actual payment by Respondents, provisionally set at January 15, 2018, amounting to
RMB749,518.04; the two items totaling [page 17] RMB14,630,662.17.

      5.     Respondents should be liable to Claimant for the other damages suffered and
costs incurred by Claimant because of this case.

      Section 10.1 of the Purchase Agreement provided, "Scope of Indemnification. Each Party
(an 'Indemnifying Party') shall indemnify and hold the other Parties and their directors, officers
and agents (collectively, the 'Indemnified Party') harmless from and against any losses, claims,
damages, liabilities, judgments, fines, obligations, expenses and liabilities of any kind or nature
whatsoever, including but not limited to any investigative, legal and other expenses incurred in
connection with, and any amounts paid in settlement of, any pending or threatened legal action
or proceeding, but excluding consequential damages, special or incidental damages, indirect
damages, punitive damages, lost profits, and diminution in value (collectively, 'Losses')
resulting from or arising out of: (i) the breach of any warranty of such Indemnifying Party
contained in the Basic Documents or in any schedule or exhibit hereto determined without regard
to any materiality qualifier therein; or (ii) the violation or nonperformance, partial or total, of any
covenant or agreement of such Indemnifying Party contained in the Basic Documents for reasons
other than gross negligence or willful misconduct of the Indemnified Party. The Company, the
WFOE and the Owner shall jointly and severally indemnify the Investor and its directors,
officers, and agents harmless and against any Losses resulting from or arising out of: (i) the
breach of any warranty of the Company, the WFOE and the Owner contained in this Agreement
or in any schedule or exhibit hereto determined without regard to any materiality qualifier therein;
or (ii) the violation or nonperformance, partial or total, of any covenant or agreement of the
Company, the WFOE or the Owner contained in this Agreement for reasons [page 18] other than

Exhibit 2
-71-

gross negligence or willful misconduct of the Indemnified Party. In calculating the amount of any Losses of an Indemnified Party hereunder, there shall be subtracted the amount of any insurance proceeds and third-party payments received by the Indemnified Party with respect to such Losses."

Since the Debtor has failed to timely pay the Original Creditor or Claimant the redemption prices, the costs and expenses incurred by Claimant to take legal actions to enforce its creditor's rights should be deemed indemnified "Losses" set forth in Section 10.1 of the Purchase Agreement. Meanwhile, according to the Hong Kong Legal Opinion, due to Respondents' failure to perform the Purchase Agreement and pay the redemption prices, they should be required to pay Claimant for its losses pursuant to the above provision in Section 10.1.

Since Claimant, to protect its creditor's rights, has applied to the Third Intermediate People's Court of Beijing for attachment of Respondents' assets, incurring an asset attachment fee of RMB5,000 and a premium of RMB972,467.93 paid to Huaan Property Insurance Co., Ltd. for asset attachment bond, which should be deemed as indemnified losses described above.

In addition, in enforcing its creditor's rights, Claimant retained lawyers in mainland China and Hong Kong, incurring attorneys' fees, which should be deemed indemnified losses described above.

6.      Calculation of attorneys' fees.

According to the Hong Kong Legal Opinion, in applying Hong Kong law, all the attorneys' fees of lawyers in mainland China and Hong Kong incurred by Claimant could be claimed from Respondents under Hong Kong law.

Since the mainland China law firm Beijing [page 19] Guantao Zhongmao (Shanghai) is a law firm established and operating in Shanghai under Chinese law, the engagement agreement (including the provision therein about attorneys' fees) entered into between such firm and Claimant is governed by Chinese law.

Rule 8 of *Shanghai Legal Fee Regulations* promulgated by Shanghai Development and Reform Commission and Shanghai Justice Bureau on January 26, 2017 provides: "Legal fee rates under government price guidance should be implemented in accordance with the *Shanghai Government Price Guide for Legal Fees* (see Appendix I). Where the government price guide requires any adjustment, such adjustment shall be made and publicized by the municipal price control department in conjunction with the municipal judicial administrative department in accordance with applicable procedures. Law firms should agree on the fees rates for specific matters with their clients within the range of the government price guide. For major, difficult, complex litigation matters (see Appendix II), upon mutual agreement between the law firm and its client, the fee rates may be increased up to five times (including five times) the standard rates." Section 2 of Appendix I "*Shanghai Government Price Guide for Legal Fees*" attached to the *Regulations* provides: "For any representation involving property matters, the fees may be set according to the amount involved in such representation in a gradual cumulative fee schedule as follows: for the portion below RMB100,000 (including RMB100,000), the fee will be 8%~12%, for fees below RMB3,000, the collection can be RMB3,000; for the portion above RMB100,000 through RMB1,000,000 (including RMB1,000,000), the fee will be 5%~7%; for the portion above RMB1,000,000 through RMB10,000,000 (including RMB10,000,000), the fee will be 3%~5%; for the portion above RMB10,000,000 through RMB100,000,000 (including RMB100,000,000), the fee will be 1%~3%; for the portion above RMB100,000,000, the fee will

be 0.5%~1%." The amount at issue in this case (including the redemption prices, default interest and asset attachment fees) total [page 20] RMB663,892,780.10; in accordance with the above gradual cumulative fee schedule, the range of the legal fees would be between RMB4,042,463 and RMB8,863,927.

Meanwhile, since this case has Hong Kong law as the governing law and concerns more than three sets of legal relationships, it is a "major, difficult and complex litigation matter" as defined in Section 1 of Appendix II "*Rules for Determination of Major, Difficult and Complex Litigation Matters in Charging Legal Fees*" attached to the *Regulations*. According to the provisions in the Regulations, applying a five-times multiplier of the standard rates, the range of the attorneys' fees will be between RMB20,213,315 and RMB44,319,635.

Considering that this case applies Hong Kong law and concerns multiple legal relationships, the difficulty and complexity are substantial, and the transaction documents at issue were almost all drafted in English and all the English documents had to be translated after the arbitration language was changed to Chinese, the workload for counsel was tremendous. Therefore, the attorneys' fees of RMB8,708,119 set forth in the engagement agreement between Claimant and Beijing Guantao Zhongmao (Shanghai) Law Firm was completely within the fee ranges as provided in Shanghai Legal Fee Regulations and was in fact at the lower end of such fee ranges, in compliance with the applicable rules.

In addition, since the Hong Kong law firm Guantao & Chow (Hong Kong) retained by Claimant for this case was a law firm established and operating under Hong Kong law,  the engagement agreement (including the provision therein about attorneys' fees) entered into between such firm and Claimant and the invoices issued by such firm should be governed by

Hong Kong law. Claimant and Guantao & Chow (Hong Kong) agreed in the engagement agreement that the legal fees would be based upon the time incurred, in compliance with the applicable rules of Hong Kong law.

[page 21]

In summary, Claimant's arbitration demands are reasonable and legal and Claimant prays for an award by the arbitral panel of all the remedies demanded by Claimant.

(iv)    Argument by Respondents.

With respect to applicability of Hong Kong law to the liability for and rates of attorneys' fees, Respondents made the following argument:

Respondents think that the governing law applicable to the issue of whether there is liability for attorneys' fees and the fee standard in this case should be consistent with the governing law applicable to this case, i.e., Hong Kong law should be consistently applied. Section 14.2(b) of the Purchase Agreement between Claimant and Respondents clearly provided that the governing law was Hong Kong law. Second Respondent petitioned in October 2017 to change the governing law to the laws of the People's Republic of China to facilitate the adjudication. In its November 2, 2107 reply, Claimant unambiguously refused to have the governing law in this case changed to the laws of the People's Republic of China and insisted on Hong Kong law as the governing law. Since the parties did not reach an agreement as to the change of the governing law, the arbitral panel decided that Hong Kong law would be the governing law in this case.

In this case, the issues of whether Respondents should be liable for expenses incurred to enforce creditor's rights such as the attorneys' fees and attachment bond premium and of whether the charge of such expenses was reasonable were the focus of the dispute between the parties, were major issues concerning the determination of the scope of Respondents' liabilities, and were the core issues. Since Claimant had repeatedly insisted on Hong Kong law as the governing law, Hong Kong law should be applied to all the liability issues and legal issues in this case, specifically, Hong Kong law should be applied in determining whether to make Respondents liable for such expenses, Hong Kong law should be applied in determining the cap on the enforcement expenses (including without limitation the attorneys' fees) [page 22] for which Respondents should be liable, Hong Kong law should be applied in determining whether the rates for the attorneys' fees Claimant is seeking from Respondents were reasonable and necessary.

Respondents separately submitted its counsel's argument as follows:

Claimant in items 2, 3 and 4 of its arbitration demand requested to order Respondents to pay default interest, pay attorneys' fees and be liable for all the costs and expenses incurred because of this case. Such demands lack support in contract or in law and are contrary to the fundamental principle of fairness and, as such, should be rejected.

First, the above arbitration demands of Claimant lack support in contract or in law and Claimant should be responsible for the adverse consequences of its failure of proof.

For Claimant to demand to hold First Respondent and Second Respondent liable for costs and expenses incurred in enforcement of creditor's rights such as default interest and attorneys' fee, Claimant must first provide evidence to prove that Claimant and Respondents had reached

an agreement regarding the responsibility for the above expenses. However, in this case, none of the Purchase Agreement, Supplementary Agreement I and Supplementary Agreement II contained any agreement of the parties to make Respondents liable for default interest and enforcement expenses (attorneys' fees, all the expenses and costs incurred because of this case, etc.) and the parties to those agreements did not reach a clear agreement regarding this.

At the arbitration hearing, Claimant requested to hold Respondents liable for such expenses pursuant to Section 10.1 "Scope of Indemnification." But the agreement in Section 10.1 had no connection with the matters requested by Claimant. The provision was: "Each Party (an 'Indemnifying Party') shall indemnify and hold the other Parties and their directors, officers and agents (collectively, the 'Indemnified Party') harmless from and against any losses, claims, damages, liabilities, judgments, fines, obligations, expenses and liabilities of any kind or nature whatsoever…" Based upon a reasonable person's [page 23] understanding of this provision, what was agreed to in Section 10.1 was that each party should be obligated to protect the other parties from losses, rather than an agreement to make a party fully liable for expenses incurred by the other parties. It is obviously improper for Claimant to wantonly deduce from the above provision Respondents' liability for the full amount of the losses and such expanded interpretation should not be made. Furthermore, the obligations applicable to the parties under that provision should be with respect to the effect and content of the executed agreement, requiring each party to indemnify the other parties from claims arising from the execution, effect or breach of the agreement, not including the claim by Claimant for Respondents to pay default interest or be liable for expenses. Moreover, even if Section 10.1 provided that each party would indemnify the other parties from losses, that section also expressly provided " excluding consequential damages, special or incidental damages, indirect damages, punitive damages, lost

profits, and diminution in value," i.e., the indemnifying party will not be liable for any consequential damage, special or incidental damage, indirect damage, punitive damage, lost profit, and diminution in value. The default interest and enforcement expenses such as attorneys' fees claimed by Claimant obviously belong to the above excluded liabilities.

The most fundamental premise for Claimant's claim of Respondents' liabilities for the above default interest and costs and expenses should be the parties having reached an agreement on default interests and enforcement expenses. Yet, as discussed above, the parties in this action did not have such an agreement, so Claimant is not entitled to demand that Respondents be held liable for the default interest and enforcement expenses such as attorneys' fees pursuant to the Purchase Agreement.

Without the parties having previously reached an agreement, there is no provision under Hong Kong law regarding a debtor's liability for default interest or enforcement expenses. Claimant as [page 24] the requesting party bears the burden to present the legal authority or case precedents in support of its demand. However, Claimant has failed to provide any so far, so Claimant should suffer the consequences of its failure of proof. Therefore, the demands by Claimant lack support in the underlying agreement or law and the arbitral panel should reject its claims.

Second, Claimant's claims for Respondents' liabilities for the default interest and expenses such as attorneys' fees have virtually increased Respondents' financial burden, in violation of the basic legal principles of justice and fairness.

The closing dates for the two convertible notes in this case were respectively July 7, 2015 and August 17, 2015. According to Section 7.2(c)(ii), the corresponding redemption dates for

these convertible notes would respectively be July 7, 2017 and August 17, 2017. Claimant submitted its arbitration application with respect to both convertible notes before the first convertible note became due, depriving Respondents an opportunity of reaction and consultation. Any party to a contract should act from goodwill. It is extremely unfair to Respondents for Claimant to directly apply for arbitration prior to the due dates for the convertible notes and to ask Respondents to pay default interest and enforcement expenses such as attorneys' fees, exploiting its advantageous position to make Respondents liable for huge amounts of extra costs. Claimant's conduct is obviously contrary to law and the arbitral panel should not support such conduct.

In addition, in this case, Claimant partook in the investment project as an investor and was already entitled to high interest. As such, Claimant should be responsible for the expenses incurred that may arising from its investment failure, rather than unjustifiably shifting the burden of all expenses to Respondents, in violation of the basic principle of proportionality between rights and obligations. At the time when the Purchase [page 25] Agreement, the supplementary agreements and other documents were entered into, Respondents, as the borrowers and guarantors, were the weak side, which already promised a high interest rate in order to obtain badly needed loans. In exchange for the capital Respondents already paid tremendous costs and bore tremendous risks. Under such circumstances, to further make Respondents liable for default interest and enforcement expenses such as attorneys' fees has further exacerbated Respondents' burden, creating extreme inequality and harm to contractual fairness and equality. The arbitral panel should provide appropriate balancing to the actual inequality between the parties to the transaction and adjust unreasonable rights and obligations and risk sharing in its adjudication, so as to achieve substantive justice.

Third, currently Claimant has not provided any effective evidence to prove expenses such as attorneys' fees and attachment bond premium, and also some of the expense amounts claimed by Claimant are obviously unreasonable.

When a party to a contract asks the other party to be responsible for enforcement expenses such as attorneys' fees, it must prove that both parties had reached an agreement with regard to such expenses and then, if there is an agreement, must also prove that such expenses have already been incurred. In this case, the parties did not have such an agreement, so Claimant has no right to claim from Respondents the enforcement expenses such as attorneys' fees. Even if we were to assume for argument's sake that Respondents were liable for expenses such as attorneys' fees, Claimant has not provided powerful evidence to prove that such expenses have indeed been incurred, not to mention that the various expenses claimed by Claimants are obviously unreasonable.

1.      Regarding the attorneys' fees, Claimant is asking Respondents to pay RMB8,708,119 in fees for Chinese attorneys and HK$400,000 in fees for Hong Kong attorneys, totaling [page 26] over RMB9,000,000. Such demand should be rejected.

(1)      At the arbitration hearing, Claimants only provided two engagement agreements, without any evidence of the actual attorneys' fees incurred. After Respondents submitted its Preliminary Defense Argument on December 4, 2017 which disputed the incurrence of the fees, Claimant submitted the following supplemental evidence to prove the amounts of the attorneys' fees prior to the commencement of the arbitration hearing: an invoice for attorneys' fees in the amount of RMB8,708,119 issued on December 5, 2017 by Beijing Guantao Zhongmao (Shanghai) Law Firm engaged by Claimant; a billing statement of the hours incurred by

attorneys issued by Guantao & Chow (Hong Kong) on November 29, 2017; a statement in the amount of RMB180,000 issued on December 5, 2017; payment receipts for Claimant's payments of RMB180,000 and RMB2,100,000 to Beijing Guantao Zhongmao (Shanghai) Law Firm. Respondents' counsel thinks that the above evidence is obviously insufficient proof and fails to prove that the high amounts of attorneys' fees have already been incurred.

First, since the legal fee invoice issued by Beijing Guantao Zhongmao (Shanghai) Law Firm, the service fee statement issued by the Hong Kong attorneys and the confirmations of payments made by Claimant were all prepared after Respondents had submitted their preliminary rebuttals, counsel has reasons to believe that the issuance of such evidentiary documents was intended to claim huge fees from Respondents and were not based upon facts. Second, the Bank of China confirmations for domestic payments can only prove that Claimant made two payments to Beijing Guantao Zhongmao (Shanghai) Law Firm, but not these expenses had been incurred because of this case. Furthermore, it is a common practice of the industry for law firms to issue receipts prior to payments by their clients, so the receipt for RMB8,708,119 in legal fees cannot prove that such fees have already been incurred.

[page 27]

(2)     The attorneys' fees claimed by Claimant are obviously too high and, as such, should be rejected by the arbitral panel. As agreed between Claimant and Respondents, this case is governed by the laws of Hong Kong, so in determining whether Respondents should be liable for attorneys' fees, in determining the cap on the attorneys' fees for which Respondents should be liable, and in determining whether the attorneys' fees claimed by Claimant are reasonable, the arbitral panel should apply the laws of Hong Kong. According to Hong Kong case precedents

Exhibit 2

and industry practice for charging legal fees, Hong Kong lawyers charge fees based upon the hours worked, regardless of the amount in controversy, and definitely not as a percentage thereof. Since this case is governed by Hong Kong law, the amount of attorneys' fees for which Respondents should be liable should be subject to Hong Kong's legal fee charging practice and be determined in accordance with the average legal fee rates in Hong Kong. As the attorneys' fees in the amount of RMB8,708,119 claimed by Claimant were calculated as a higher percentage of the amount in controversy in accordance with the Shanghai Government Guideline for Legal Fees, they should be rejected by the arbitral panel.

Section 2 of Article 52 of the Arbitration Rules provides, "In deciding whether or not the winning party's expenses incurred in pursuing the case are reasonable, the arbitral tribunal shall take into consideration various factors such as the outcome and complexity of the case, the workload of the winning party and/or its representative(s), the amount in dispute, etc."  In this case, the legal relationships are relatively simple without much controversy and the actual workload of the attorneys has been relatively small. Considering the overall case, based upon the above provision, the arbitral panel should reject Claimant's demand to make Respondents liable for an exorbitant amount of attorneys' fees.

2.      With regard to the premium for the asset attachment bond, Claimant is asking Respondents to pay RMB5,000 in court attachment fee and over [page 28] RMB970,000 in third party bond premium. Such demand should be rejected.

Section 100(2) of the *Civil Procedures of the People's Republic of China* provides, "In adopting asset attachment measures, a People's Court may order the applicant to provide a bond; if the applicant is unable to provide a bond, the application shall be dismissed." According to this

Exhibit 2

-82-

provision, when Claimant applied to the court for asset attachment, it was enforcing its litigation right, so providing a bond as required by the court was an obligation it had to perform. After submitting its application for attachment, Claimant paid the People's Court RMB5,000 as attachment fee under the law and now is asking Respondent to be liable for such fee. At the same time Claimant is also asking Respondent to be liable for the RMB970,000 in premium paid to an insurer to issue the bond. Such demand is obviously improper.

(1)    As Claimant and Respondents did not reach an agreement as to liabilities for bond premiums, Respondents should not be liable for such.

(2)    The bond premium of over RMB970,000 paid to a third-party insurer was not required by law. The payment had no necessary connection with this case or Respondents. Such premium was not absolutely necessary or mandatory and, as such, should never become Respondents' responsibility. When Claimant applied for attachment, it was required to post a bond, rather than having a third-party insurer issue a bond. Rule 4 of *Beijing People's High Court Rules on Asset Attachment (Provisional)* clearly provides: "In applying for attachment, the applicant may provide the following bonds: (A) an -in-kind bond or cash bond provided by the applicant; (B) a credit bond, in-kind bond or cash bond provided by a third party; (C) a credit bond issued by a professional bond company." Accordingly, the kinds of bonds acceptable to the court are [page 29] multiple, a bond issued by a third-party insurer is not the only method, and Claimant could absolutely have adopted other methods in posting the attachment bond. For its own reasons Claimant elected to have a third-party insurer issue a bond. Under such circumstances, Claimant should naturally be responsible for the fees incurred. Even if the parties had reached an agreement about the Debtor's liability for enforcement expenses, Respondents should only be liable for the absolutely necessary expenses incurred in enforcement, rather than

being held liable for the expenses squandered by Claimant. The parties in this case had not reached an agreement as to the liabilities for expenses and definitely should not be liable for the extra, unnecessary bond premium claimed by Claimant.

(v)     Evidence Presentation and -Examination by the Parties.

Together with its arbitration application (in English), Claimant also submitted 12 pieces of documentary evidence, including Exhibit 1: Convertible Note Purchase Agreement (in English), Exhibit 2: Convertible Note I (in English), Exhibit 3 Supplementary Agreement I (in English), Exhibit 4: Deed of Undertakings and Guarantees I (in Chinese); Exhibit 5: Application for Remittance I (in both Chinese and English), Exhibit 6: Supplementary Agreement II (in English), Exhibit 7: Deed of Undertakings and Guarantees II (in Chinese), Exhibit 8: Application for Remittance II (in both Chinese and English), Exhibit 9: Redemption Notices (one in Chinese and one in English, two documents in total), Exhibit 10: Lawyers Letters (in both Chinese and English, three documents in total) and Delivery Vouchers (in both Chinese and English, two documents in total), Exhibit 11: Deed of Assignment, Exhibit 12: Engagement Agreements (one in both Chinese and English, one in English, two documents in total).

[page 30]

After the arbitration language was changed to Chinese, Claimant submitted seven pieces of documentary evidence (in Chinese), including Exhibit 1: Convertible Note Purchase Agreement, Exhibit 2: Convertible Note (i.e., Convertible Note I), Exhibit 3: Supplementary Agreement (i.e., Supplementary Agreement I), Exhibit 5: Assignment Agreement, Exhibit 6: invoices and receipts issued of Beijing Guantao Zhongmao (Shanghai) Law Firm, Exhibit 7: invoices and payment confirmations of Guantao & Chow (Hong Kong. During the arbitration

Exhibit 2

-84-

hearing, Respondents conducted their examination of the above seven pieces of evidence (in Chinese).

After the arbitration hearing was concluded, Claimant submitted to the arbitral panel seven pieces of supplemental evidence (in Chinese), including Exhibit 1: Hong Kong Legal Opinion (including attachments), Exhibit 2: proof of the U.S. dollar cash selling rates published by the People's Bank of China, Exhibit 3: short-term loan benchmark interest rates, Exhibit 4: notice of the Third Intermediate People's Court of Beijing for payment of asset attachment fees and payment receipt, Exhibit 5:  policy for asset attachment bond, invoice and payment receipt issued by Huaan Property Insurance Co., Ltd., Exhibit 6: receipts for payments of legal fees of Beijing Guantao Zhongmao (Shanghai) Law Firm, Exhibit 7: invoices and payment receipts of Guantao & Chow (Hong Kong).  Respondents conducted their examination of the above seven pieces of supplemental evidence.

Respondents did not submit any documentary evidence to the arbitral panel.

## II. OPINION OF THE ARBITRAL PANEL

In accordance with the provisions of applicable law and judicial interpretations, based upon the facts of this case, the application, rebuttals, evidence and evidentiary examination submitted by the parties on both sides, the arbitral panel issues the following opinion:

[page 31]

(i)    The Governing Law for This Dispute

In accordance with the provision in Rule 1 of *Interpretation by the Supreme People's Court of Certain Issues in Applying the Law of the People's Republic of China on Governing Laws in Foreign-related Civil Matters (1)*, "Any civil matter having any of the following circumstances may be deemed by the People's Court as a foreign-related civil matter: (A) either or both of the parties are foreign citizens, foreign legal persons, other entities or stateless persons; (B) the permanent residency of either or both of the parties is outside the People's Republic of China; (C) the property in controversy is outside the People's Republic of China; (D) the legal facts giving rise to, changing or extinguishing the  civil matter occurred outside the People's Republic of China; (E) any other circumstance that may be determined as a foreign-related civil matter." In this case, although all the parties are Chinese natural persons or legal persons and maintain permanent residency in China, the issuance and purchase of the convertible notes all occurred outside mainland China, meeting the criterion that "the legal facts giving rise to, changing or eliminating civil matters occurred outside the People's Republic of China." Therefore, this case has foreign-related elements.

In accordance with the provision in Rule 41 of the *Law on Governing Laws in Foreign-related Civil Matter*s, "the parties may select the governing law through contract. Where the parties have not made such selection, the governing law shall be the law of the permanent residency of the party whose performance of obligations can best epitomize the contract or other law that is most closely associated with the contract. In this case, pursuant to Section 1 of the letters of guarantee (Guarantee I and Guarantee II), "the guarantors hereby provide an irrevocable joint liability guarantee for the cross-border repayment obligations of the Target Company, and once [page 32] such repayment obligation becomes due, [Claimant] shall be entitled to directly demand the guarantors to perform their cross-border repayment obligations

Exhibit 2

and the guarantors shall at that time perform cross-border repayment obligations on behalf of the target company in accordance with [Claimant's] demand." Accordingly, Claimant's claims against Respondents are specifically based upon these two Letters of Guarantee. Section 5 in both Letter of Guarantee I and Letter of Guarantee II provided: "This letter shall be governed by and interpreted in accordance with the laws of Hong Kong." Therefore, Claimant and Respondents have expressly agreed to Hong Kong law as the governing law for this dispute. In the Opinion on Changing the Governing Law to the Laws of the People's Republic of China they submitted, Respondents requested to have the governing law of this case changed to the laws of mainland China, but Claimant expressly refused any change of the governing law in the Reply Letter on Change of the Governing Law it submitted. Therefore, the laws of Hong Kong should be the governing law for the substantive dispute in this case.

  (ii)  The Effectiveness of the Underlying Agreements of This Case.

    With regard to the effectiveness of the underlying agreements of this case, Convertible Note Purchase Agreement, Supplementary Agreement I, Supplementary Agreement II, Letter of Guarantee I, Letter of Guarantee II and Deed of Assignment, neither Claimant nor Respondents have raised any objection. Moreover, according to Rule 10 of the *Law on Governing Laws in Foreign-related Civil Matters*, "The foreign governing law for any foreign-related civil matter shall be ascertained by the People's Court, arbitration institution or administrative body. Where the parties have selected a foreign governing law, the law of such country must be provided. Where the foreign law cannot be ascertained or the foreign law has no applicable provision, the laws of the People's Republic of China shall govern." In this case, while the parties have agreed to Hong Kong law as the governing law for this substantive dispute, neither side has provided the arbitral panel with the applicable provisions under Hong Kong law with respect to the

Exhibit 2

-87-

effectiveness of the above agreements, which should therefore be ascertained under the laws of mainland China. The arbitral panel holds that the above agreements [page 33] have embodied the actual intentions of the parties, do not violate any mandatory provision of Chinese law or administrative regulations, do not become void under Rule 52 of the Contract Law of the People's Republic of China, and therefore should be deemed effective.

(iii)    Claimant's Demands.

1.    About Claimant's first arbitration demand.

Claimant demands that Respondents pay the redemption prices for the convertible bonds involved in this dispute and interest totaling RMB648,311,950. In the Explanation of Arbitration Demands it submitted, Claimant changed the exact amount of this arbitration demand to RMB648,284,650, which change was a voluntary adjustment of its claims by Claimant and is hereby accepted by the arbitral panel.

2.    About Claimant's second arbitration demand.

Claimant demands that Respondents be jointly liable for default interest on the redemption price for Convertible Note I based upon the current benchmark interest rate of 4.35% for short-term (one year, including one year) loans published by the People's Bank of China, with the computation period commencing on July 7, 2017 (the redemption date for Convertible Note I) and ending provisionally on January 15, 2018, amounting to RMB13,881,144.13; that Respondents be jointly liable for default interest on the redemption price for Convertible Note II based upon the current benchmark interest rate of 4.35% for short-term (one year, including one year) loans published by the People's Bank of China, with the computation period commencing on August 17, 2017 (the redemption date for Convertible Note II) and ending provisionally on

January 15, 2018, amounting to [page 34] RMB749,518.04; the two items provisionally totaling RMB14,630,662.17.

With respect to Convertible Note I, section 7.2(c)(iii) provided, "The Investor upon exercise of its redemption right shall have the right to redeem the Convertible Note at the Redemption Price, which is calculated as the total outstanding principal amount with respect to the Convertible Note, plus any accrued and unpaid interest at 15% per annum calculated by using the then outstanding principal amount multiplied by actual number of days elapsed since the Completion date divided by 365 days; the payment is to be made by cash, and the Investor may request for the cash payment to come from the Owner or other companies and institutions designated or owned by the Owner." With respect to Convertible Note II, section 1 of Supplementary Agreement II provided that the provision in section 7.2(c)(iii) of the Purchase Agreement shall equally apply to the redemption of Convertible Note II. The 15% interest rate in the above provisions are for the interest on Convertible Note I and Convertible Note II and is not for the agreed default interest rate for payments made past the redemption dates, which should in its computation use the redemption price for each convertible note (i.e., the principal plus interest accrued at the 15% annual interest rate) as the principal amounts.

Therefore, with respect to this arbitration demand the key issue is, where the parties have not agreed on any default interest, whether Respondents should be liable to Claimant for such interest or how such interest should be calculated. As discussed above, the law governing the substantive dispute in this case is Hong Kong law. The issue whether Respondents should be liable to Claimant for any interest arising from the delay in redeeming Convertible Note I and Convertible Note II and the calculation of such interest is a part of the substantive dispute of this case and, therefore, should be determined under Hong Kong law.

According to Rule 10(1) of the *Law on Governing Laws in Foreign-related Civil Matters*, []age 35] where the parties have selected a foreign governing law, the law of such country must be provided. Based upon the Hong Kong Legal Opinion, with respect to whether interest should be paid or how interest should be calculated, the arbitral panel has confirmed that there are applicable provisions under Hong Kong law as follows:

Section 79 of *Hong Kong Arbitration Ordinance* provides:

"(1)      Unless otherwise agreed by the parties, an arbitral tribunal may, in the arbitral proceedings before it, award simple or compound interest from the dates, at the rates, and with the rests that the tribunal considers appropriate, subject to section 80, for any period ending not later than the date of payment—

(a)      on money awarded by the tribunal in the arbitral proceedings;

(b)      on money claimed in, and outstanding at the commencement of, the arbitral proceedings but paid before the award is made; or

(c)      on costs awarded or ordered by the tribunal in the arbitral proceedings.

(2)      Subsection (1) does not affect any other power of an arbitral tribunal to award interest.

(3)      A reference in subsection (1)(a) to money awarded by the tribunal includes an amount payable in consequence of a declaratory award by the tribunal."

Section 80 of *Hong Kong Arbitration Ordinance* provides:

"(1)      Interest is payable on money awarded by an arbitral tribunal from the date [page 36] of the award at the judgment rate, except when the award otherwise provides.

(2)      Interest is payable on costs awarded or ordered by an arbitral tribunal from —

(a)      the date of the award or order on costs; or

(b)      the date on which costs ordered are directed to be paid forthwith, at the judgment rate, except when the award or order on costs otherwise provides.

(3)      In this section, 'judgment rate' (判定利率) means the rate of interest determined by the Chief Justice under section 49(1)(b) (Interest on judgments) of the High Court Ordinance."

Section 40 of *Hong Kong High Court Ordinance* provides:

"Interest on judgments

(1)      Judgment debts shall carry simple interest—

(a)      at such rate as the Court of First Instance may order; or

(b)      in the absence of such order, at such rate as may be determined from time to time by the Chief Justice by order, on the aggregate amount thereof, or on such part thereof as for the time being remains unsatisfied from the date of the judgment until satisfaction.

(2)      Interest under this section may be calculated at different rates in respect of different periods."

With respect to paragraphs 116-127 on "Applicable law on interest" in the Hong Kong Legal Opinion submitted by Claimant, Respondents raised two rebuttals in its examination

argument: First, according to subsection (2) of Section 5 ("Arbitration to which this Ordinance applies") of the *Arbitration Ordinance*, [page 37] "If the place of arbitration is outside Hong Kong, only sections 20, 21, 45, 60 and 61 and Part 10 apply to the arbitration." As this case is an arbitration conducted in mainland China, *the Arbitration Ordinance* does not apply. Second, the agreement to Hong Kong law as the governing law in this case between Claimant and Respondents should be about the substantive governing law, rather than an agreement as to the procedural law, so the *Arbitration Rules* should be applied to the arbitration adjudication procedures, arbitration proceeding, arbitration basis and arbitration procedures.

On this issue, the arbitral panel does not believe that the legal opinion of a Hong Kong barrister submitted by Claimant is of much help. First, that opinion does not provide any legal basis or authority to the effect that the issue of interest is an issue of substantive law; second, although that opinion deems interest as a substantive law issue, the law quoted therein is all Hong Kong procedural law. The arbitral panel thinks that there is a contradiction here. Especially in paragraphs 114-115 of the legal opinion, it was stated that "since interest, legal expenses and other expenses constitute a part of the performance and enforcement of the arbitration agreement, Hong Kong law applies to interest, legal expenses and other expenses." Such logic has no legal basis. When it has been expressly agreed that the *Arbitration Rules* applies to the procedures of this case, the *Arbitration Rules*, instead of *Hong Kong's Arbitration Ordinance*, should be applied to what constitutes a part of the performance and enforcement of the arbitration, including the commencement of arbitration, the formation of the arbitral panel, the arbitration proceeding and the preparation of the arbitration award.

The arbitral panel thinks that there is no impediment to the adjudication of the issue of interest in this case. For whether or not the issue of interest is deemed a substantive mater or

procedural matter, namely whether to apply [page 38] Hong Kong law or mainland China law, the result will be the same.  In the arguments and evidence presented by both sides there is no indication that neither Hong Kong law nor mainland China law permits awarding interest. Also as understood by the arbitral panel, the calculation of interest usually references the bank loan interest for the same period. Although the *Arbitration Rules* is silent about an arbitrator's power to award interest, there is no denial of an arbitrator's power to award interest either. Furthermore, this is absolutely permitted by the *Civil Procedure* applicable to mainland China, in which sits Beijing, the venue of this arbitration.

In this case, Claimant demands default interest on the overdue redemption payments accrued from the first day of the respective redemption dates through the date of actual payment at the current benchmark interest rate of 4.35% for short-term (one year, including one year) loans published by the People's Bank of China. With respect to such interest accrued from the first day of the respective redemption dates through the date of actual payment, the arbitral panel thinks that the annual interest rate of 4.35% is reasonable. As to the interest accruing from the date of this award through the actual date of payment, the annual interest rate of 4.35% claimed by Claimant is lower than the judgment rate of 8% under Hong Kong law and is a voluntary adjustment by Claimant, which the arbitral panel supports.

3.      About Claimant's third arbitration demand.

Claimant demands that Respondents be held jointly liable for the attorneys' fees incurred by Claimant because of this case, including RMB8,708,119 in fees for mainland China lawyers, and RMB767,293.30 in fees for Hong Kong lawyers, totaling RMB9,475,412.30.

Exhibit 2

In support of such arbitration demand, Claimant submitted legal fee receipts for payments to Beijing Guantao Zhongmao [page 39] (Shanghai) Law Firm and receipts for payments to Guantao & Chow (Hong Kong), which separately prove payments it has made in this case in the amounts of RMB8,708,119 for mainland China attorneys' fees and RMB767,293.30 for Hong Kong attorneys' fees. Among the receipts are those for attorneys' fee payments to Beijing Guantao Zhongmao (Shanghai) Law Firm, including four Bank of China Domestic Payment Service Payment Confirmations, with respective payments amounts of RMB2,100,000, RMB3,000,000, RMB2,600,000 and RMB1,008,119, totaling RMB8,708,119, with respective payment dates of December 18, 2017, December 25, 2017, January 4, 2018 and January 9, 2018, the payor being Claimant Shanghai Qichengyueming Investment Partnership Enterprise and the payee being Beijing Guantao Zhongmao (Shanghai) Law Firm in all instances. Respondents have not objected to the authenticity of the above evidence, which is recognized by the arbitral panel. From the information on the payment confirmations regarding the payment amounts, payment dates, the payor and the payee, it can be confirmed that such amounts were legal fees for mainland China lawyers Claimant paid for this case. The invoices and payments receipts of Guantao & Chow (Hong Kong) included invoices of Guantao & Chow (Hong Kong) for legal fees incurred by Claimant in this case as well as two bank payment confirmations (with the respective amounts of RMB767,000 and RMB293.30, totaling RMB767,293.30, both paid on January 13, 2018), which prominently contain the case number for this case and can be confirmed as for amounts of Hong Kong legal fees incurred by Claimant for this case. In sum, the arbitral panel finds that Claimant has incurred a total of RMB9,475,412.30 in attorneys' fees for this case.

As to the issue whether Respondents should be liable for the above attorneys' fees incurred by Claimant and as to the exact [page 40] amount of such liability, the arbitral panel thinks that the attorneys' fees have been incurred by Claimant for the arbitration proceeding of this case and therefore this issue does not constitute a substantive dispute in this case, but a procedural issue, to which the provisions of the *Arbitration Rules* should first apply. Section 2 of Article 52 ("Allocation of Fees") of the *Arbitration Rules* provides, "The arbitral tribunal has the power to decide in the arbitral award, having regard to the circumstances of the case, that the losing party shall compensate the winning party for the expenses reasonably incurred by it in pursuing the case. In deciding whether or not the winning party's expenses incurred in pursuing the case are reasonable, the arbitral tribunal shall take into consideration various factors such as the outcome and complexity of the case, the workload of the winning party and/or its representative(s), the amount in dispute, etc." As to the attorneys' fees incurred by Claimant in this case, considering that Respondents have not raised any objection to the first arbitration demand, the dispute in this case is not complex. Taking into account the actual workload of Claimant's counsel and the amount in controversy in this case, the arbitral panel thinks that it is more appropriate to make Respondents jointly liable for the attorneys' fees incurred by Claimant in the amount of RMB1,000,000.

4.      About Claimant's fourth arbitration demand.

Claimant demands that Respondents be held jointly liable for the attachment expenses incurred by Claimant in this case, including RMB5,000 in asset attachment fee and RMB972,467.93 in premium paid by Claimant to acquire an attachment bond with respect to Respondents' assets, totaling RMB977,467.93, in addition to the arbitration fee for this case.

With respect to the attachment fee and attachment bond premium paid by Claimant, Claimant has submitted a notice of the Third Intermediate People's Court of Beijing for payment of asset attachment fees [page 41] and payment receipt, and a policy for the asset attachment bond, invoice and payment receipt issued by Huaan Property Insurance Co., Ltd., of which notice for payment of asset attachment fees clearly states the amount as RMB5,000, the asset attachment bond policy, invoice and payment receipt clearly state the premium amount as RMB972,467.93. Respondents did not raise any objection as to the authenticity of the above evidence, which is recognized by the arbitral panel. From the information on the payor, payment date and use contained in the above evidence, it can be confirmed that such amount was the expenses incurred by Claimant for attachment of assets covered by this case.

With respect to the issue whether Respondents should be liable to Claimant for the above attachment expenses and the exact amount of the liability, the arbitral panel thinks that such expenses were incurred for the proceeding of this arbitration and as such does not constitute a substantive dispute in this case. According to section 2 of Article 52 ("Allocation of Fees") of the *Arbitration Rules* quoted above, the arbitral panel finds that such expenses and the amounts thereof claimed by Claimant have not exceeded the scope of "reasonable fees" and should be accepted by the arbitral panel.

As to the allocation of the fees incurred in connection with the arbitration of this case, considering all the circumstances of this case, the arbitral panel finds that the arbitration fees arising from this case should all be the responsibility of Respondents.

With respect to Claimant's fifth arbitration demand for other remedies, since Claimant has not clarified the exact types or amounts of such other remedies, and the arbitral panel has

already adjudicated all the substantive claims made by Claimant in this case, such arbitration demand is hereby [page 42] rejected.

To the extent that the arguments and evidence of Claimant and Respondents quoted in this arbitration award have not included all the information submitted by the parties, it does not mean that the arbitral panel did not consider such information in its adjudication or has tacitly adopted such information. The arbitral panel finds that this award has contained enough arguments and evidence of the parties to enable the arbitral panel to render this award.

## III. AWARD

Based upon its opinion above, the arbitral panel hereby makes the following award:

(1)     Respondents shall pay Claimant the redemption prices for the convertible notes at issue (including principals and interest) totaling RMB648,284,650.

(2)     Respondents shall pay Claimant default interest on RMB606,635,250 as the principal of the redemption price for Convertible Note I, accruing from July 7, 2017 through the date of actual payment, and on RMB41,649,400 as the principal of the redemption price for Convertible Note II, accruing from August 17, 2017 through the date of actual payment, at an annual interest rate of 4.35%.

(3)     Respondents shall pay Claimant attorneys' fees incurred for this case in the amount of RMB1,000,000.

(4)     Respondents shall pay Claimant asset attachment fee in the amount of RMB5,000 and the premium for asset attachment bond in the amount of RMB972,467.93.

[page 43]

108666247\V-5

Exhibit 2

(5)      The arbitration fee of RMB3,544,631 arbitration fee shall be the responsibility of Respondents. Since such arbitration fee has been fully deducted from a deposit made by Claimant with CIETAC, Respondent shall pay Claimant RMB3,544,613 as reimbursement of the arbitration fee advanced by Claimant. The special compensation for arbitrator Yang Liang-Yee appointed by Claimant is USD29,678.49, which shall all be paid by Respondents. After offsetting such expense against a deposit of USD43,000 made by Claimant, there is a remainder of USD13,321.51, which shall be returned to Claimant by CIETAC. Respondents shall pay Claimant USD29,678,49. The actual fee for arbitrator Qiang Li appointed by Respondents in the amount of RMB1,180 was Respondents' sole responsibility. After offsetting such fee against a deposit of RMB15,000 made by Respondents, there is a remainder of RMB13,820, which shall be returned to Respondents by CIETAC.

(6)      All the other demands of Claimant are rejected.

Payment of the above amounts owed to Claimant by Respondents must be completed within five days of this award.

This award is a final adjudication and shall become effective from the date it is made.

[page 44]

(No content on this page)

|  |  |
|---|---|
| Chief Arbitrator | Wang Xuehua [signature] |
| Arbitrator | Yang Liang-Yee [signature] |
| Arbitrator | Qiang Li [signature] |

CHINA INTERNATIONAL ECONOMIC AND TRADE ARBITRATION COMMISSION [seal]

May 9, 2018 in Beijing

[End]

**Abacus Consulting Services**

401 N. Garfield Ave. Ste 1, Alhambra, CA 91801 Tel: 626-487-8909  Fax: 626-282-9252
Website: http://www.certifiedchinesetranslation.com/ Email: info@certifiedchinesetranslation.com

## CERTIFICATION OF TRANSLATION
### (Certified by Courts)

This is to certify under the penalty of perjury that I am a court certified interpreter in California with license number #301138 and I am fluent in Chinese (Mandarin) and English languages, that the document(s) listed as

**CHINA INTERNATIONAL ECONOMIC AND TRADE ARBITRATION COMMISSION AWARD**

is (are) complete and accurate translations of the original written document(s) to the best of my ability and knowledge.

I certify under penalty of perjury under the Laws of the State of California that the foregoing is true and correct.

Signed on August 20, 2018 in Los Angeles, California, USA

Samuel Shen Chong
Federal Court Registered Interpreter (US District Courts)
CA Court Certified Interpreter (License No. 301138), New York Court Certified Interpreter
ATA (American Translators Association) Associate # 243264
Abacus Consulting Services
401 N. Garfield Ave.
#1
Alhambra, CA 91801, USA
Tel: 626-487-8909
Fax: 626-282-9252

Exhibit 2

**EXHIBIT 3**

**Execution Version**

# CONVERTIBLE NOTE PURCHASE AGREEMENT

among

## QC INVESTMENT LTD.

## SHANGHAI QICHENGYUEMING INVESTMENT PARTNERSHIP ENTERPRISE (LIMITED PARTNERSHIP)

## LEVIEW MOBILE LTD.,

## LE LTD.,

## YUETING JIA,

and

## LESAI MOBILE TECHNOLOGY (BEIJING) CO., LTD.,

## LEVIEW HOLDING (BEIJING) LIMITED

**Dated June 3, 2015**

Exhibit 3

-102-

## TABLE OF CONTENTS

SECTION 1 INTERPRETATION.................................................................................................................3

SECTION 2 SALE AND PURCHASE OF THE CONVERTIBLE NOTE .......................................9

SECTION 3 CONDITIONS PRECEDENT TO COMPLETION ...................................................10

SECTION 4 COMPLETION ACTIONS...............................................................................................13

SECTION 5 OBLIGATIONS OF THE COMPANY, THE OWNER AND ................................13

THE INVESTOR BETWEEN EXECUTION AND COMPLETION.............................................13

SECTION 6 REPRESENTATIONS AND WARRANTIES...............................................................14

SECTION 7 COVENANTS, UNDERTAKINGS AND AGREEMENTS.......................................15

SECTION 8 CONFIDENTIALITY; RESTRICTION ON ANNOUNCEMENTS ....................27

SECTION 9 FEES AND EXPENSES....................................................................................................28

SECTION 10 INDEMNIFICATION.....................................................................................................28

SECTION 11 TERMINATION..............................................................................................................29

SECTION 12 NOTICES..........................................................................................................................30

SECTION 13 MISCELLANEOUS ........................................................................................................30

SECTION 14 GOVERNING LAW AND DISPUTE RESOLUTION...........................................33

**SCHEDULES**

SCHEDULE 1  CONSIDERATION ALLOCATION

SCHEDULE 2  SHAREHOLDING STRUCTURE OF THE GROUP

SCHEDULE 3  COLLECTIVE WARRANTIES

SCHEDULE 4  INVESTOR WARRANTIES

**EXHIBITS**

EXHIBIT A  FORM OF CONVERTIBLE NOTE

EXHIBIT B  FORM OF SHARE MORTGAGE

EXHIBIT C  FORM OF DEED OF UNDERTAKING AND GUARANTEE

Exhibit 3

-103-

**CONVERTIBLE NOTE PURCHASE AGREEMENT** (this "Agreement") made on June 3 , 2015,
AMONG:

(1)    **LEVIEW MOBILE LTD.**, an exempted company incorporated and existing under the laws of
       the Cayman Islands with its company number 296318 and registered office at Sertus Chambers,
       P.O. Box 2547, Cassia Court, Camana Bay, Grand Cayman, Cayman Islands (the "Company");

(2)    **LE LTD.**, an exempted company incorporated and existing under the laws of the Cayman
       Islands with its company number 295848 and registered office at Sertus Chambers, P.O. Box
       2547, Cassia Court, Camana Bay, Grand Cayman, Cayman Islands (the "Cayman Co");

(3)    **YUETING JIA (贾跃亭)**, holder of PRC Identification Card Number of 14262319731215081X,
       Linfen City, Shanxi Province, PRC (the "Owner");

(4)    **LESAI MOBILE TECHNOLOGY (BEIJING) CO., LTD. (乐赛移动科技（北京）有限公
       司)**, a wholly foreign-owned enterprise organized and existing under the laws of China with its
       registered office at 16/F, Leshi Building, No. 105, Yaojiayuan Road, Chaoyang District, Beijing,
       100025, PRC (the "WFOE")

(5)    **LEVIEW HOLDING (BEIJING) LIMITED (乐视控股（北京）有限公司)**, a company
       incorporated and existing under the Laws of China with its registration no. of 110105014249493
       and its registered office at 16/F, Leshi Mansion, 105 Yaojiayuan Road, Chaoyang District,
       Beijing, 100025, PRC (the "Leview Holding");

(6)    **QC INVESTMENT LTD.**, a company incorporated and existing under the laws of the British
       Virgin Islands (the "Investor"); and

(7)    **SHANGHAI QICHENGYUEMING INVESTMENT PARTNERSHIP ENTERPRISE
       (LIMITED PARTNERSHIP)(上海奇成悦名投资合伙企业（有限合伙）)**, a company
       incorporated and existing under the Laws of China with its registered office at Room 790A,
       Level 7, Building D, No.137 Haining Road, Hongkou District, Shanghai, China. (the
       "Shanghai QC")

**RECITALS:**

(A) Upon the terms and conditions set forth in this Agreement, the Company intends to
    issue and sell to the Investor, and the Investor intends to acquire, that amount of
    certain convertible redeemable note in the form of Exhibit A (the "Convertible
    Note"), as indicated opposite the Investor's name in Schedule 1 attached hereto; and

(B) The Investor is a wholly owned subsidiary of Shanghai QC and is  used by
    Shanghai QC to hold the Convertible Note.

**AGREEMENT:**

**SECTION 1**
**INTERPRETATION**

1.1    Definitions.   In this Agreement, unless the context otherwise requires the
       following words and expressions have the following meanings:

       "Accounting Standards" means the International Financial Reporting Standards

Exhibit 3  3
-104-

(IFRS) or the Accounting Principles Generally Accepted in China (Chinese GAAP) adopted by the Company and applied on a consistent basis.

"Affiliate" of a Person (the "Subject Person") means (a) in the case of a Person other than a natural person, any other Person that directly or indirectly Controls, is Controlled by or is under common Control with the Subject Person and (b) in the case of a natural person, any other Person that directly or indirectly is Controlled by the Subject Person or is a Relative of the Subject Person. In the case of an Investor, the term "Affiliate" includes (v) any shareholder of the Investor, (w) any of such shareholder's general partners or limited partners, (x) the fund manager managing such shareholder (and general partners, limited partners and officers thereof) and (y) trusts controlled by or for the benefit of any such individuals referred to in (v), (w) or (x).

"Basic Documents" means this Agreement, the Convertible Note, the Company Charter Documents and the Onshore Contracts.

"Big Four Accounting Firms" means Deloitte Touche Tohmatsu Limited, PricewaterhouseCoopers, Ernst & Young Global Limited and Klynveld Peat Marwick Goerdeler.

"Board" means the board of directors of the Company or Cayman Co as from time to time constituted.

"Business Day" means any day other than a Saturday, Sunday or other day on which commercial banks in the PRC, HKSAR or Cayman Islands are required or authorized by law or executive order to be closed or on which a tropical cyclone warning no. 8 or above or a "black" rainstorm warning signal is hoisted in HKSAR at any time between 9:00 a.m. and 5:00 p.m. Hong Kong time.

"BVI Co" means Lele Holding Ltd., a business company incorporated and existing under the laws of the British Virgin Islands with its company number 1859050 and registered office at P.O. Box 905, Quastisky Building, Road Town, British Virgin Islands.

"China" or the "PRC" means the People's Republic of China and for the purpose of this Agreement shall exclude HKSAR, Taiwan and the Macau Special Administrative Region.

"Collective Warranties" means the representations, warranties and undertakings of the Company and the Owner set forth in Schedule 3.

"Company Account" means a bank account opened by the Company outside of HKSAR with a bank approved by the Investor and having a mandate requiring the signatures of both a representative of the Investor and the Company to withdraw, transfer or pay any funds from such account.

"Company Charter Documents" means the Memorandum of Association and Articles of Association of the Company.

"Completion Date" means the date on which the closing of the purchase of the Convertible Note occurs as contemplated under Section 2.1.

"Control" of a Person means (a) ownership of more than 50% of the shares in issue or other equity interests or registered capital of such Person or (b) the power to direct the management or policies of such Person, whether through the ownership of more than 50% of the voting power of such Person, through the power to appoint a majority of the members of the board of directors or similar governing body of such Person, through contractual arrangements or otherwise.

"Encumbrance" means (a) any mortgage, charge (whether fixed or floating), pledge, lien (other than lien created by operation of law), hypothecation, assignment, deed of trust, title retention, security interest or other encumbrance of any kind securing, or conferring any priority of payment in respect of, any obligation of any Person, including any right granted by a transaction which, in legal terms, is not the granting of security but which has an economic or financial effect similar to the granting of security under applicable law, and (b) any proxy, power of attorney, voting trust agreement, interest, option, right of first offer, negotiation or refusal or transfer restriction in favor of any Person.

"Equity Securities" means, with respect to any Person, such Person's capital stock, membership interests, partnership interests, registered capital, joint venture or other ownership interests or any options, warrants or other securities that are directly or indirectly convertible into, or exercisable or exchangeable for, such capital stock, membership interests, partnership interests, registered capital or joint venture or other ownership interest.

"Existing Business" means the business of researching, designing, developing, manufacturing, selling and marketing of mobile phones and other personal devices, as well as other related internet or mobile internet business.

"Governmental Authority" means any nation or government or any province or state or any other political subdivision thereof; any entity, authority or body exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government, including any government authority, agency, department, board, commission or instrumentality or any political subdivision thereof, any court, tribunal or arbitrator, the governing body of any securities exchange and any other self-regulatory organization.

"Group" means collectively the BVI Co, the Cayman Co, the Company, the HK Co, the WFOE, the Onshore Companies and any other Person in which the BVI Co, the Cayman Co, the Company, the HK Co or the WFOE directly or indirectly owns a majority interest and "Group Member" means any of them.

"HK Co" means Leview Mobile HK Limited, a limited company incorporated and existing under the laws of HKSAR with its company number 2205943 and registered office at RM 504, 5/F Valley Centre, No. 80-82 Morrison Hill Road, Wanchai, HKSAR.

Exhibit 3    5
-106-

"HKSAR" means the Hong Kong Special Administrative Region of the PRC.

"Intellectual Property" means (a) patents and patent applications, (b) trademarks, service marks, trade names, trade dress and domain names, together with the goodwill associated exclusively therewith, (c) copyrights, including copyrights in computer software, (d) confidential and proprietary information, including trade secrets and know-how, and (e) registrations and applications for registration of the foregoing, in each case, relating to the business of researching, designing, developing, manufacturing, selling or marketing mobile phones and other personal devices, as well as other related internet or mobile internet business.

"Investor Director" means the Director nominated and appointed by the Investor to the Board.

"Investor Warranties" means the representations, warranties and undertakings of the Investor set forth in Schedule 4.

"Leview Holding" means Leview Holding (Beijing) Limited Company (乐视控股（北京）有限公司), a company incorporated and existing under the Laws of PRC with its registered number being 11010501429493."Lefeng Mobile" means Lefeng Mobile Technology (Beijing) Co., Ltd. (乐风移动科技（北京）有限公司), a company incorporated under the laws of the PRC with its registered office at Room 1109, 10/F, No. 3 Building, 105 Yaojiayuan Road, Chaoyang District, Beijing, 100025, PRC.

"Maturity Date" means the third-year anniversary of the Completion Date or the two years anniversary of the Completion Date, which is subject to the sole discretion of the Investor.

"Mortgaged Shares" means (i) 7,500 Ordinary Shares or the Pro Rata Ordinary Shares (whichever is higher) of the Company; "Pro Rata Ordinary Shares" in this definition is the ratio of (a) the Principal Amount; to (b) the total paid-in convertible bond(note) investment amount in this round of convertible bond financing; and (ii) any shares acquired in respect of Mortgaged Shares by reason of a stock split, stock dividend, reclassification or otherwise.

"Onshore Companies" means Beijing Pala Culture & Media Co., Ltd. (北京百乐文化传媒有限公司), Lefeng Mobile Technology (Beijing) Co., Ltd. (乐风移动科技（北京）有限公司) and Leview Mobile & Intelligent Information Technology (Beijing) Co., Ltd. (乐视移动智能信息技术（北京）有限公司), which incorporated under the laws of the PRC, and "Onshore Company" means any of them.

"Onshore Contracts" means agreements entered into between WFOE, Lefeng Mobile, the Owner or any of their Affiliates, prior to or simultaneously with the Completion Date, including an exclusive consulting and services agreement, an exclusive call option agreement, an equity pledge agreement, a voting right proxy agreement and a business operation agreement, each in the form and the

Exhibit 3    6
-107-

substance reasonably satisfactory to the Investor.

"Qualified Financing" means the first issue of preferred shares or equity-linked convertible debt securities of the Company or another company contemplated under the Basic Documents after the Completion date but on or before the Maturity Date to institutional investors (other than the Investor) on terms and conditions that would be reasonably acceptable to prudent, sophisticated investors in light of the circumstances, or any other issuance of equity securities of the Company after Completion date.

"Ordinary Shares" means the ordinary shares having a par value of US$0.0001 per share in the capital of the Company.

"Party" or "Parties" means any signatory or the signatories to this Agreement and any Person who subsequently becomes a party to this Agreement pursuant to the terms and conditions hereof.

"Person" means any natural person, firm, company, governmental authority, joint venture, partnership, association or other entity (whether or not having separate legal personality).

"Related Party" means (a) any shareholder of any Group Member, (b) any director of any Group Member, (c) any officer of any Group Member, (d) any Relative of a shareholder, director or officer of any Group Member, (e) any Person in which any Group Member, any shareholder, director or officer of any Group Member has any interest other than a passive shareholding of less than five percent in a publicly listed company, or over which a Related Party exercises Control or significant influence through contractual arrangements, voting, management or directorship position or ownership, and (f) any other Affiliate of any Group Member.

"Relative" of a natural person means the spouse of such person, and any parent, grandparent, child, grandchild, sibling, uncle, aunt, nephew, or niece of such person or such person's spouse.

"Restructuring" means the restructuring the result of which (i) is the corporate structure set forth in Schedule 2A hereof as of the date of this Agreement and as of the Completion Date respectively; and (ii) will be the corporate structure set forth in Schedule 2B hereof within the timeframe after the Completion Date agreed upon by the Investor, the Owner and the Company in this Agreement.

"RMB" means the renminbi yuan, the lawful currency of the PRC.

"Share Mortgage" means the share mortgage agreement to be entered into by and between Cayman Co and the Investor within 30 days following the Completion Date, pursuant to which the Mortgaged Shares shall be mortgaged to the Investor for the benefit of the Investor to secure the payment and other obligations of the Company under the Convertible Note.

"Tax" or "Taxes" means all forms of taxation, estate, duties, deductions,

withholdings, duties, imposts, levies, fees, charges, social security contributions and rates imposed, levied, collected, withheld or assessed by any local, municipal, regional, urban, governmental, state, national or other body in the PRC or elsewhere having competent jurisdiction and any interest, additional taxation, penalty, surcharge or fine in connection therewith.

"US$" means United States Dollars, the lawful currency of the United States of America.

"Warranties" means the Collective Warranties and the Investor Warranties.

1.2     Terms Defined Elsewhere in this Agreement.  The following terms are defined in this Agreement as follows:

| Term | Section |
|---|---|
| "Agreement" | Preamble |
| "Company" | Preamble |
| "Completion" | Section 2.1 |
| "Compliance Certificate" | Section 3.1(d) |
| "Confidential Information" | Section 8.1 |
| "Consideration" | Section 2.1 |
| "Convertible Note" | Recitals |
| "Disposed Shares" | Section 7.5(a) |
| "Disposition" | Section 7.5(a) |
| "Disposition Notice" | Section 7.5(a) |
| "Dispute" | Section 14.2 |
| "Election Period" | Section 7.4(d) |
| "Financing Terms" | Section 8.1 |
| "HKIAC" | Section 14.2 |
| "Indemnified Party" | Section 10.1 |
| "Indemnifying Party" | Section 10.1 |
| "Investor" | Preamble |
| "Losses" | Section 10.1 |
| "New Securities" | Section 7.4(a) |
| "Observer" | Section 7.7(b) |
| "Owner" | Preamble |
| "Preemptive Right" | Section 7.4(a) |
| "Pro Rata Share" | Section 7.4(b) |
| "Representatives" | Section 8.1 |
| "Tag-along Right" | Section 7.5(b) |
| "Tag-along Shares" | Section 7.5(b) |
| "Undertaking" | Section 3.1(b) |
| "WFOE" | Preamble |

1.3     Interpretation.

(a)     Directly or Indirectly.  The phrase "directly or indirectly" means directly, or indirectly through one or more intermediate Persons or through contractual or other arrangements, and "direct or indirect" has the correlative meaning.

(b)     Gender and Number.  Unless the context otherwise requires, all words (whether gender-specific or gender neutral) shall be deemed to include each of the masculine, feminine and neuter genders, and words importing the singular include the plural and vice versa.

each of the masculine, feminine and neuter genders, and words importing the singular include the plural and vice versa.

(c)     Headings. Headings are included for convenience only and shall not affect the construction of any provision of this Agreement.

(d)     Include not Limiting. "Include," "including," "are inclusive of" and similar expressions are not expressions of limitation and shall be construed as if followed by the words "without limitation."

(e)     Law. References to "law" shall include all applicable laws, regulations, rules and orders of any Governmental Authority, securities exchange or other self-regulating body, any common or customary law, constitution, code, ordinance, statute or other legislative measure and any regulation, rule, treaty, order, decree or judgment; and "lawful" shall be construed accordingly.

(f)     References to Documents. References to this Agreement include the Schedules and Exhibits, which form an integral part hereof. A reference to any Section, Schedule or Exhibit is, unless otherwise specified, to such Section of, or Schedule or Exhibit to this Agreement. The words "hereof," "hereunder" and "hereto," and words of like import, unless the context requires otherwise, refer to this Agreement as a whole and not to any particular Section hereof or Schedule or Exhibit hereto. A reference to any document (including this Agreement) is to that document as amended, consolidated, supplemented, novated or replaced from time to time.

(g)     Time. If a period of time is specified and dates from a given day or the day of a given act or event, such period shall be calculated exclusive of that day.

(h)     Writing. References to writing and written include any mode of reproducing words in a legible and non-transitory form including emails and faxes.

(i)     Language. This Agreement is drawn up in the English language. If this Agreement is translated into any language other than English, the English language text shall prevail.

Notwithstanding the above, Exhibit C FORM OF DEED OF UNDERTAKING AND GUARANTEE is prepared in the Chinese language only. If Exhibit C is translated into any language other than Chinese, the Chinese language text shall prevail.

## SECTION 2
### SALE AND PURCHASE OF THE CONVERTIBLE NOTE

2.1     Sale and Purchase. Upon the terms and subject to the applicable conditions of this Agreement, the Company shall issue and sell to the Investor, and the

Exhibit 3   9
-110-

Investor shall purchase from the Company, a Convertible Note in the principal amount as indicated opposite the Investor's name in <u>Schedule 1</u> attached hereto (the "<u>Consideration</u>") on the Completion Date (the "<u>Completion</u>").

2.2     <u>Consideration</u>. Subject to fulfillment of all the conditions precedent set forth in Section 3.1 (other than those conditions precedent that by their terms cannot be fulfilled until the Completion), Section 9 and the other terms and conditions of this Agreement, the Investor shall pay a Consideration payable at Completion, by means of wire transfer of immediately available funds to the Company Account.

2.3     <u>Use of Proceeds</u>. The Company shall use the Consideration received from the Investor on the Completion Date to fund (a) the expansion of the business of the Company in accordance with the business plan approved by the Board, including the consent of the Investor Director, and (b) other uses approved by the Board, including the consent of the Investor Director.

## SECTION 3
## CONDITIONS PRECEDENT TO COMPLETION

3.1     <u>Conditions Precedent to Obligations of Investor at Completion</u>. The obligation of the Investor to complete the purchase of the Convertible Note at the Completion is subject to the fulfillment, prior to or simultaneously with the Completion, of the following conditions, any one or more of which may be waived by the Investor in writing, *provided* that if any of the following conditions is waived by the Investor on or before the Completion, the Company, the Owner and the WFOE shall cause such conditions to be fulfilled promptly after the Completion if requested by the Investor in writing:

(a)     the Collective Warranties remaining true and correct in all material respects on the Completion Date as provided in Section 6.5, except for those representations and warranties that already contain any materiality qualification, which representations and warranties, to the extent already so qualified, shall instead be true and correct in all respects as so qualified as of the Completion Date;

(b)     each of the Group Members, the Onshore Companies and the Owner having performed and complied in all material respects with all of its agreements and obligations contained in the Basic Documents to which it is a party that are required to be performed or complied with by it on or before the Completion;

(c)     the Investor having completed its business, legal and financial due diligence review of the Company and its subsidiaries and the results of that review shall be satisfactory to the Investor.

(d)     each of the Group Members and the Onshore Companies having duly attended to and carried out all corporate procedures that are required under the laws of its place of incorporation or establishment to effect its execution, delivery and performance of the Basic Documents to which it

is a party, and the transactions contemplated hereby and thereby, and having provided complete and correct copies of all resolutions (and all attachments thereto) described below to the Investor (certified by the Compliance Certificate to be true, complete and correct copies as of the Completion Date) which corporate procedures shall include without limitation:

(i)    approval by the Board and the shareholders of the Company, each to the extent required by the applicable law and Company Charter Documents, of the following:

    (1)    the authorization and issuance to the Investor of a Convertible Note in a principal amount equal to the Consideration; and

    (2)    the execution, delivery and performance by the Company of each Basic Document to which it is a party, and all the transactions contemplated by such Basic Documents;

(ii)    approval by the boards of directors and, if required, the shareholders of each other Group Member and the Onshore Companies, to the extent required by the applicable law and the constitutional documents of the relevant entity, of the execution, delivery and performance by such entity, of each Basic Document to which it is a party, and all the transactions contemplated by such Basic Documents to which it is a party.

(e)    all consents and approvals of, notices to and filings or registrations with any Governmental Authority or any other Person required to consummate the transactions contemplated under this Agreement and the other Basic Documents (to the extent that such transactions are to be completed on or prior to the Completion Date), shall have been obtained or made (including all required approvals for the Restructuring and all required approvals and registration of the establishment of the WFOE and the Deed of Undertaking and Guarantee (the "Undertaking") by the Owner and Leview Holding as well as the direct or indirect ownership by any PRC residents of an interest in the Company including registrations pursuant to the Notice on Relevant Issues Concerning Foreign Exchange Control on Domestic Residents' Corporate Financing and Roundtrip Investment through Offshore Special Purpose Vehicles issued by State Administration of Foreign Exchange on July 4, 2014 and any subsequent similar rules, amendments or supplements of the PRC) and copies thereof having been provided to the Investor;

(f)    there being no Governmental Authority or other Person that has:

(i)    instituted or threatened in writing any legal, arbitral or administrative proceedings against the Owner, any Group Member, or the Onshore Companies to restrain, prohibit or otherwise challenge the purchase of the Convertible Note by the

Exhibit 3  11

-112-

Investor and the mortgage of the Mortgaged Shares to the Investor or any of the other transactions contemplated under the Basic Documents (including without limitation, the Restructuring); or

(ii) proposed or enacted any statute or regulation which would prohibit, materially restrict or materially delay implementation of the transactions contemplated under the Basic Documents (including without limitation, the Restructuring), or the operation of the Group as a whole after the Completion as contemplated in the Basic Documents;

(g) the Owner, the WFOE and the relevant Onshore Companies having entered into the Onshore Contracts to which it/he/she is a party, each in form and substance reasonably satisfactory to the Investor;

(h) the Company having delivered to the Investor a certificate, dated the Completion Date and signed by an authorized signatory of the Company (the "Compliance Certificate"), certifying that the conditions set forth in this Section 3.1 to be satisfied by the Group Members, have been satisfied;

(i) Leview Holding and the Owner shall collectively deliver to the Investor an executed the Undertaking substantially consistent with the form attached as Exhibit C hereof, to secure the payment and other obligations of the Company to the Investor and Shanghai QC under the Convertible Note and the Basic Documents; and

(j) the Investor having received (i) a legal opinion from Walkers, the Cayman Islands counsel of the Company, and (ii) a legal opinion from King & Wood Mallesons, the PRC counsel of the Company, in each case, dated as of the Completion Date and in the form and substance satisfactory to the Investor.

3.2 Conditions Precedent to Obligations of Company at Completion. The Company's obligation to complete the allotment and issuance of the Convertible Note at the Completion is subject to the fulfillment, prior to or simultaneously with the Completion, of the following conditions, any one or more of which may be waived by the Company:

(a) the Investor Warranties remaining true and correct in all material respects on the Completion Date as provided in Section 6.5, except for those representations and warranties that already contain any materiality qualification, which representations and warranties, to the extent already so qualified, shall instead be true and correct in all respects as so qualified as of the Completion Date;

(b) the Investor having performed and complied in all material respects with all of its agreements and obligations contained in this Agreement and the other Basic Documents to which it is a party that are required to be

performed or complied with by it on or before the Completion;

(c)    the Investor having duly attended to and carried out all corporate procedures that are required under the laws of its place of incorporation or establishment to effect its execution, delivery and performance of this Agreement and the other Basic Documents to which it is a party, and the transactions contemplated hereby and thereby; and

(d)    each of the Basic Documents to which an Investor is a party having been executed by the Investor and delivered to the Company.

## SECTION 4
## COMPLETION ACTIONS

4.1    Time and Place of Completion.  The Completion ("Completion Date") shall take place at 4:00 p.m. Beijing time on the third Business Day after all the conditions precedent set forth in Sections 3.1 and 3.2 (other than those conditions precedent that by their terms cannot be fulfilled until the Completion) are satisfied or waived or, at such other time and place as the Parties may agree.

4.2    Actions at Completion.  At the Completion,

(a)    the Company shall deliver to the Investor a duly executed Convertible Note registered in the name of the Investor in a principal amount equal to the Consideration, payable to the order of the Investor ;

(b)    the Company shall deliver to the Investor (i) a certified copy of the board resolutions of the Company approving and authorising the execution and performance of this Agreement and all the transactions contemplated in this Agreement; and (ii) evidence reasonably satisfactory to the Investor that all the Conditions Precedent set out in Section 3.1 have been fulfilled;

(c)    the Investor shall deliver to the Company (i) a certified copy of the board resolutions of the Investor approving and authorising the execution and performance of this Agreement and its purchase of the Convertible Note; and

(d)    subject to fulfillment of all the conditions precedent set forth in Section 3.1 (other than those conditions precedent that by their terms cannot be fulfilled until the Completion) and Section 9.1, the Investor shall pay the Consideration by wire transfer of immediately available funds to the Company Account.

## SECTION 5
## OBLIGATIONS OF THE COMPANY, THE OWNER AND

## THE INVESTOR BETWEEN EXECUTION AND COMPLETION

5.1    Notices of Breaches by the Company, the WFOE and the Owner.  From the date hereof until the Completion Date, except as disclosed in the Basic Documents

Exhibit 3 13
-114-

or otherwise as contemplated thereunder, the Company and the WFOE shall, and the Company and the Owner shall cause each of the other Group Members and Onshore Companies to, conduct its respective business in a manner so as to ensure that the Collective Warranties continue to be true and correct on and as of the Completion Date as if made on and as of Completion Date. The Company, the WFOE and the Owner shall give the Investor prompt notice of any event, condition or circumstance occurring prior to the Completion Date that would constitute a breach of any Collective Warranty if such Collective Warranty were made as at any date between the date hereof and the Completion Date, or that would constitute a breach of any terms and conditions contained in this Agreement.

5.2     Business Operation.  From the date hereof until the Completion Date, the Company and the Owner shall, and shall cause each other Group Member where applicable to, (i) carry on their respective business in the ordinary course; (ii) comply in all material respects with all applicable law and other requirements relating to the operation of their respective businesses; and (iii) with no less diligence and efforts that would be applied in the absence of the transactions contemplated hereunder.

5.3     Notifications.  Until the Completion, each Party shall promptly notify the other Parties in writing of any fact, change, condition, circumstance or occurrence or nonoccurrence of any event of which it is aware that will or is reasonably likely to result in any of the conditions set forth in Section 3 becoming incapable of being satisfied.

5.4     Further Action.  The Parties shall use all reasonable efforts to take, or cause to be taken, all appropriate action, to do or cause to be done all things necessary, proper or advisable under applicable law, and to execute and deliver such documents and other papers, as may be required to carry out the provisions of this Agreement and consummate and make effective the transactions contemplated by this Agreement.

## SECTION 6
## REPRESENTATIONS AND WARRANTIES

6.1     Collective Warranties.  The Company, the WFOE and the Owner, severally and jointly, represent, warrant and undertake to the Investor in the terms of the Collective Warranties and acknowledge that the Investor in entering into this Agreement is relying on such Collective Warranties.

6.2     Investor Warranties.  The Investor represents, warrants and undertakes to the Company in the terms of the Investor Warranties and acknowledges that the Company in entering into this Agreement is relying on the Investor Warranties.

6.3     Knowledge of Claims.  No investigation by or on behalf of any Party shall prejudice any claim made by such Party under the indemnity contained in Section 10 or operate to reduce any amount recoverable thereunder, provided that a Party shall have no liability for (i) any breach of or inaccuracy in the Warranties made by such Party to the extent the Indemnified Party has actual

6.3     Knowledge of Claims. No investigation by or on behalf of any Party shall prejudice any claim made by such Party under the indemnity contained in Section 10 or operate to reduce any amount recoverable thereunder, provided that a Party shall have no liability for (i) any breach of or inaccuracy in the Warranties made by such Party to the extent the Indemnified Party has actual knowledge, at or prior to the Completion of such breach or inaccuracy, (ii) any breach of or failure to perform any covenant or obligations of such Party which are required to be performed at or prior to the Completion hereunder, to the extent that the Indemnified Party has actual knowledge, at or prior to the Completion of such breach or failure.

6.4     Separate and Independent. The Collective Warranties shall be separate and independent and save as expressly provided shall not be limited by reference to any other paragraph or anything in this Agreement or the Schedules.

6.5     Bring-Down to Completion. The Warranties shall be deemed to be repeated as at the Completion Date as if they were made on and as of the Completion Date, other than such Warranties as are made specifically as of another specified date, which shall be true and correct as of such date, and all references therein to the date of this Agreement were references to the Completion Date.

6.6     Survival of Warranties. All of the Warranties shall survive the Completion for a period of 18 months after the Completion, *provided* that the warranties set forth in Section 2, 10 and 12 of Schedule 3 and Section 2 and 4 of Schedule 4 should survive indefinitely.

6.7     The terms and conditions offered to the Investor by the Company, the Cayman Co, Leview Holding, the WFOE, the Owner, the Group and any of Group Members under this Agreement are not less favorable than those offered to other investors other than CCCFII (CHINA CONSUMER CAPITAL FUND II, L.P.) as well as Sanpower (CCCFII's following investor of the same round) of the convertible notes issued by the Company or the Cayman Co or any of the Onshore Companies before or after or on the date of the Convertible Note herein. If the terms and conditions offered to other investors of the convertible notes issued by the Company or the Cayman Co or any of the Onshore Companies before or after or on the date of the Convertible Note herein are more favorable than those offered to the Investor herein, the Investor shall be entitled to enjoy such more favorable terms and conditions automatically at its sole discretion and without any discrepancy from the Company, the Cayman Co, Leview Holding, the WFOE, the Owner, the Group and any of Group Members. To avoid doubt, the aforesaid terms and conditions offered to CCCFII and Sanpower means only the interest rate and discount of the convertible notes offered by the Company, the Cayman Co, Leview Holding, the WFOE, the Owner, the Group and any of Group Members and exclude other terms and conditions under the agreements related thereto.

## SECTION 7
### COVENANTS, UNDERTAKINGS AND AGREEMENTS

7.1     Delivery of Share Mortgage. Within 30 days following the Completion Date,

the Investor and the Cayman Co shall execute a Share Mortgage, which is
substantially consistent with the form attached as Exhibit B hereof, and the
Company shall deliver to the Investor a copy of the Register of Mortgages and
Charges of the Company certified by the registered office provider of the
Company which evidences the mortgage of the Mortgaged Shares to the
Investor and all the other documentation required to be delivered to the Investor
pursuant to the terms of the Share Mortgage.

7.2     Redemption.

    (a)     Redemption on Maturity. The Investor shall have the right to require the
Company to redeem the Convertible Note on the Maturity Date or upon
or immediately following the second-year anniversary of the Completion
date at the Redemption Price (defined as below) by delivering a prior
written notice (the "Redemption Notice") to the Company following the
Redemption Procedure set forth in Section 7.2(c).

    (b)     Redemption on Event of Default.

        (i)     The occurrence of any one or more of the following events shall
constitute an "Event of Default":

            (1)     the Owner, the Company, the Cayman Co and/or any of
the Onshore Companies shall fail to pay debt that is due
and payable or any other amount (if any) when due in
accordance with the terms hereof;

            (2)     the change of actual controller of the Company or the
Cayman Co and/or any of the Onshore Companies;

            (3)     any representation, warranty, covenant, undertaking,
certification or statement made by or on behalf of the
Owner, the Company, the Cayman Co and/or any of the
Onshore Companies in any Basic Documents or in any
certificate or other document delivered pursuant thereto
shall have been materially incorrect, misleading or false
in any material respect when made (a "Breach") and, if
capable of being remedied, has not been remedied within
thirty (30) days after being notified in writing of such
Breach by the Investor; provided that such Breach has
caused or is likely to cause a material adverse change on
the business of the Group as a whole or on the rights and
liabilities of the Investor under the Basic Documents;

            (4)     any breach of the undertakings and covenants as specified
in Sections 7.4, 7.5, 7.6, 7.7 and 7.8 of this Agreement.

            (5)     the Company, the Cayman Co and/or any of the Onshore
Companies or any of their respective significant or
material Affiliates shall commence any case, proceeding

or other action (i) under any existing or future law of any jurisdiction, domestic or foreign, relating to bankruptcy, insolvency, reorganization or relief of debtors, seeking to have an order for relief entered with respect to any Group Member, or seeking to adjudicate any Group Member bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, winding-up, liquidation, dissolution, composition or other relief with respect to any Group Member or its debts, or (ii) seeking appointment of a receiver, trustee, custodian, conservator or other similar official for any Group Member or for all or any substantial part of its assets;

(6)     the involuntary delisting of Leshi Internet Information Technology Corp., Beijing (乐视网信息技术（北京）有限公司, 300104.CH);

(7)     the Company shall fail to deliver the Relevant Securities when such Relevant Securities are required to be delivered following conversion of the Convertible Note (defined as below) in accordance with the terms hereof.

(ii)     Upon the occurrence of an Event of Default, the Company shall give the Investor a prompt notice of the occurrence of such Event of Default.

(iii)     Upon the occurrence and during the continuance of an Event of Default, the Investor may, by notice in writing to the Company (the "Default Notice"), request the Event of Default to be remedied within ten (10) Business Days or other time the Investor may deem to be reasonable.

(iv)     Upon the failure of the Owner, the Company, the Cayman Co and/or any of the Onshore Companies or any of their respective applicable Affiliates to remedy the default in accordance with the Default Notice, the Investor shall be entitled to declare the Convertible Note in whole or in part, and require the Company to redeem the Convertible Note on the Redemption Date at the Redemption Price by delivering a Redemption Notice to the Company following the Redemption Procedure set forth in Section 7.2(c).

(c)     Redemption Procedures.

(i)     On or before the Redemption Date, the Investor shall surrender a request for redemption (the "Redemption Request") to the Company, in the manner and at the place designated in the Redemption Notice. Upon the surrender of the Redemption Request to the Company, the applicable Redemption Price shall be payable to the order of the Investor.

(ii)    The Redemption Date for Section 7.2(a) shall be Maturity Date or the second-year anniversary of the Completion date, as the case may be, and for Section 7.2(b) shall be 3rd Business Day after the date of Redemption Notice.

(iii)    The Investor upon exercise of its redemption right shall have the right to redeem the Convertible Note at the Redemption Price, which is calculated as the total outstanding principal amount with respect to the Convertible Note, plus any accrued and unpaid interest at 15% per annum calculated by using the then outstanding principal amount multiplied by actual number of days elapsed since the Completion date divided by 365 days; the payment is to be made by cash, and the Investor may request for the cash payment to come from the Owner or other companies and institutions designated or owned by the Owner.

(iv)    The payment shall become due and payable on the Redemption Date, and calculated from and including the Completion date until the payment date, plus any accrued and unpaid interest.

(v)    If prior to the Maturity Date the Investor is unable to exercise its right to convert the Convertible Note into any shares in the Company or the Cayman Co, as the case may be, as the result of the non-occurrence e of any Qualified Financing for a reason attributable to the Owner, the Company, the Cayman Co and/or any of the Onshore Companies, the Investor upon exercise of its redemption right shall have the right to redeem the Convertible Note at a new redemption price, which is calculated as the total outstanding principal amount with respect to the Convertible Note, plus any accrued and unpaid interest at 25% per annum calculated by using the then outstanding principal amount multiplied by actual number of days elapsed since the Completion date divided by 365 days; the payment is to be made by cash, and the Investor may request for the cash payment to come from the Owner or other companies and institutions designated by the Owner.

(vi)    If the Investor, at its own election, does not exercise its right to convert the Convertible Note which the Investor may subscribe prior to the Qualified Financing into preferred shares of the Company or the Cayman Co or subscribe or receive any shares of the Company or the Cayman Co on the Qualified Financing prior to the Maturity Date as provided in Section 7.3(a)(i), the Investor shall be entitled to redeem the Convertible Note at the Redemption Price in accordance with Section 7.2(c)(iii).

7.3    Conversion.

(a)    General

Exhibit 3
-119-

convert the Convertible Notes into preferred shares of the Company or the Cayman Co on the Qualified Financing or another date as defined in the Convertible Note in accordance with the terms and conditions of the Convertible Note.

(ii) After the Completion Date, the Investor shall have the right to convert the Convertible Notes into shares of Leview Holding,.

(iii) After the Completion Date, the Investor shall have the right to convert the Convertible Notes into preferred shares or ordinary shares of any of the Onshore Companies provided that the Onshore Company is structured to initial public offering in the PRC on the Qualified Financing or another date as defined in the Convertible Note in accordance with the terms and conditions of the Convertible Note.

(iv) Upon the Investor's exercise of its right to convert the Convertible Note into shares of the Cayman Co, the Leview Holding or the Onshore Companies, the Owner and the Cayman Co undertake, and shall procure to the extent permitted by law, that the Investor shall enjoy the same rights set forth under this Section 7 in the event that the Convertible Note held by the Investor is converted to the Cayman Co shares, Leview Holding shares or any of the Onshore Companies, at the election of the Investor, as specified under Section 6 of the Convertible Note.

(b) Conversion on Qualified Financing. The Investor shall be entitled to exercise its right of conversion as specified under this Section 7.3(b).

(i) Should a Qualified Financing occur prior to the Maturity Date, the Investor shall have the right, but not the obligation, to convert the then outstanding amount owing under the Convertible Note, in whole or in part, into preferred shares subject to Section7.3(c) in accordance with the method as follows:

(1) if converted to the Company shares:

outstanding principal amount x (1 + 15% x actual days elapsed since Completion date /365)

80% x per share price as at the Company's Qualified Financing

(2) if converted to Cayman Co or any of the Onshore Companies shares and by then Cayman Co or any of the Onshore Companies has had a Qualified Financing:

outstanding principal amount x (1 + 15% x actual days elapsed since Completion date /365)

80% x per share price as at the Qualified Financing of the Cayman Co or the Onshore Company

or

(3) if converted to Cayman Co shares and by then the

Exhibit 3  19
-120-

Cayman Co has not had a Qualified Financing, the Investor shall negotiate with the Owner of the valuation (the "Valuation") of the Cayman Co and the shares shall be calculated as follows:

outstanding principal amount x (1 + 15% x actual days elapsed since Completion date /365)

80% x per share price as at the Valuation

(ii) Within 30 Business Days after the request of the Investor, the Owner shall procure that the Company shall deliver to the Investor all legal, financial and business information, the final form of the transaction documents with respect to the financing, and such other materials related thereto that may be reasonably requested by the Investor.

(iii) Except for Section 7.3(b)(i)(3), Qualified Financing Securities issued to the Investor upon conversion of the Convertible Note shall be identical with respect to rights, preferences and designations as, and shall rank *pari passu* with, the Qualified Financing Securities issued to the investors in the Qualified Financing and Investor shall otherwise be entitled to rights under the applicable Qualified Financing definitive documents, as the case may be, on parity with the investors thereunder.

(iv) Despite of the above, the parties confirm that: the share price mentioned in the formats under Section 7.3 above shall refer to the lowest share price offered to a third party investor by the Company, the Cayman Co or the Onshore Company when its aforesaid Qualified Financing occurs; and that: if the Company, the Cayman Co or any of the Onshore Companies issues preferred shares or equity-linked convertible debt securities after the Qualified Financing, the Investor shall be entitled to apply the formats under Section 7.3 to convert the convertible note as held then by the Investor, for which the Company, the Cayman and other related parties herein shall not disagree or raise any discrepancy.

(c) Conversion Procedures.

(i) Subject to compliance with the procedures set forth in Section 7.3, the conversion rights set forth in this Agreement shall be exercised by the Investor at any time during usual business hours on a Business Day, at the registered office of the Company (or such other office or agency of the Company as the Company and the Investor may agree), accompanied by a conversion notice (the "Convertible Notice") specifying (i) that the Investor elects to convert the entire or part of Convertible Note and (ii) subject to the transfer restrictions as agreed, the name or names (with address) in which a certificate or certificates for the Relevant Securities are to be issued.

Exhibit 3 20
-121-

(ii)    As soon as practicable and in any event within 5 Business Days after the date of the Conversion Notice, the Company shall:

(1)    take all actions and execute all documents necessary to effect the issuance and to the extent the Relevant Securities are in the form of equity securities, registration of such Relevant Securities on the register of the Company (including, where applicable, giving all necessary instruction to the relevant share registry to effect such issuance) and deliver to the Investor certified copies of the register of members reflecting the Relevant Securities in the name of the Investor or its nominee or assignee, and

(2)    deliver to the Investor (x) where the Relevant Securities are in the form of equity securities, certificate(s) representing the number of validly issued, fully paid and non-assessable Relevant Securities calculated in accordance with Section 7.3 as the case may be and (y) where the Relevant Securities are in the form of equity-linked securities, certificate(s) representing the principal amount of Relevant Securities calculated in accordance with Section7.3(b)(i)(1) or7.3(b)(i)(2).

(d)    <u>Fractional Shares</u>. If the conversion of t the Convertible Note would result in the issuance of any fractional share, the Company shall, at its option, round upwards and issue one additional share or pay to the Investor the portion of the principal amount convertible into such fractional share.

(e)    <u>Availability of Equity Securities</u>. The Company covenants that it will at all times reserve and maintain authority to issue the maximum number of Equity Securities issuable upon conversion of the Convertible Note. The Company covenants that all Equity Securities, when issued or delivered pursuant to Section7.3(c), shall be duly and validly issued, shall rank *pari passu* with all other Equity Securities issued in the Qualified Financing, as the case may be, and where they are in the form of equity securities non-assessable, fully paid, free and clear of all Encumbrances, other than Encumbrances arising under the Basic Documents or created, imposed or agreed in writing by the Investor.

7.4    <u>Preemptive Right</u>.

(a)    The Company hereby grants to the Investor the right of first refusal to purchase the Investor's Pro Rata Share (as defined below), of all (or any part) of any Equity Securities (the "<u>New Securities</u>") that the Company may from time to time issue after the Completion Date (the "<u>Preemptive Right</u>").

(b)    An Investor's "<u>Pro Rata Share</u>" for purposes of the Preemptive Right is

Exhibit 3 <sup>21</sup>
-122-

the ratio of (a) the number of Ordinary Shares held by the Investor on or after the conversion, or, prior to the conversion, the number of Ordinary Shares that would have been held by the Investor as if the Convertible Note held by the Investor were converted into preferred shares, in each case, as if on a fully-converted basis immediately prior to the issuance of the New Securities (assuming full conversion of all preferred shares and full conversion or exercise of all outstanding convertible securities, rights, options and warrants held by the Investor), to (b) the total number of Ordinary Shares (including preferred shares on an as-converted basis and assuming that all outstanding options or warrants) then outstanding immediately prior to the issuance of New Securities (assuming full conversion of preferred shares and full conversion or exercise of all outstanding convertible securities, rights, options and warrants).

(c)   In the event the Company proposes to undertake an issuance of New Securities, it shall give the Investor written notice of its intention, describing the type of New Securities, and their price and the terms upon which the Company proposes to issue the same. The Investor shall have 10 days after any such notice is mailed or delivered to agree to purchase the Investor's Pro Rata Share of such New Securities and to indicate whether the Investor desires to exercise its Preemptive Right for the price and upon the terms specified in the notice by giving written notice to the Company and stating therein the quantity of New Securities to be purchased.

(d)   In the event the Investor fails to exercise fully the Preemptive Right, if any within said 10 day-period (the "Election Period"), the Company shall have 120 days thereafter to sell or enter into an agreement (pursuant to which the sale of New Securities covered thereby shall be closed, if at all, within 120 days from the date of said agreement) to sell that portion of the New Securities with respect to which the Investor's Preemptive Right set forth in this Section 7.4(a) was not exercised, at a price and upon terms no more favorable to the purchasers thereof than specified in the Company's notice to the Investor delivered pursuant to Section 7.4(c). In the event the Company has not sold within such 120-day period following the Election Period, or such 120-day period following the date of said agreement, the Company shall not thereafter issue or sell any New Securities, without first again offering such securities to the Investor in the manner provided in this Section 7.4.

7.5   Tag-along Right.

(a)   Following any conversion of the Convertible Notes held by the Investor, if any of the shares (the "Disposed Shares") in the Company held directly or indirectly by the Owner is to be sold to any third party (the "Disposition"), the Investor may elect to exercise its tag-along right (the "Tag-along Right") and participate on a pro-rata basis in the Disposition on the same terms and conditions as set forth in the written notice (the "Disposition Notice") to the Company and the Investor sent by the Owner, which notice shall state:(i) the name of the Owner, (ii) the name

and address of the proposed purchaser, (iii) the number of shares to be disposed; (iv) the amount and form of the proposed consideration for the Disposition, (v) any other material business relations between the Owner and the purchaser, and (vi) the other terms and conditions of the proposed Disposition. In the event that the proposed consideration for the Disposition includes consideration other than cash, the Disposition Notice shall include a calculation of then fair market value of such consideration and an explanation of the basis for such calculation.

(b)     To exercise its Tag-along Right, the Investor must give the Owner, as applicable, written notice to that effect within 40 days after delivery of the Disposition Notice, and upon giving such notice the Investor shall be deemed to have effectively exercised the Tag-along Right. A Investor may sell all or any part of that number of Shares (the "Tag-along Shares") held by the Investor equal to the product obtained by multiplying (x) the number of Disposed Shares by (y) a fraction, the numerator of which is the number of Ordinary Shares (calculated on an as-converted and fully-diluted basis) at the time owned by the Investor and the denominator of which is the aggregate number of Ordinary Shares (calculated on an as-converted and fully-diluted basis) owned by the Investor.

7.6     Information Rights. After the Completion Date, the Company shall regularly deliver to the Investor information relating to the daily business operation of the Company, including but not limited, to the following documents or reports:

(a)     within 90 days after the end of each fiscal year of the Company, a consolidated income statement and statement of cash flows for the Company for such fiscal year and a consolidated balance sheet for the Company as of the end of the fiscal year, audited and certified by one of the Big Four Accounting Firms accepted by the Board, all prepared in English and in accordance with the Accounting Standards consistently applied throughout the period;

(b)     (i) within 45 days after the end of each quarter, a consolidated income statement and statement of cash flows for the Company for such quarter and a consolidated balance sheet for the Company as of the end of such quarter, all prepared in English and in accordance with the Accounting Standards consistently applied throughout the period, and (ii) promptly following the end of each quarter an up-to-date capitalization table, and both items (i) and (ii) shall be certified by the chief financial officer or the financial controller of the Company;

(c)     within 20 days of the end of each month, a consolidated unaudited income statement and statement of cash flows for such month and a consolidated balance sheet for the Company as of the end of such month, all prepared in English and in accordance with the Accounting Standards consistently applied throughout the period (except for customary year-end adjustments and except for the absence of notes) and certified by the chief financial officer of the Company;

Exhibit 3 23
-124-

(d)     a comprehensive operating budget forecasting the Company's revenues, expenses, and cash position for the following fiscal year within 30 days prior to the end of each fiscal year, in reasonable detail on a monthly basis, broken down by different operating subsidiaries and associated companies; and

(e)     as soon as practicable, any other information reasonably determined by the Board or reasonably requested by the Investor.

7.7     Inspection Rights.  After the Completion Date, the Company and the WFOE shall, and the Company and the Owner shall cause each of the other Group Members to, give to the Investor and its Representatives reasonable access, upon reasonable prior notice, to the premises and the books and records, and instruct its officers and employees to furnish all information and explanations to the Investor or any such Persons as the Investor may reasonably request during normal business hours, under the supervision of a Company officer and in such a manner as not to interfere with the normal business operations of the Company or any other Group Member.

7.8     Appointment of Investor Director and Board Observer.

(a)     As long as the Convertible Note is outstanding or the Investor holds any share in the Company or Cayman Co when the convertible note conversion completed whether convert into preferred shares or ordinary shares, the Company or Cayman Co shall procure that the Investor shall be entitled to, from time to time, at its own expense and at its own discretion, and at any time, to designate one individual that is an employee or officer of the Investor or any of its Affiliates (the "Observer") to attend all meetings of the Board and all committees thereof (whether in person, by telephone or other) in a non-voting observer capacity. The Company or Cayman Co or the Owner shall not have any discrepancy about the appoint of such person.

(b)     After the full conversion of the Convertible Note held by the Investor into preferred shares and if the Investor hold 5% or more shares of the Company or Cayman Co, the Investor shall have the right to appoint one director (Investor Director) as a member of the Director Board of the Company or the Cayman Co, and Investor Director shall continuously serves as a director of the Board with full voting capacity provided that the Investors continuously holds 5% or more shares, preferred or ordinary shares, of the Company or the Cayman Co.  If the Investor Director ceases to serve as a director of the Board then but the Investor still hold 1% or more shares of any classification of the Company or the Cayman Co, the Investor shall have the right, from time to time, at its own expense, and at any time, to designate one individual that is an employee or officer of the Investor or any of its Affiliates (the "Observer") to attend all meetings of the Board and all committees thereof (whether in person, by telephone or other) in a non-voting observer capacity.

7.9     Reserved Matters. From the Completion Date until the occurrence of the Qualified Financing, the following matters in connection with the Company shall be subject to the Investor's prior written consent:

    (a)     any amendment or modification to the Company Charter Documents;

    (b)     any material change to the nature or scope of the business of the Company;

    (c)     any material merger, amalgamation, scheme or arrangement, reorganization, restructuring, or consolidation of the Company or any of its subsidiaries;

    (d)     any liquidation, winding up, dissolution, disposition, reorganization, or arrangement of the Company or any of its subsidiaries;

    (e)     any change to the size or composition of the board of directors of the Company or any of its subsidiaries;

    (f)     any change to the accounting policies or the auditor of the Company not in compliance with the International Financial Reporting Standards, Generally Accepted Accounting Principles or Hong Kong Financial Reporting Standards;

    (g)     appointment or removal of any key employees of the Company;

    (h)     determination or adjustment of the pricing basis of transactions between the Company and any of its related parties;

    (i)     any related party transaction entered into by the Company in excess of US$10 million (or its equivalent in other currencies) individually or in excess of US$90 million in the aggregate over any 12 consecutive calendar months period; and

    (j)     any other material matters of the Company.

7.10     Dividend. After the full conversion of the Convertible Note held by the Investor into preferred shares, the Investor shall be entitled to participate any dividend distribution declared by the Company from time to time.

7.11     Business Plan. The Company shall formulate and implement a five-year business operation plan, which shall be approved by the Investor and shall set forth the Company's development strategy, financial forecast, operational capital expenditure plan and implementation plan.

7.12     Lock-up. Subject to a 90-day prior written notice to the Investor, the Owner may transfer or assign, directly or indirectly, his interest in the Company or Cayman Co at any time prior to the full conversion or redemption of the Convertible Note; *provided* that the forgoing transfer or assignment will not result in the Owner ceasing to be the Company's and the Cayman Co's actual controlling person; *provided* further that if the forgoing transfer or assignment

Exhibit 3 25
-126-

will result in the Owner ceasing to the Company's and the Cayman Co's actual controlling person. such transfer or assignment will be subject to the Investor's prior written consent.

7.13    Restructuring.

(a)    The Company, the Cayman Co and the WFOE shall, and the Owner shall cause the applicable Group Members and the Onshore Companies to:

(i)    complete all the steps of the Restructuring in accordance with all applicable laws and reasonably satisfactory to the Investor within 6 months after the Completion Date, which will result in a corporate structure consistent with the structure set forth in Schedule 2B hereof; and

(ii)    duly perform each Onshore Contract to which it is a party in accordance with the terms thereof.

(b)    So long as any of the Convertible Note remains outstanding. the Owner shall not without the prior consent of the Investor, sell, give, assign, hypothecate, pledge, encumber, grant a security interest in or otherwise dispose of, or suffer to exist (whether by operation of law or otherwise) any Encumbrance on any equity interest in the Onshore Companies.

(c)    All the following assets related to the Existing Business held or owned by any Affiliate of the Owner other than the Group and the Onshore Companies shall be transferred or assigned to the Onshore Companies or the WFOE, as the case may be, within 12 months following the Completion Date, which may be extended subject to the Investor's prior written consent:

(i)    all the employment agreements of Xing FENG (冯幸), Lin MA (马麟), Zhizhong AN (安志忠), Zhanliang CUI (崔战良) and Zhisheng DONG (董志升);

(ii)    all the relevant Intellectual Property (including without limitation to trademarks, patents and application rights to such Intellectual Property);

(iii)    all the material contracts, including but not limited to, purchase contracts with suppliers and sales contracts with customers; and

(iv)    all the applicable licenses or permits required by law or applicable Governmental Authority to conduct the Existing Business.

(d)    As Leview Mobile & Intelligent Information Technology (Beijing) Co., Ltd. needs to use for its Existing Business the video content and other Intellectual Property of Leview Internet Information & Technology

Corp., Bei Jing ("Leview Internet") or another corporation owned or controlled by the Owner, the Company, the Cayman Co, the WFOE, the Owner shall cause the Leview Mobile & Intelligent Information Technology (Beijing) Co., Ltd to sign with Leview Internet the agreements for using such video content and Intellectual Property in a fair and reasonable price and under normal commercial terms.

## SECTION 8
### CONFIDENTIALITY; RESTRICTION ON ANNOUNCEMENTS

8.1     General Obligation. Each Party undertakes to the other Parties that it shall not reveal, and that it shall procure that its directors, equity interest holders, partners, representatives, members, advisors (including auditors, accountants, consultants, financial advisors and attorneys), financing sources, officers, employees and agents (collectively, "Representatives") do not reveal, the Confidential Information to any third party without the prior written consent of other Parties or use any Confidential Information in such manner that is detrimental to the Company or the concerned Party, as the case may be. Each Party shall be responsible for any breach of obligations set forth herein by any of its Affiliates, its Representatives or its Affiliates' Representatives, and shall procure that its Affiliates, its Representatives or its Affiliates' Representatives shall comply with the obligations set forth in this Section 8 as of it were a party to this Agreement. The term "Confidential Information" as used in this Section 8 means, (a) any information concerning the organization, business, technology, safety records, investment, finance, marketing, business plans, transactions or affairs of any Party or any Group Member or any of their respective directors, officers or employees (whether conveyed in written, oral or in any other form and whether such information is furnished before, on or after the date of this Agreement) and (b) the terms and existence of this Agreement, the Convertible Note and the Onshore Contracts (other than the Basic Documents that are required by law or any applicable Governmental Authority to be publicly filed or disclosed) (collectively, the "Financing Terms"); provided, that Confidential Information does not include information that (i) is or becomes publicly known or available through no breach of this Agreement, (ii) is rightfully acquired free of restrictions on its disclosure, or (iii) is independently developed without any use of or reference to any Confidential Information.

8.2     Exceptions. The provisions of Section 8.1 shall not apply to:

(a)     disclosure by a Party to its Representative, *provided* that such Representative (i) is under a similar obligation of confidentiality or (ii) is otherwise under a binding professional obligation of confidentiality;

(b)     disclosure by a Party to its Affiliates and their respective Representatives, *provided* that such Affiliate and Representative (i) is under a similar obligation of confidentiality or (ii) is otherwise under a binding professional obligation of confidentiality;

(c)     disclosure, after giving prior notice to the other Parties to the extent practicable under the circumstances and subject to any practicable

Exhibit 3<sup>27</sup>
-128-

arrangements to protect confidentiality, to the extent required under the rules of any stock exchange on which the shares of a Party or its parent company are listed or by law or any applicable Governmental Authority and only to the extent required thereby; or

(d)    disclosure of any Confidential Information other than the Financing Terms by any Group Member, the Owner or their Representatives of any of such Confidential Information to a third party in connection with any existing or proposed transaction or other contractual relationship of any Group Member or their Affiliates, *provided* that such third party (i) is under a similar obligation of confidentiality or (ii) is otherwise under a binding professional obligation of confidentiality.

8.3    Publicity.  Except as required by law, by any Governmental Authority, by any relevant stock exchange on which the shares of a Party or its parent company are listed or otherwise agreed by all the Parties, no public release or public announcement concerning the relationship or involvement of the Parties shall be made by any Party.

## SECTION 9  FEES AND EXPENSES

9.1    General.  Each Party shall pay all of its own costs and expenses incurred in connection with or relating to the negotiation, execution, delivery and performance of the Basic Documents and the transaction contemplated thereby. Each of the Parties hereto shall bear its own costs and expenses in connection with the negotiation, execution, delivery and performance of this Agreement and the other Basic Documents and the transactions contemplated hereby and thereby.

## SECTION 10  INDEMNIFICATION

10.1    Scope of Indemnification.    Each Party (an "Indemnifying Party") shall indemnify and hold the other Parties and their directors, officers and agents (collectively, the "Indemnified Party") harmless from and against any losses, claims, damages, liabilities, judgments, fines, obligations, expenses and liabilities of any kind or nature whatsoever, including but not limited to any investigative, legal and other expenses incurred in connection with, and any amounts paid in settlement of, any pending or threatened legal action or proceeding, but excluding consequential damages, special or incidental damages, indirect damages, punitive damages, lost profits, and diminution in value (collectively, "Losses") resulting from or arising out of: (i) the breach of any warranty of such Indemnifying Party contained in the Basic Documents or in any schedule or exhibit hereto determined without regard to any materiality qualifier therein; or (ii) the violation or nonperformance, partial or total, of any covenant or agreement of such Indemnifying Party contained in the Basic Documents for reasons other than gross negligence or willful misconduct of the Indemnified Party.  The Company, the WFOE and the Owner shall jointly and severally indemnify the Investor and its directors, officers, and agents harmless and against any Losses resulting from or arising out of: (i) the breach of any warranty of the Company, the WFOE and the Owner contained in this

Exhibit 3  28

-129-

Agreement or in any schedule or exhibit hereto determined without regard to any materiality qualifier therein; or (ii) the violation or nonperformance, partial or total, of any covenant or agreement of the Company, the WFOE or the Owner contained in this Agreement for reasons other than gross negligence or willful misconduct of the Indemnified Party. In calculating the amount of any Losses of an Indemnified Party hereunder, there shall be subtracted the amount of any insurance proceeds and third-party payments received by the Indemnified Party with respect to such Losses.

10.2    Notice of Claims; Procedures.  If an Indemnified Party makes any claim against an Indemnifying Party for indemnification, the claim shall be in writing and shall state in general terms the facts upon which such Indemnified Party makes the claim. In the event of any claim or demand asserted against an Indemnified Party by a third party upon which the Indemnified Party may claim indemnification, the Indemnifying Party shall give written notice to the Indemnified Party within 30 days after receipt from the Indemnified Party of the claim referred to above, indicating whether such Indemnifying Party intends to assume the defense of the claim or demand. If an Indemnifying Party assumes the defense, such Indemnifying Party shall have the right to fully control and settle the proceeding, provided, that any settlement or compromise shall be permitted hereunder only with the written consent of the Indemnified Party, which consent shall not be unreasonably withheld or delayed.    If the Indemnifying Party elects not to assume the defense or fails to make such an election with the 30-day period, the Indemnified Party may, at its option, defend, settle, compromise or pay such action or claim; provided, that any settlement or compromise shall be permitted hereunder only with the written consent of the Indemnifying Party, which consent shall not be unreasonably withheld or delayed.

## SECTION 11  TERMINATION

11.1    Effective Date; Termination.  This Agreement shall become effective upon execution by all of the Parties and shall continue in force until terminated in accordance with Section 11.2.

11.2    Events of Termination.  This Agreement may be terminated at any time prior to the Completion as follows:

(a)    at the election of the Investor, if the Company, WFOE or the Owner has materially breached any Collective Warranty, or any other covenant or agreement of the Company, WFOE or the Owner contained in any Basic Document, which breach cannot be cured or, if it is capable of being cured, is not cured within 30 days after the Company, WFOE and the Owner being notified in writing of the same and which breach would give rise to the failure to satisfy a condition set forth in Section 3.1;

(b)    at the election of the Company, if the Investor has materially breached any Investor Warranty, or any other covenant or agreement of the Investor contained in the Basic Documents, which breach cannot be cured or, if capable of being cured, is not cured within 30 days after the

Exhibit 3  29
-130-

Investor being notified in writing of the same and which breach would give rise to the failure to satisfy a condition set forth in Section 3.2; or

(c)     by written consent of the Company, WFOE, the Owner and the Investor.

11.3    Survival.  If this Agreement is terminated in accordance with Section 11.2, it shall become void and of no further force and effect, except for the provisions of Section 8 (Confidentiality; Restriction on Announcements),Section 9 (Fees and Expenses), Section 10 (Indemnification), this Section 11.3, Section 12 (Notices), Section 13 (Miscellaneous), and Section 14 (Governing Law and Dispute Resolution); provided, however, that such termination shall, unless otherwise agreed by the Parties, be without prejudice to the rights of any Party in respect of a breach of this Agreement prior to such termination.

## SECTION 12  NOTICES

12.1    Notices.  Each notice, demand or other communication given or made under this Agreement shall be in writing in English and delivered or sent to the relevant Party at its address or fax number set out below (or such other address or fax number as the addressee has by five days' prior written notice specified to the other Parties).  Any notice, demand or other communication given or made by letter between countries shall be delivered by air mail.  Any notice, demand or other communication so addressed to the relevant Party shall be deemed to have been delivered, (a) if delivered in person or by messenger, when proof of delivery is obtained by the delivering party; (b) if sent by post within the same country, on the third day following posting, and if sent by post to another country, on the seventh day following posting; and (c) if given or made by fax, upon dispatch and the receipt of a transmission report confirming dispatch.

12.2    Addresses and Fax Numbers.  The initial address and facsimile for each Party for the purposes of this Agreement are:

If to the Investor:

27F, No.1717, North Sichuan Road, Shanghai
Facsimile:86-2153064128
Attention: Liu Jiong(刘炯)

If to the Company, Cayman Co, the WFOE, Leview Holding, or the Owner:

16/F, Leshi Building, No. 105, Yaojiayuan Road, Chaoyang District, Beijing, 100025, PRC
Attention: Wei DENG (邓伟)

## SECTION 13 MISCELLANEOUS

13.1    Enforcement Action.  For the avoidance of doubt, any obligation on the part of the Investor to make the investment hereunder is made solely to the Company.

the WFOE and the Owner, and no other Person shall have any right to enforce such obligation against the Investor.

13.2    No Partnership.    The Parties expressly do not intend hereby to form a partnership, either general or limited, under any jurisdiction's partnership law. The Parties do not intend to be partners one to another, or partners as to any third party, or create any fiduciary relationship among themselves, solely by virtue of the Investor's status as the holder of the Convertible Note and the Investor's status as the mortgagee of the Mortgaged Shares.

Exhibit 3 $^{31}$
-132-

13.3 <u>Amendment</u>. This Agreement may not be amended, modified or supplemented except by a written instrument executed by each of the Parties.

13.4 <u>Waiver</u>. No waiver of any provision of this Agreement shall be effective unless set forth in a written instrument signed by the Party waiving such provision. No failure or delay by a Party in exercising any right, power or remedy under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of the same preclude any further exercise thereof or the exercise of any other right, power or remedy. Without limiting the foregoing, no waiver by a Party of any breach by any other Party of any provision hereof shall be deemed to be a waiver of any subsequent breach of that or any other provision hereof.

13.5 <u>Entire Agreement</u>. This Agreement (together with the other Basic Documents and any other documents referred to herein or therein and any documents executed to implement the transactions contemplated by the Basic Documents) constitutes the whole agreement between the Parties relating to the subject matter hereof and supersedes any prior agreements or understandings relating to such subject matter.

13.6 <u>Severability</u>. Each and every obligation under this Agreement shall be treated as a separate obligation and shall be severally enforceable as such and in the event of any obligation or obligations being or becoming unenforceable in whole or in part. To the extent that any provision or provisions of this Agreement are unenforceable they shall be deemed to be deleted from this Agreement, and any such deletion shall not affect the enforceability of this Agreement as remain not so deleted.

13.7 <u>Counterparts</u>. This Agreement may be executed in one or more counterparts including counterparts transmitted by telecopier or facsimile, each of which shall be deemed an original, but all of which signed and taken together, shall constitute one document.

13.8 <u>Consent to Specific Performance</u>. The Parties declare that it is impossible to measure in money the damages that would be suffered by a Party by reason of the failure by any other Party to perform any of the material obligations hereunder and that, in addition to all other remedies, each Party will be entitled to seek specific performance and to seek injunctive or other equitable relief as a remedy for any such breach or failure to perform its material obligations hereunder.

13.9 <u>Transfer; Assignment</u>. This Agreement shall inure to the benefit of and be binding upon the Parties, and their respective successors and permitted assigns. This Agreement shall not be assigned without the express written consent of all the Parties (which consent may be granted or withheld in the sole discretion of any Party), and any purported assignment without such consent shall be void, *provided* that, the Investor shall be entitled to transfer or assign its rights and obligations under the Basic Documents to any of its Affiliates, including Shanghai QC.

**SECTION 14**

**GOVERNING LAW AND DISPUTE RESOLUTION**

14.1    GOVERNING LAW.  THIS AGREEMENT TOGETHER WITH OTHER BASIC DOCUMENTS SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE HKSAR APPLICABLE TO CONTRACTS TO BE PERFORMED WHOLLY WITHIN SUCH JURISDICTION, WITHOUT REGARD TO THE PRINCIPLES OF CONFLICTS OF LAW OF ANY JURISDICTION.

14.2    Dispute Resolution.

(a)    In the event of any dispute, controversy or, claim or difference of any kind whatsoever arising out of, relating to or in connection with this Agreement, including the existence, validity, interpretation, performance, breach or termination thereof, the validity, scope and enforceability of this arbitration provision and any dispute regarding no-contractual obligations arising out of or relating to it (the "Dispute"), the parties hereto shall firstly consult and negotiate with each other to settle it in an amicable manner. If no settlement can be reached by the parties within 30 days of the occurrence of the Dispute, any party is entitled to submit, at its sole discretion, such dispute to the China International Economic and Trade Arbitration Commission (the "CIETAC") for arbitration in Beijing in accordance with the then applicable arbitration rules of CIETAC.  However, if such rules are in conflict with the provisions of this Section 14.2, including the provisions concerning the appointment of arbitrators, the provisions of this Section 14.2 shall prevail.

(b)    The law of this arbitration clause shall be HKSAR law. The seat of arbitration shall be Beijing.

(c)    The number of arbitrators shall be three, of which the applicant of the arbitration shall be entitled to appoint, individually or collectively, one arbitrator and the defendant shall be entitled to appoint, individually or collectively, the other arbitrator and the third arbitrator shall be appointed by CIETAC, and the language of the arbitration proceedings and written decisions or correspondence shall be English.

(d)    Any party to the Dispute shall be entitled to seek preliminary injunctive relief, if possible, from any court of competent jurisdiction pending the constitution of the tribunal.

IN WITNESS WHEREOF this Agreement has been executed on the day
and year first above written.

COMPANY:

LEVIEW MOBILE LTD.

By: _____
Name:
Title:

*For and on behalf of*
*Leview Mobile Ltd.*

*Authorized Signature(s)*

CAYMAN CO:

LE LTD.

By: _____
Name:
Title:

*For and on behalf of*
*Le Ltd.*

*Authorized Signature(s)*

WFOE:

LESAI   MOBILE   TECHNOLOGY
(BEIJING) CO., LTD.
(乐赛移动科技（北京）有限公司)

By: _____
Name:
Title:

LEVIEW   HOLDING   (BEIJING)
LIMITED (乐视控股（北京）有限公司)

By: _____
Name:
Title:

OWNER:

YUETING JIA (贾跃亭)

_____

Exhibit 3
-135-

**PRC Identification Card Number:**

Exhibit 3 35

-136-

IN WITNESS WHEREOF this Agreement has been executed on the day
and year first above written.

**INVESTOR:**

**QC INVESTMENT LTD.**

By: _____

Name:

Title:

**Shanghai QC:**

**SHANGHAI QICHENGYUEMING
INVESTMENT PARTNERSHIP
ENTERPRISE (LIMITED
PARTNERSHIP)**

**(上海奇成悦名投资合伙企业（有限合
伙）)**

By: _____

Name:

Title:

Exhibit 3 36
-137-

## SCHEDULE 1
## CONSIDERATION ALLOCATION

| Entity | Principal Amount of Convertible Note |
|---|---|
| QC INVESTMENT LTD. | US$ 75,000,000 |
| | |
| | |

Exhibit 3

-138-

## SCHEDULE 2

## SHAREHOLDING STRUCTURE OF THE GROUP

Exhibit 3

-139-

## SCHEDULE 2A

## SHAREHOLDING STRUCTURE OF THE GROUP AS OF THE DATE OF THIS AGREEMENT



Exhibit 3

-140-



SCHEDULE 2B

SHAREHOLDING STRUCTURE OF THE GROUP AFTER COMPLETION OF RESTRUCTURING

Exhibit 3

-141-

## SCHEDULE 3

## COLLECTIVE WARRANTIES

### Definitions

In this Schedule, capitalized terms not otherwise defined have the meanings set forth in this Agreement, and the following terms have the meanings specified:

"Contracts" means all contracts, agreements, licenses, engagements, leases, financial instruments, purchase orders, commitments and other contractual arrangements, that are currently subsisting and not terminated or completed.

"Environmental Laws" means any and all applicable current PRC or non-PRC national, federal, state, or local Law, statutes, rules, regulation, orders, ordinances, guidance documents, judgments, authorizations by any Governmental Authority, or any other requirement of any Governmental Authority relating to (a) environmental matters, (b) the generation, use, storage, transportation or disposal of hazardous substances, or (c) occupational safety and health, industrial hygiene, handling and disposal of medical waste, land use or the protection of human, plant or animal health or welfare.

"Intellectual Property" means (a) patents and patent applications, (b) trademarks, service marks, trade names, trade dress and domain names, together with the goodwill associated exclusively therewith, (c) copyrights, including copyrights in computer software, (d) confidential and proprietary information, including trade secrets and know-how, and (e) registrations and applications for registration of the foregoing, in each case, relating to the business of researching, designing, developing, manufacturing, selling or marketing mobile phones and other personal devices, as well as other related internet or mobile internet business.

"Liabilities" means all indebtedness and other liabilities of any nature whatsoever, actual or contingent, and whether or not of a nature required to be disclosed in the accounts of the Group.

"Litigation" has the meaning set forth in Section 11 of this Schedule 3.

"Permits" means all permits, consents, approvals, authorizations, franchises, certifications and licenses from, and all registrations with, any Governmental Authority.

### The Warranties

The Company, the Cayman Co., the WFOE, Leview Holding and the Owner hereby, severally and jointly, represent and warrant to the Investor that the following representations and warranties are true and complete as of the date hereof and the Completion Date, except as otherwise stated.

1.    **CORPORATE MATTERS**

(a)    Organization, Good Standing and Qualification. Each of the Group Members and the Onshore Companies has been duly incorporated and organized, is validly existing and, where applicable, is (i) in good standing and (ii) in compliance with all registration and

Exhibit 3
-142-

approval requirements. Each of the Group Members and the Onshore Companies has the corporate power and authority to own and operate its assets and properties and to carry on its business as currently conducted and as contemplated to be conducted.

(b)     Charter Documents. The Company Charter Documents and the constitutional documents of the Onshore Companies furnished to the Investor are effective, have not been superseded and are true and complete.

(c)     Capitalization and Shareholding Structure of the Group. The shareholding structure of the Group set forth in Schedule 2A are true, complete and correct description of the share capital of such entity on the date hereof and on the Completion Date. Immediately following the Completion, the authorized capital of the Company will consist of only one class of shares, namely, 50,000 Ordinary Shares, par value US$0.0001 per share, 100% of which are duly and validly issued, fully paid, nonassessable, and outstanding, and were issued in accordance with all applicable laws.

(d)     Options, Warrants and Reserved Shares. Except for (A) the Convertible Note, and (B) the preferred shares issuable upon conversion of the Convertible Note and any rights to be granted pursuant to the Basic Documents, there are no outstanding options, warrants, rights (including conversion or preemptive rights) or agreements for the subscription or purchase from any Group Member of any Equity Securities of any Group Member or any securities convertible into or ultimately exchangeable or exercisable for any Equity Securities of any Group Member.

(e)     Other Rights With Respect to Shares. Except as provided in the Basic Documents, no voting or similar agreements exist in relation to the Equity Securities of any Group Member that are presently outstanding or that may hereafter be issued.

(f)     Subsidiaries. Save for the HK Co and the WFOE, the Company does not directly or indirectly own any interests in or Control any other entities. Neither of the HK Co or the WFOE directly or indirectly owns any interests in or Controls any other entities.

(g)     Corporate Records. The registers of shareholders, resolutions and all other documents of the Group required to be kept or filed with any relevant Governmental Authority have been kept, filed or submitted for filing.

(h)     Competitive Activities. The Owner does not hold any equity interests in any entity that carries on any business that competes with the business of any Group Member, or the Onshore Company as presently conducted or as contemplated to be conducted, except the ownership of shares in publicly traded companies representing less than five percent of the outstanding share capital of such company.

## 2.     AUTHORIZATION AND VALIDITY OF TRANSACTIONS

(a)     Authorization. Each of the Company, the Cayman Co., the WFOE, Leview Holding, the Owner, the other Group Members and the Onshore Companies has the power and authority to execute, deliver and perform the Basic Documents to which it/he is a party. All actions on the part of the Company, the Cayman Co., the WFOE, Leview Holding, the Owner, the other Group Members and the Onshore Companies necessary for the authorization, execution, delivery of and the performance of all of its/his obligations under the Basic Documents have been taken or will be taken prior to the Completion. All actions on the part of the Company, the Cayman Co., the WFOE, Leview Holding, and the Owner necessary for or related to the authorization, allotment, issuance and delivery of the Convertible Note have been taken or will be taken prior to the Completion.

(b)     Valid Issuance of Stock. The preferred shares when issued upon conversion of the Convertible Note will be duly authorized and validly issued, fully paid and non-assessable, free of restrictions on transfer other than restrictions on transfer under this Agreement, the

Exhibit 3
-143-

Convertible Note and any applicable securities or corporate laws.

(c) Enforceability. The Basic Documents to which any Group Member, the Company, the Cayman Co., the WFOE, Leview Holding, the Owner or the Onshore Company is a party will, when executed, be the valid and binding obligation of such Group Member, the Company, the Cayman Co., the WFOE, Leview Holding, the Owner or the Onshore Company, enforceable against such Group Member, the Company, the Cayman Co., the WFOE, Leview Holding, the Owner or the Onshore Company, as applicable, in accordance with their respective terms, except where such enforceability may be limited by (i) applicable bankruptcy, insolvency, reorganization, moratorium; (ii) similar laws affecting creditors' rights generally; or (iii) any indemnification provisions contained in the Basic Documents.

(d) Consents and Approvals. On or prior to the Completion Date, all consents, approvals, orders or authorizations of, or registrations, qualifications, designations, declarations or filings with, any Governmental Authority or any other Person required in connection with the execution, delivery and performance by the Group, the Company, the Cayman Co., the WFOE, Leview Holding, the Onshore Companies and the Owner of the Basic Documents or the consummation of the transactions contemplated hereby or thereby (including without limitation, the Restructuring) have been duly obtained in compliance with all applicable laws.

(e) No Breach. The execution and delivery by the Company, the Cayman Co., the WFOE, Leview Holding, any Group Member, the Onshore Company and the Owner of each of the Basic Documents to which it is a party and the implementation and performance by the Company, the Cayman Co., the WFOE, Leview Holding, such Group Member, the Onshore Company and the Owner of all the transactions contemplated under such Basic Documents (including without limitation, the Restructuring) do not and will not:

   (i) breach or constitute a default under the Company Charter Documents or the constitutional document of the Company, the Cayman Co., the WFOE, Leview Holding any other Group Member or the Onshore Company;

   (ii) result in a breach of, or constitute a default under, any Contract to which the Company, the Cayman Co., the WFOE, Leview Holding, any Group Member, the Onshore Company or the Owner is a party or by which such Group Member, the Onshore Company or the Owner or their respective property or assets is bound or result in the creation or increasing of any obligation on the Company, the Cayman Co., the WFOE, Leview Holding, such Group Member, the Onshore Company or the Owner (whether to make payment or otherwise) to any Person; or

   (iii) result in a violation or breach of or default under any applicable law.
   
   except, in the case of clauses (ii) and (iii), as could not materially and adversely affect the ability of the Company, the Cayman Co., the WFOE, Leview Holding, any Group Member, the Onshore Company or the Owner to carry out its obligations under, and to consummate the transactions contemplated by, the Basic Documents to which it is a party.

## 3. LEGAL COMPLIANCE

(a) No Violation of Law. None of the Company, the Cayman Co., the WFOE, Leview Holding, the Group Members or the Onshore Company is or has at any time been in violation of any applicable law or regulation, which may have a material adverse effect on the ability of any Group Member to conduct its business as currently conducted or as contemplated to be conducted.

(b) Permits and Registrations. Each of the Company, the Cayman Co., the WFOE, Leview Holding, Group Member and the Onshore Company has all Permits and has completed all

Exhibit 3

-144-

government registrations necessary for the conduct of its business as currently conducted and as contemplated to be conducted and to own its assets. None of the Company, the Cayman Co., the WFOE, Leview Holding, the Group Members or the Onshore Company is in material breach of or default under any such Permit, and there is no reason to believe any such Permit shall be suspended, cancelled or revoked.

## 4. ENVIRONMENTAL ISSUES

Each of the Company, the Cayman Co., the WFOE, Leview Holding, Group Member and the Onshore Company is currently in compliance with all Environmental Laws and has at all times complied with all Environmental Laws in all material aspects.

## 5. PROPERTIES AND ASSETS

(a) <u>Status of Properties and Assets</u>. Each of the Company, the Cayman Co., the WFOE, Leview Holding, Group Member and the Onshore Company owns or has the right to use all material properties and assets currently used by it in the conduct of its business as currently conducted and contemplated to be conducted. The properties and assets owned by the Company, the Cayman Co., the WFOE, Leview Holding, the Group and Onshore Company are free and clear of all Encumbrances. The tangible assets and real property of each of the Company, the Cayman Co., the WFOE, Leview Holding, Group Member and the Onshore Company have been properly maintained and are in working condition, and are in all respects in a condition that is adequate for the intended uses of such assets, subject to continued repair and replacement in accordance with past practice.

(b) <u>General Liabilities</u>. None of the Company, the Cayman Co., the WFOE, Leview Holding, the Group Members or the Onshore Company has any obligations or liabilities or any nature, whether accrued, absolute or contingent, whether liquidated or unliquidated, and whether now due or to become due, except for trade or business obligations and liabilities incurred in the ordinary course of business since such entity's inception.

## 6. CONTRACTS AND TRANSACTIONS

(a) <u>Validity of Material Contracts</u>.
  (i) None of the Company, the Cayman Co., the WFOE, Leview Holding, Group Member or the Onshore Company is in breach of or has knowledge of the invalidity of or grounds for rescission, avoidance or repudiation of any material contract to which the Company, the Cayman Co., the WFOE, Leview Holding, the Group Member or the Onshore Company is a party, nor has the Company, the Cayman Co., the WFOE, Leview Holding, any Group Member or the Onshore Company received notice of any intention to terminate any such material contract.

  (ii) To the best knowledge of the Company, the Cayman Co., the WFOE, Leview Holding and the Owner, no party with whom the Company, the Cayman Co., the WFOE, Leview Holding, a Group Member or an Onshore Company has entered into any material contract is in default thereunder, except for defaults which would not have a material adverse effect on the financial condition of the Company, the Cayman Co., the WFOE, Leview Holding, the Group or the Onshore Companies; to the best knowledge of the Company, the Cayman Co., the WFOE, Leview Holding and the Owner, there are no circumstances likely to give rise to any such default.

(b) <u>Brokers and Finders</u>. No broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated by the Basic Documents based upon arrangements made by or on behalf of the Company and the Owner.

Exhibit 3
-145-

## 7. FINANCIAL MATTERS

(a) Liabilities. Neither the Group and Leview Holding nor the Onshore Companies with respect to its Existing Business has any Liabilities other than (i) Liabilities reflected or reserved against in their respective accounts, a true and complete copy of which has been delivered to the Investor; (ii) Liabilities incurred in the ordinary course of business; or (iii) Liabilities in relation to the Basic Documents. No Group Member or the Onshore Company has guaranteed any indebtedness of any other Person.

(b) Financial Materials. All the accounts, books, registers, ledgers and financial and other material records of whatsoever kind of each of Leview Holding and Group Member and the Onshore Company which have been provided to the Investor are accurate and complete in all material respects, and they present a true and fair view of the financial, contractual and trading position of each of Leview Holding and Group Member and the Onshore Company and of its respective facilities and machinery, fixed and current assets and liabilities (actual and contingent), debtors, creditors and work-in-progress.

## 8. TAX, RECORDS AND RETURNS

(a) Compliance with Laws. None of Leview Holding, the Group Members or the Onshore Company is or has at any time been in violation of any applicable law or regulation regarding Tax which may result in any liability or criminal or administrative sanction or otherwise having a material adverse effect on Leview Holding, any Group Member or the Onshore Company, other than such violation that has been rectified or resolved and does not have any foreseeable liability or criminal or administrative sanction or otherwise.

(b) Tax Returns and Payments. Each Group Member or the Onshore Company has filed all tax returns and reports as required by law, and such returns and reports are true and correct in all material respects. Each Group Member or the Onshore Company has paid all taxes and other assessments due and none of the Group Members is or will become liable to pay any fine, penalty, surcharge or interest in relation to Tax with respect to activities of any Group Member prior to the Completion Date. There have been no extraordinary examinations or audits of any tax returns or reports by any applicable Governmental Authority. There are in effect no waivers of applicable statutes of limitations with respect to taxes for any year.

(c) Deductions and Withholdings. Each Group Member and the Onshore Company has made all deductions and withholdings in respect, or on account, of any Tax from any payments made by it which it is obliged or entitled to make and has duly accounted in full to the appropriate authority for all amounts so deducted or withheld.

(d) Preferred Tax Treatments. All exemptions, reductions and rebates of Taxes granted to the Group by a Governmental Authority are in full force and effect and have not been terminated. To the knowledge of the Company, the WFOE and the Owner, the transactions contemplated under the Basic Documents will not, and, there is no other circumstance or event that will, result in any such exemption, reduction or rebate being cancelled or terminated, whether retroactively or for the future.

## 9. OPERATIONS

(a) Current Operations. There is no existing fact or circumstance that will have a material adverse effect on the ability of any Group Member or the Onshore Company to conduct its business as currently conducted and contemplated to be conducted.

(b) General Change. Since the date hereof, there has been no material adverse change in the financial position of the Group or the Onshore Company relating to the Existing Business.

## 10. EMPLOYEES

Exhibit 3
-146-

(a) Status of Employees.

(i) No Group Member, or the Onshore Company has at any time since its establishment had, or is being threatened in writing by, any strike, collective work stoppage or other material labor dispute.

(ii) The Group and the Onshore Company each has complied in all material respects with all applicable laws regarding employees, employee benefits, employee safety and labor matters for all of their employees.

(b) Employment Agreements and Compensation Arrangements. Except as required by law, the labor contract and employee non-competition, intellectual property assignment and confidentiality agreement between the WFOE and each key employee, no Group Member is a party to or is bound by any currently effective employment contract (other than contracts that can be terminated on an at-will basis), deferred compensation agreement, pension, provident, superannuation, life assurance, disability or other similar schemes or arrangements, bonus plan, incentive plan, profit sharing plan, retirement agreement or other employee compensation agreement.

## 11.   CLAIMS AND PROCEEDINGS

(a) No Litigation. No Group Member, the Onshore Company, or the Owner is engaged in or has been notified that it is the subject of any litigation, arbitration or administrative or criminal proceedings (collectively, "Litigation"), whether as plaintiff, defendant or otherwise. None of the shareholders or equity interest holders of any Group Member, or the Onshore Company, directors of any such entity is engaged in or has been notified that it is the subject of any Litigation, whether as plaintiff, defendant or otherwise, which has had or may have an adverse effect on any Group Member, or the Onshore Company. There is no judgment, decree, or order of any court in effect against any Group Member or the Onshore Company. There is no judgment, decree, or order of any court in effect with respect to the Existing Business against Lefeng Moible or the Owner. None of the Group Members or the Onshore Company is in default with respect to any order of any Governmental Authority to which it/he is a party or by which it/he is bound. Neither Lefeng Mobile nor the Owner is in default with respect to any order of any Governmental Authority with respect to the Existing Business to which it/he is a party or by which it/he is bound.

(b) No Pending Proceedings. No Litigation is pending or, to the knowledge of the Owner, the Company and the WFOE, threatened against any Group Member, or the Onshore Company; no Litigation in relation to the Existing Business is pending or, to the knowledge of the Owner, the Company and the WFOE against Lefeng Moible or the Owner.

(c) No Undertaking; No Injunction. None of the Group Members, or the Onshore Company nor any shareholder, director, officer or agent of any of the foregoing entities is party to any undertaking or assurance given to any Governmental Authority or the subject of any injunction that is still in force. Neither Lefeng Mobile nor any of its shareholder, director, officer or agent is party to any undertaking or assurance given to any Governmental Authority or the subject of any injunction that is still in force in relation to Existing Business.

(d) No Insolvency. No order has been made and no resolution has been passed for the winding up or liquidation as dissolution of any Group Member or the Onshore Company. No distress, execution or other process has been levied on the whole or a substantial part of the assets of any Group Member or the Onshore Company. None of the Group Members or the Onshore Company is insolvent or unable to pay its debts as they fall due.

(e) No Investigation or Inquiry. No Group Member, the Onshore Company, or the Owner (in relation to the foregoing entities) is the subject of any investigation or inquiry by any

Exhibit 3
-147-

Governmental Authority with respect to the Existing Business and there are no facts which are likely to give rise to any such investigation or inquiry.

## 12. INTELLECTUAL PROPERTY

(a) Each Group Member and the Onshore Company owns or otherwise has the right or license to use all Intellectual Property as necessary for the operation of the Existing Business without, to the knowledge of the Company and the Owner, any violation or infringement of the rights of any third party, free and clear of all Encumbrances. There is no claim, proceeding or litigation pending or, to the knowledge of the Company and the Owner, threatened against any Group Member or the Onshore Company, contesting their right to use its Intellectual Property, asserting the misuse thereof, or asserting the infringement or other violation of any Intellectual Property of any third party.

(b) There are no pending proceedings or claims in which any Group Member or the Onshore Company alleges that any Person is infringing upon, or otherwise violating, its Intellectual Property rights. Nor have any such proceedings or claims been served, instituted or asserted by any Group Member or the Onshore Company.

(c) None of the key employees of any Group Member and the Onshore Company is obligated under any Contract, or subject to any judgment, decree or order of any court or administrative agency, that would interfere with the use of his or her best efforts to promote the interests of his/her employer, or that would conflict with the business of his/her employer as presently conducted, or that would prevent such employees from assigning to his/her employer inventions conceived or reduced to practice or copyrights for materials developed in connection with services rendered to it.

## 13. RESTRUCTURING

The Restructuring has been carried on by the Company in compliance with applicable laws.

## 14. DISCLOSURE

(a) No Misrepresentation. No representation, warranty or statement by the Company, the WFOE and the Owner in this Agreement, any other Basic Document, or in any Exhibit, Schedule, Appendix, statement or certificate furnished to the Investor pursuant to any Basic Document, contains any untrue statement of a material fact or omits to state a material fact necessary to make the statements made herein, in the light of the circumstances under which they were made, not misleading.

(b) Full Disclosure. There is no fact or circumstance relating to the affairs of any Group Member and the Onshore Companies which has not been disclosed to the Investor and which if the disclosed information might reasonably have been expected to influence the decision of the Investor to purchase the Convertible Note.

Exhibit 3
-148-

highest

highest

highest

highest

highest

highest

highest

highest

highest

highest

highest

highest

highest

highest

highest

highest

highest

highest

highest

highest

highest

highest

highest

highest

highest

# SCHEDULE 4

## INVESTOR WARRANTIES

1. <u>Organization, Good Standing and Qualification</u>. The Investor have been duly established or incorporated and organized, is validly existing and, where applicable, in good standing.

2. <u>Authorization</u>. The Investor has the full power, authority and legal right to own assets and carry on its business. The Investor is not in receivership or liquidation or have taken any steps to enter into liquidation, and no petition has been presented for the winding-up of the Investor. There are no grounds on which a petition or application could be based for the winding-up or appointment of a receiver of the Investor or its general partner.

3. The execution, delivery and performance of this Agreement by Investor will not:

   (a) violate any provision of its partnership agreement or the Memorandum of Association or Articles of Association of the Investor;

   (b) require the Investor to obtain any consent, approval or action of, or make any filing with or give any notice to, any Governmental Authority or any other third party pursuant to any agreement to which the Investor is a party or by which the Investor is bound;

   (c) conflict with or result in any material breach or violation of any of the terms and conditions of, or constitute (or with notice or lapse of time or both constitute) a default under, any agreement to which the Investor is a party or by which the Investor is bound;

   (d) violate any court order, judgment, injunction, award, decree or writ against, or binding upon, the Investor or upon its securities, properties or business; or

   (e) violate any law or regulation of the country where the Investor is incorporated or any other jurisdiction in which the Investor maintains a business presence.

4. <u>Enforceability</u>. The Investor has the full power and authority to enter into, execute and deliver the Basic Documents to which it is a party and to perform the transactions contemplated hereby and thereby. The execution and delivery by the Investor of the Basic Documents to which it is a party and the performance by the Investor of the transactions contemplated hereby and thereby have been duly authorized by all necessary corporate or other action of the Investor. Assuming the due authorization, execution and delivery hereof by the other parties hereto, the Basic Documents to which the Investor is a party constitutes the legal, valid and binding obligation of the Investor, enforceable against the Investor in accordance with its terms, except as such enforceability may be limited by (i) applicable bankruptcy, insolvency, reorganization, moratorium;(ii) similar laws affecting creditors' rights generally; or (iii) any indemnification provisions contained in the Basic Documents.

5. <u>Financing</u>. The Investor has sufficient immediately available funds to pay, in cash, the Consideration at the Completion.

6. <u>Litigation</u>. As of the date hereof, no Litigation by or against the Investor is pending or, to the best knowledge of the Investor, threatened in writing, which could affect the legality, validity or enforceability of the Basic Documents to which it is a party, or the consummation of the transactions contemplated hereby and thereby.

7. <u>Brokers</u>. No broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated by the Basic Documents based upon arrangements made by or on behalf of the Investor.

Exhibit 3

-149-

# EXHIBIT A

## FORM OF CONVERTIBLE NOTE

Exhibit 3

-150-

# EXHIBIT B

## FORM OF SHARE MORTGAGE

Exhibit 3

-151-

# EXHIBIT C

## FORM OF DEED OF UNDERTAKING AND GUARANTEE

Exhibit 3

-152-